# 15-2164-cv

## United States Court of Appeals
### *for the*
## Second Circuit

GLOBAL REINSURANCE CORPORATION OF AMERICA, Successor in
Interest Constitution Reinsurance Corporation,

*Plaintiff-Counter-Defendant-Appellee,*

– v. –

CENTURY INDEMNITY COMPANY, Successor in Interest,
CCI Insurance Company, Successor in Interest Insurance Company
of North America,

*Defendant-Counter-Claimant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-COUNTER-
## CLAIMANT-APPELLANT

DARYN E. RUSH
ELLEN K. BURROWS
WHITE AND WILLIAMS LLP
*Attorneys for Defendant-Counter-
Claimant-Appellant*
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, Pennsylvania 19103
(215) 864-7000

## CORPORATE DISCLOSURE STATEMENT OF
## DEFENDANT-COUNTER-PLAINTIFF-
## APPELLANT, CENTURY INDEMNITY COMPANY

All outstanding capital stock of Century Indemnity Company is owned by

Brandywine Holdings Corp., which is a subsidiary of INA Financial Corporation.

The ultimate owner of Century Indemnity Company is ACE Limited, a publicly

traded company.

# **Table of Contents**

I.     JURISDICTIONAL STATEMENT ...................................................1

II.    STATEMENT OF ISSUES FOR REVIEW....................................1

III.   STATEMENT OF THE CASE ......................................................2

     A.    Procedural History................................................................2

     B.    Statement of the Facts ..........................................................3

          1.    The Reinsured or "Underlying" Policies ...................3

          2.    General Reinsurance Principles Applicable to the Global Reinsurance Contracts ............................................4

          3.    Global's Reinsurance of Century................................6

          4.    Century's Reinsurance Billings to Global ................11

IV.   SUMMARY OF THE ARGUMENT .............................................12

V.    STANDARD OF REVIEW ..........................................................15

VI.   ARGUMENT.............................................................................16

     A.    The District Court's Application of *Bellefonte* and *Unigard* to This Case Was Error..................................................................16

     B.    The District Court's "Cap" Ruling was Incorrect Under New York Contract Interpretation Principles as Clarified by *Utica*....................25

          1.    The District Court Incorrectly Applied the Item 4 Dollar Amount as an Absolute "Cap" Without Considering the Entire Contract and Industry Custom and Practice ............................25

          2.    Case Law, Custom and Practice and the Risk Transfer Mechanism Require a Presumption of Concurrency ...............27

          3.    The Court Should Consider Extrinsic Evidence to Determine the Contracts' Meaning...........................................29

VII.  CONCLUSION.........................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aetna Cas. & Sur. Company v. Home Ins. Co.*,
  882 F. Supp. 1328 (S.D.N.Y. 1995) ............................................................16, 17

*Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*,
  No. 85 Civ. 2706, 1989 WL 106469 (S.D.N.Y. Sept. 5, 1989)....................18, 19

*Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*,
  No. 85 Civ. 2706, 1989 WL 146248 (S.D.N.Y. Nov. 22, 1989).......................19

*Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*,
  903 F.2d 910 (2d Cir. 1991) .....................................................................*passim*

*Bryant v. Maffucci*,
  923 F.2d 979 (2d Cir. 1991) .............................................................................16

*Century Indem. Co., et al. v. OneBeacon Ins. Co.*,
  No. 02928 (Pa. Com. Pl. Mar. 27, 2015).....................................................22, 24

*Comm. Union Ins. Co. v. Swiss Reins. Am. Corp.*,
  413 F.3d 121 (1st Cir. 2005).............................................................................28

*Cont'l Cas. Co. v. Midstate Reins. Corp.*,
  24 N.E.3d 122 (Ill. Ct. App. 2014) ...................................................................22

*Excess Ins. Co. Ltd. v. Factory Mut. Ins. Co.*,
  822 N.E.2d 768 (N.Y. 2004).......................................................................22, 23

*In re Payne*,
  707 F.3d 195 (2d Cir. 2013) .............................................................................14

*Lightfoot v. Union Carbide Crop.*,
  110 F.3d 898 (2d Cir. 1997) .............................................................................26

*Mentor Ins. Co. v. Norges Brannkasse*,
  996 F.2d 506 (2d Cir. 1993) .............................................................................19

*Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*,
  225 F.3d 270 (2d Cir. 2000) .............................................................................26

*Myers ex rel. C.N. v. Astrue*,
    993 F. Supp. 2d 156 (N.D.N.Y. 2012)................................................................23

*Niagara Frontier Transp. Auth. v. Euro-United Corp.*,
    303 A.D. 920 (4th Dep't 2003)...........................................................................26

*Pac. Emps. Ins. Co. v. Global Reins. Corp. of Am.*,
    No. 09-6055, 2010 WL 1659760 (E.D. Pa. April 23, 2010) ..............................22

*Pac. Empl. Ins. Co. v. Global Reins. Corp.*,
    No. 11-cv-6301 (S.D.N.Y. Dec. 9, 2011) ..........................................................23

*Penn Re, Inc. v. Aetna Cas. & Sur. Co.*,
    No. 85-385-Civ-5, 1987 WL 909519 (E.D.N.C. June 30, 1987) .......................16

*Rogath v. Siebenmann*,
    129 F.3d 261 (2d Cir. 1997) ..............................................................................15

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
    691 F.2d 1039 (2d Cir. 1982) ............................................................................22

*Teig v. Suffolk Oral Surgery Assocs.*,
    2 A.D.3d 836 (2d Dep't 2003)...........................................................................26

*Travelers Cas. & Sur. Co. v. ACE Am. Reins. Co.*,
    392 F. Supp. 2d 659 (S.D.N.Y. 2005) .......................................19, 24, 27, 28, 29

*Travelers Cas. & Sur. Co. v. ACE Am. Reins. Co.*,
    201 F. App'x 40 (2d Cir. 2006) (Summary Order) ..................19, 27, 28, 29, 30

*Unigard Sec. Ins. Co. v. N. River Ins. Co.*,
    762 F. Supp. 566 (S.D.N.Y. 1991) ............................................................13, 21

*Unigard Sec. Ins. Co. v. N. River Ins. Co.*,
    4 F.3d 1049 (2d Cir. 1993) ........................................................................*passim*

*Utica Mut. Ins. Co. v. Clearwater Ins. Co.*,
    No. 6:13-cv-1178, 2014 WL 6610915 (N.D.N.Y., Nov. 20, 2014) ............22, 24

*Utica Mut. Ins. Co. v. Clearwater Ins. Co.*,
    No. 6:13-cv-1178, 2015 WL 4496374 (N.D.N.Y. July 23, 2015)......................24

*Utica Mut. Ins. Co. v. R&Q Reins. Co.*,
   No. 6:13-cv-1332, 2015 WL 4254074 (N.D.N.Y. June 4, 2015).......................24

*Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*,
   594 F. App'x 700 (2d Cir. 2014) (Summary Order) ...................................*passim*

## STATUTES AND COURT RULES

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. § 1332(a)(1) ...........................................................................................1

Fed. R. Civ. P. 56(c)..............................................................................................16

## OTHER AUTHORITIES

*Arbitration Panel Finds Expenses in Excess of Limits Covered*, Mealey's
   Litigation Reports: Reinsurance, Vol. 4, No. 18, Jan. 27, 1994.......................23

B. Ostrager and M. Vyskocil, *Modern Reinsurance Law and Practice*,
   §§ 2.01(b); 5.03 (1996) ....................................................................................5

Eugene Wollan, *Handbook of Reinsurance Law*, §§ 1.02; 1.04(A);
   2.05 (2003) ....................................................................................................4, 23

# I.    JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are diverse and the amount in controversy exceeds $75,000.  (A-25; A-33.) A Final Order and Judgment was entered on June 3, 2015.  (SPA-19.)  Notice of appeal was timely filed on July 2, 2015.  (A-417.)  This Court has jurisdiction under 28 U.S.C. § 1291.

# II.    STATEMENT OF ISSUES FOR REVIEW

1.    Did the district court err in ruling that the dollar amount stated in the contracts' "Reinsurance Accepted" provision unambiguously capped the reinsurer's obligation to pay loss and expense combined where: (1) the "Reinsurance Accepted" expressly applies "as original" and the limit applies only to "loss" under the policy; (2) the reinsured paid expense in addition to the limit under the policy; and (3) the reinsurance is subject to the terms and conditions of the reinsured policy unless otherwise specifically provided?

2.    Did the district court err in refusing to consider evidence of reinsurance industry custom and practice and the industry meaning of contract terms to determine if ambiguity existed in the first instance?

3.    Did the district court err in concluding that the reinsurance contracts were unambiguous (and in refusing to consider extrinsic evidence)?

## III.   STATEMENT OF THE CASE

### A.   Procedural History

Century is a Pennsylvania insurance company that has paid, and continues to pay, millions of dollars in loss and expense for asbestos bodily-injury claims incurred by its policyholder under certain primary and excess liability insurance policies.  Global is a New York reinsurance company that issued individual contracts of reinsurance ("facultative certificates") on certain Century excess policies.  In reinsurance parlance, Century (the "cedent" or "ceding company") "ceded" and Global (the reinsurer) "assumed" a share of risk under the policies.  When amounts became due under certain facultative certificates, Century billed Global.  Global, however, refused to pay the billings and, instead, filed suit in the United States District Court for the Southern District of New York seeking a declaratory judgment that it was not liable for the amounts billed or, if at all, only up to the dollar amount set forth as part of the "Reinsurance Accepted" provision of each facultative certificate (Global's "cap" defense).  (A-24.)  Century answered and counterclaimed for amounts then due and for declaratory relief as to anticipated future billings.  (A-33.)

On January 10, 2014, Global filed a pre-discovery motion for partial summary judgment on its so-called "cap" defense.  On August 15, 2014, relying on this Court's decisions in *Bellefonte Reinsurance Company v. Aetna Casualty &*

*Surety Company*, 903 F.2d 910 (2d Cir. 1991) and *Unigard Security Insurance Company v. North River Insurance Company,* 4 F.3d 1049 (2d Cir. 1993), the district court granted Global's motion. (SPA-3.) In doing so, the district court refused to consider evidence of reinsurance industry custom and practice and the meaning of industry terminology. Having decided that the contracts were unambiguous, the district court refused to consider other evidence of the parties' intent. On April 15, 2015, the district court denied Century's Rule 54(b) motion for review based upon this Court's *Utica Mutual Insurance Company v. Munich Reinsurance America, Inc.,* 594 F. App'x 700 (2d Cir. 2014) summary decision. (SPA-15.) Because Global withdrew its remaining defenses to payment, the parties stipulated to judgment in accordance with the district court's "cap" rulings. (A-412.) Final judgment was entered on June 3, 2015. (SPA-19.) On July 2, 2015, Century appealed the August 15, 2014 "cap" ruling and the June 3, 2015 Final Order and Judgment. (A-417.)

**B.    Statement of the Facts**

**1.    The Reinsured or "Underlying" Policies.**

Beginning in 1962 and continuing through 1981, Century issued primary and excess insurance policies to Caterpillar. (A-153 at ¶5.) Under each policy, Century paid claims for damages up to the policy limit. Similarly, Century also has paid and continues to pay associated defense costs in addition to the policy

limits.  (*Id.* at ¶12.)  Defense costs do not erode the limits.  This treatment contrasts

with other situations where insurers pay defense costs solely within limits or where

insurers pay no defense costs at all.

### 2.  General Reinsurance Principles Applicable to the Global Reinsurance Contracts.

Century obtained reinsurance for a portion of the risk it assumed under each

policy.  Reinsurance is the method used by insurance companies to spread risk**.**

*See* Eugene Wollan, *Handbook of Reinsurance Law*, § 1.02 (2003) ("Handbook").

This integral part of the risk-transfer mechanism ultimately inures to the benefit of

policyholders and claimants.  *See id.*  Reinsurance contracts typically are written

either as treaties or as facultative certificates.  (A-144 at ¶14);[1] *see also* Handbook

at § 1.04.  Under a treaty, the insurer cedes and the reinsurer assumes all or part of

an entire category or "book" of business.  (A-144 at ¶13).  Under a facultative

certificate, the reinsurer assumes all or part of the risk under an individual policy of

insurance.  (A-144 at ¶14); *see also* Handbook at § 1.04[A][1].

Facultative reinsurance contracts often are evidenced by one-page (two-

sided) pre-printed forms or "certificates."  (A-144 at ¶15.)  The precise wording of

the contract varies as between companies and forms.  In Global's case, forms were

updated periodically, with variations in wordings.  (*Compare* A-101 *with* A-116.)

---

[1] Century proffered evidence of industry custom and practice and industry meanings of relevant contract words and phrases via the expert affidavit of Robert M. Hall (A-141) and the affidavit of Martin J. Calpin (reinsurance intermediary who actually placed the first certificates).  (A-136.)

The certificate forms include "fill-in-the-blanks" declarations identifying the insurance policy that is reinsured, the share of the policy liability that the reinsurer accepted, and the basis on which the reinsurance was accepted. The reverse side typically contains terms and conditions in paragraph form. (A-144 at ¶15.) The same certificate form would be used to reinsure a policy that pays expense within limits, a policy that pays expense in addition to limits and a policy that does not pay expense at all. (A-145 at ¶16.)

Facultative reinsurance contracts are not integrated agreements; they typically incorporate by reference the terms and conditions of the reinsured policy. *See* B. Ostrager and M. Vyskocil, *Modern Reinsurance Law and Practice*, §2.01(b). They are a "short-hand" version of the contract between the parties. (A-145 at ¶17.) This "short-hand" is workable because the cedent and reinsurer, both sophisticated industry participants, understand the reinsurance contracts' meaning based on the terms and conditions of the insurance policies that they reinsure and the industry understandings applicable to reinsurance contract terms. (*Id.*); *see also Modern Reinsurance Law and Practice*, § 5.03.

Concurrency between the cedent's liability under the policy and the reinsurer's liability under its facultative certificate is presumed, with the reinsurer accepting a "part of" or pro rata share of the risk assumed by the cedent. (A-145 at ¶18.) This concurrency is critical to the operation of the insurance industry. It

provides for the transfer of risk to reinsurers consistent with the risk faced by insurers under their policies.  If concurrency is not intended by the parties, the facultative certificate must make that explicit.  (A-145 at ¶19.)

### 3.    Global's Reinsurance of Century.

Global's facultative reinsurance contracts are substantively similar but not identical.  Each certificate: (a) reinsures "part of" a specified policy or policy layer; (b) provides that the reinsurance is "subject to" the limit or amount of liability specified in Item 4 ("Reinsurance Accepted"); and (c) provides that the reinsurer's Item 4 liability is "subject to" the terms and conditions of the insurance company's policy.  (*See, e.g.,* A-88 to 96 and A-115 to 118.)  This means that the "limit" or "amount of liability" shown in Item 4 will apply in the same manner as in the reinsured policy.  (A-145 at ¶18.)  Each certificate identifies the "Basis of Acceptance" (Item 5) as either "excess of loss" (*e.g.*, A-115) or "contributing excess" (*e.g.*, A-97).  None of the certificates are non-concurrent.  (A-88; A-97; A-100; A-103; A-107; A-111; A-115; A-119; A-122.)  Only two certificates have been billed to date.  Because these contracts are substantively the same as the remaining certificates, Century focuses on their wording.

Global Certificate No. E89-191 (referred to by the district court and hereinafter as "Certificate X") is a manuscript, or individually prepared,

certificate.  It reinsures a $250,000 "part of" policy SRL 5023's $500,000 limit.[2]

(A-88.)  Certificate X provides that Global (as successor to Constitution Re) "does

hereby reinsure [Century]" in respect of its policy and "in consideration of the

payment of premium and subject to the terms, conditions and amount of liability

set forth herein, as follows . . . ."  (*Id.*)  Certificate X lists the insured, the type of

policy (Item 1), the policy limits and application (Item 2), the insurance company

retention (Item 3), the "Reinsurance Accepted" (Item 4) and the "Basis for

Acceptance" (Item 5).  (*Id.*)  Item 4, "Reinsurance Accepted," states:

> $250,000. *part of* $500,000. each occurrence *as original* excess of the
> Company's retention as shown in Item #3 above.

(*Id.* (emphasis added).)  The phrase "part of" demonstrates that the reinsurance is

for a 50% share of the policy risk as shown in Item 2.  (A-147 at ¶28.)  The phrase

"as original" is understood in the reinsurance industry to refer to the terms and

conditions of the reinsured or "original" policy.  (*Id.* at ¶26.)  Each of Items 1

through 4 of the Declarations is written with reference to and relates back to the

reinsured policy.  (*Id.*)  Certificate X includes the following terms and conditions:

> [T]he liability of the Reinsurer specified in Item 4 above shall follow
> that of the Company and, except as otherwise *specifically* provided
> herein, *shall be subject in all respects to* all the terms and conditions
> of the Company's Policy.

---

[2] Certificate X identifies the reinsured policy as having a $1 million limit of which Global
reinsured 50% of the $500,000 layer excess of $500,000.  (A-88.)  As finally structured, the first
$500,000 of coverage in this year was provided by a separate primary policy.  (A-169.)  Global
reinsured 50% of the $500,000 excess policy.  (A-187; A-156 to 157 at ¶¶23, 27.)

(A-89 (emphasis added).)  This provision is referred to in reinsurance parlance as a follow-the-form or follow-the-liability provision.  (A-148 at ¶30.)  Certificate X also states:

> All claims involving this reinsurance, when settled by the Company, shall be binding on the Reinsurer, who shall be bound to pay its proportion of such settlements, *and in addition thereto, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment, its proportion of expenses, . . . .*

(A-89 (emphasis added).)  The beginning of this provision is commonly referred to as a follow-the-settlements provision.  The remainder of the paragraph is referred to as the loss payment provision.  (A-148 at ¶31.)

The term "loss," as used above, is understood in the reinsurance industry to refer to amounts covered ***within*** the policy limit.  (*Id.*)  That is, if a reinsured policy pays expense within its limits, the reinsurance "loss" will include both claim settlement/damage payments and defense costs.  That combined amount will be used both to meet the reinsurance retention shown in Item 3 and to exhaust the reinsurance limit shown in Item 4.  Conversely, when a reinsured policy pays expense ***in addition to*** limits, the reinsurance "loss" is comprised of claim settlement/damages only.  Defense costs, in that case, are "expense" and, like in the underlying insurance policy, are payable in addition to "loss."  (*Id.*)  In the case of an "expense in addition" policy, the Item 3 reinsurance retention can be met only with claim/settlement payments and the Item 4 limit, likewise, is exhausted

only by claim/settlement payments.  The reinsurance coverage, thus, is concurrent with the coverage provided by the reinsured policy.  (A-149 at ¶¶33-36.)

Global Certificate No. 64748 (the "1977 Certificate") reinsures a 12.5% part of a $4 million layer of Policy No. LAB 16100.  (A-115.)  The 1977 Certificate and the remainder of the pre-printed certificates (while they varied to some extent over time) are similar to Certificate X.  Although the pre-printed certificates do not use the phrase "as original" in Item 4, they do state that the reinsurance accepted is "part of" or a proportionate share of the policy liability.  (*Id.*)  Paragraph A of the 1977 Certificate contains the follow-the-liability provision:

> The liability of the Reinsurer as specified in Item 4 of the Declarations shall follow that of the Company and shall be *subject in all respects to* all the terms and conditions of the Company's policy except when otherwise *specifically* provided herein or designated as non-concurrent reinsurance in the Declarations.

(A-116 at ¶A (emphasis added).)  Paragraph E of the 1977 Certificate contains its follow-the-settlements and loss payment provisions.  They are substantively the same as those found in Certificate X.  (*Id.* at ¶E.)  The 1977 Certificate (like Certificate X) is designated "Excess of Loss" reinsurance.  "Excess of Loss" is defined in Paragraph F as follows:

> The limit(s) of liability of the reinsurer, as stated in Item 4 of the Declarations (Reinsurance Accepted) applies(y) only to that portion of loss settlement(s) in excess of the applicable retention of the Company as stated in Item 3 of the Declarations.

(*Id.* at ¶F.)  Again, "loss" includes defense costs when the reinsured policy is "expense within limits" and includes only claim/settlement payments when, as here, the reinsured policy pays "expense in addition."  (A-148 at ¶31.)  Although the pre-printed forms contain a box that can be checked to identify a certificate as non-concurrent, the "non-concurrent" box is not checked on any of the certificates. (*See, e.g.,* A-97.)[3]

Global received premium for each reinsurance certificate commensurate with its share of policy risk.  For example, for Certificate X, Global reinsured a 50% "part of" the SRL 5023 policy risk and received 50% of the net (risk) premium.  (A-150 at ¶37; A-193.)  The 1977 Certificate reinsured 12.5% of the $4 million layer of policy LAB 16100 designated in the certificate and received 12.5% of the risk premium for that layer.  Premium, in each case, covered Century's obligation to pay settlements within limits and to pay expense in addition to limits under its policies.  (A-150 at ¶37.)

---

[3] A number of the certificates are designated as "Contributing Excess," defined as follows:

> The Company's policy applies in excess of other valid insurance, reinsurance or a self-insured retention and the limit of liability of the Reinsurer applies proportionally to all loss settlements in the percentage(s) set forth in Item 4 of the Declarations.

(*See, e.g.,* A-104 at ¶E.)

### 4. Century's Reinsurance Billings to Global.

Over time, Century paid millions of dollars in indemnity/claim settlements within its policy limits and millions more in expense in addition to its policy limits. Century allocated those payments to each of its policies in accordance with that policy's share of the loss. (A-155 at ¶¶8-16.) It then billed its reinsurers for their share of the loss and attendant expenses. So, for example, Certificate X was billed only after $500,000 of loss (claim payments/settlements only) had been paid under the underlying primary policy and loss (claim payments/settlements only) had begun to erode SRL 5023, the excess policy for which Global reinsured a 50% share. The $500,000 of loss (claim payments/settlements only) paid under the primary policy was used to satisfy the retention shown in Item 3 of Certificate X. *All* of the defense costs associated with that first $500,000 of loss stayed with the primary policy. Global was billed for its 50% share of the loss (claim payments/settlements only) in excess of $500,000 and for defense costs attributable to that portion of the loss. (A-138 at ¶¶31-32.) The amounts billed to reinsurers, thus, track and correspond to the payments under the policies. Century continues to incur claim payment and defense costs under the policies. It expects to submit additional reinsurance billings. (A-41 at ¶56.)

## IV.   SUMMARY OF THE ARGUMENT

The district court's summary judgment ruling for Global on the "cap" issue was error as a matter of law.  The court performed a "four corners" construction of the contracts in misplaced reliance on *Bellefonte* and *Unigard*.  In doing so, it ignored portions of the contract.  Its analysis, instead, focused on the "subject to" language in the preamble and the dollar amount set forth in the Reinsurance Accepted provision.  The court concluded that "[all] other contractual language must be construed in light of that cap."  It refused to consider: (a) the effect of the reinsured policies' terms and conditions; (b) material differences in contract terms between the Global certificates and those addressed in *Bellefonte* and *Unigard*; and (c) evidence of custom and practice in the specialized reinsurance industry and specialized meaning ascribed to reinsurance terminology–evidence that is admissible to determine meaning even without first finding contract ambiguity.

The district court's conclusion that the contracts were unambiguous–that they only could be interpreted by objective persons with knowledge of the industry to provide an absolute cap on loss and expense combined even when the reinsured pays expense in addition to loss under the policy–also was error.  Other courts and experienced reinsurance arbitrators have interpreted substantively similar contracts and concluded either that the reinsurer must pay expense in addition to the limit or that the contracts are ambiguous.  Their analysis applies equally here.

Century understands that the district court was obligated to consider whether *Unigard* applied to the specific contract wordings at issue here. *Unigard* held that the dollar amount set forth in the "Reinsurance Accepted" provision unambiguously created a "cap" on both loss and expense regardless of the reinsured policy's terms and conditions. *Unigard,* respectfully, was wrongly decided. No reinsurer has *ever* presented evidence that its intent was to exclude liability for expense in addition to limits where the policy, as issued and reinsured, paid expense in addition to limits. Continuing *Unigard's* error, therefore, defeats the courts' stated purpose of construing contracts consistent with the parties' intent. Moreover, it erodes the presumption of concurrency between facultative certificates and the insurance policies they reinsure.

The *Unigard* district court correctly found that the reinsurer was required to pay expense within or in addition to limits depending on the terms of the reinsured policy. Its decision upheld a presumption of concurrency and "was shown [by evidence adduced at trial] to be consistent with the customs and practice of the industry." *Unigard,* 762 F. Supp. at 595. This Court's reversal of that decision turned the presumption of concurrency into a presumption of cost-inclusiveness regardless of how the parties' intended treatment of expense is reflected in the reinsured policy. It has produced increased litigation and uncertainty in the industry. Because reinsurance arbitrators continue to apply custom and practice

despite this Court's interpretation of the contracts, results often depend simply on whether or not a certificate contains an arbitration clause. When reinsurance is "capped" even where the insurance policy pays expense in addition to limits, the insurer is deprived of coverage for which it bargained and paid premium. (A-150 at ¶37.) The intended transfer of risk, necessary to the insurance market, is undermined.

For these reasons, Century respectfully submits that *Unigard's* "cap" decision should be overturned.[4] To be clear, however, overturning *Unigard* is not necessary for Century to succeed on its appeal. The specific contract language addressed and/or relied on in *Bellefonte* and *Unigard* is not the same as here. Neither court addressed the "part of" or "as original" terms found in Certificate X or the Paragraph F description of "loss" found in the pre-printed certificates. Neither court considered the unchecked "non-concurrent" boxes that exist here. While, like *Bellefonte* and *Unigard*, the certificates' preambles state that the reinsurance is "subject to" the amount of liability or limit as expressed in Item 4, Item 4 is more than just a dollar amount. It is "part of," *i.e.*, a pro rata share of, the policy risk "as original," (Certificate X); and the Item 4 limit applies only to "loss." (1977 Certificate at ¶F.) The follow-the-liability provision in each

---

[4] Century recognizes that this Court is bound by prior panel decisions until such time as they are overruled either by an *en banc* panel of the Court or by the Supreme Court. *In re Payne*, 707 F.3d 195, 205 (2d Cir. 2013). If this panel determines that *Unigard* controls here, then Century respectfully requests that the panel refer this matter for *en banc* determination.

certificate makes the Item 4 liability, itself, "subject to" the terms and conditions of the reinsured policy unless *"otherwise specifically* provided herein."[5]  (A-89; A-116 at ¶A) (emphasis added).)  Nothing in the certificates *specifically* provides that the Item 4 limit includes expense. Thus, while the reinsurer's liability is "subject to" the limit, the *application* of that limit is "subject to" the terms and conditions of the reinsured policy.

As this Court explained in its recent summary decision in *Utica*, 594 F. App'x at 700, the district court was required to look beyond the "subject to" phrase in the preamble and the Item 4 dollar amount; it was required to consider the entire contract wording and evidence of how that wording is understood by persons knowledgeable in the industry.  *Id.* at 704.  If the district court had considered the entire contract wording and Century's "industry" evidence to determine the import of "part of," "as original," "loss," Paragraph F and the "subject to" language found both in the preamble and in the follow-the-liability provision, it only could have concluded that the contracts were, at minimum, ambiguous.

## V.    STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of Global's motion for partial summary judgment.  *Rogath v. Siebenmann*, 129 F.3d 261, 263 (2d Cir.

---

[5] Unlike *Bellefonte* and *Unigard,* all of the certificates here require that an exception to the follow-the-liability provisions be *specifically* provided.  The *Bellefonte* and *Unigard* courts did not address a *specificity* requirement.

1997).  Summary judgment is appropriate only when there is no genuine issue of

material fact and the undisputed facts warrant judgment for the moving party as a

matter of law.  Fed. R. Civ. P. 56(c).  The Court must view "all [factual]

ambiguities and reasonable inferences . . . in a light most favorable to the

nonmoving party."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## VI.    ARGUMENT

### A.    The District Court's Application of *Bellefonte* and *Unigard* to This Case Was Error.

To understand why the district court's "cap" ruling is wrong, it is important

to know how case law on the "cap" issue developed.  The first "cap" decisions

arose from a coverage dispute between Aetna and A.H. Robbins over Dalkon

Shield claims.  Three reported decisions addressed reinsurance coverage for that

dispute–*Bellefonte,* 903 F.2d at 910, *Aetna Cas. & Sur. Company v. Home Ins. Co.*,

882 F. Supp. 1328 (S.D.N.Y. 1995), and *Penn Re, Inc. v. Aetna Cas. & Sur. Co.*,

No. 85-385-Civ-5, 1987 WL 909519 (E.D.N.C. June 30, 1987).[6]

The *Home* decision is particularly instructive.  Aetna issued primary and

excess policies to A.H. Robbins from 1970 to 1976.  882 F. Supp. at 1333.  The

primary and excess policies were intended to pay expense within limits and were

---

[6] In *Home* and *Penn Re* the courts concluded that, because Aetna had entered into a good faith settlement of the risk that its policies paid defense costs in addition to limits, the reinsurers were obligated to follow that settlement and to pay defense costs in addition to limits.  While each court's analysis was different, both resulted in the presumption of concurrency being upheld.

-16-

reinsured on that basis. *Id.* at 1335-36. Realizing that the expense language in the excess policies did not track the primary policies, Aetna attempted to amend the policies to make plain that expense was within limits. *Id.* at 1343.[7] At the same time, Aetna asked its reinsurers to endorse their facultative certificates to maintain concurrency of coverage. *Id.* at 1336-37. Most reinsurers' endorsements (including those in *Bellefonte*) explicitly stated that expense was within limits under the facultative certificates. *Id.* at 1337; *see also* (A-399.) As amended, however, the Aetna excess policies did not pay expense at all. 882 F. Supp. at 1338. Faced with bad faith claims, Aetna entered into a subsequent agreement with A.H. Robbins to pay expense under the excess policies. *Id.* at 1334. Because this represented a material change to the policies, Aetna requested that its reinsurers sign on to this agreement. Most reinsurers, including Home, did so.[8] *Id.* at 1355.

The *Bellefonte* reinsurers did not agree. *Id.* at 1342; *see also Bellefonte*, 590

---

[7] Aetna's attempted amendment was not well-considered. It changed the policies' "ultimate net loss language" from expressly excluding expense to being silent on expense. The result was that Aetna did not have a defense obligation at all under the policies as written. *Id.* at 1352-53.

[8] Home's explicit consent to the agreement to pay expense was critical in that case. The court found that, because Home agreed to pay expense, it was required to follow Aetna's settlement of the risk that it would be required to pay expense *in addition* to limits. This conclusion was not dependent on whether or not there was "subject to" language in Home's reinsurance contract. It was based on the fact that, by agreement, Home's reinsurance remained concurrent with the Aetna policies. *Id.* at 1345. Aetna ultimately settled the risk that it would have to pay expense in addition to limits by increasing the policy limits and making the increased limits available to pay either indemnity or expense. *Id.* at 1342.

F. Supp. at 190 n.4.  When the *Bellefonte* reinsurers issued endorsements expressly stating that their reinsurance certificates paid expense only within limits and when they refused to consent to Aetna's subsequent agreement with Robbins to change the policies, their reinsurance, unlike the Home's, arguably became non-concurrent.

It was in this context that the *Bellefonte* district court concluded that "it had always been intended that [expense would be included within the insurance policy limits] . . . and that the reinsurance certificates were issued and the reinsurance premiums computed on the basis of this understanding."  590 F. Supp. at 190.  On cross-motions for summary judgment, and apparently with the agreement of all parties, the court conducted a "four corners" construction of the contract without resorting to evidence of industry practice and understandings.  It concluded that the limitation in the reinsurance certificate was "a 'policy' limitation rather than a 'loss' limitation" and that this meant it was a "cap on all payments by the reinsurer under the policy."  *Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*, No. 85 Civ. 2706, 1989 WL 106469, at *2 (S.D.N.Y. Sept. 5, 1989).  The *Bellefonte* district court reasoned that the "follow-the-fortunes" clause in the reinsurance contracts did not change this result.  In reaching this conclusion, the court *recited* the certificates' "follow-the-liability" provision but it cited to a case that concerned a "follow-the-settlements" provision.  *Id.* at *2-3.

The *Bellefonte* district court conflated the two concepts and did not appreciate their independent significance in the contracts. "Follow-the-liability" requires the reinsurer to provide coverage concurrent with the reinsured policy unless explicitly stated otherwise. (A-145 at ¶¶18-19); *see also Travelers Cas. & Sur. Co. v. ACE Am. Reins. Co.*, 392 F. Supp. 2d 659, 664 (S.D.N.Y. 2005), *aff'd*, 201 F. App'x 40 (2d Cir. 2006) (summary order). "Follow-the-settlements" allows a ceding company to settle a coverage dispute with its insured knowing that its reinsurers are bound by that settlement so long as the coverage provided by the settlement was a least arguably within the scope of the reinsured policy. *See, e.g.*, *Mentor Ins. Co. v. Norges Brannkasse*, 996 F.2d 506, 517 (2d Cir. 1993).

When the *Bellefonte* district court went on to say that it "found no ambiguity as to whether expenses are within policy limitations," 1989 WL 106469, at *2-3, it was not clear whether it was talking about the *reinsured* policy or the *reinsurance* "policy." This was clarified in the district court's denial of Aetna's motion for reconsideration. There, the court stated that it was the *underlying* (*i.e.*, reinsured) policy that was unambiguous. *Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*, No. 85 Civ. 2706, 1989 WL 146248, at *2 (S.D.N.Y. Nov. 22, 1989). Thus, the correct analysis is that the *Bellefonte* reinsurance was expense inclusive *because the reinsured policy limit was expense inclusive*, not because of "subject to limit" language.

-19-

On appeal, this Court compounded the error in the district court's analysis, again conflating and confusing "follow-the-liability" and "follow-the-settlements." It affirmed, holding that "the doctrine of 'follow the fortunes' does not render the reinsurers liable in this case." 903 F. 2d at 912. The court stated further that "the limitation on liability provision capped the reinsurers' liability" and that "[a]ll other contractual language must be construed in light of that 'cap'." *Id.* at 914. It reasoned, correctly, that a reinsurer cannot be held liable "in excess of its bargained-for coverage" by a follow-the-fortunes [read settlement] clause. *Id.* at 913. This is true, but not because the dollar amount in the Reinsurance Accepted provision is an absolute cap in all cases, but because the bargained-for coverage is determined by the policy coverage. In *Bellefonte*, because the court found that the policies as reinsured paid expense within limits, the reinsurers' obligations also were expense within limits. The Item 4 liability appropriately was "capped" because the policy, as originally issued, was "capped." Subsequent changes to the policy, to which the reinsurers did not consent, could not increase that limit. That, in a nutshell, is the import of the *Bellefonte* decision. When limited to its facts, the *Bellefonte* court's result, if not its analysis, arguably is correct.

In *Unigard*, 4 F.3d at 1049, the reinsurer sought to extend *Bellefonte* to a case where the reinsured policy paid expense in addition to limits. After a bench trial, at which evidence of industry custom and practice was considered, the district

court (Sweet, J.) concluded that the facultative certificate covered expense in addition to the "Reinsurance Accepted" amount *because the reinsured policy did so*. 762 F. Supp. 566, 594-95 (S.D.N.Y. 1991). Consistent with the presumption of concurrency, the court concluded that the reinsurance coverage was "largely defined by the underlying insurance terms [that were incorporated by reference into the certificate] and [that] . . . the 'reinsurance accepted' in the Certificate is the functional counterpart of the policy limits." *Id.* at 595. That decision was correct. It was consistent with industry practice. (A-139 at ¶¶17-21; A-143 at ¶10.) There was no evidence of contractual intent or industry custom to the contrary.

The Second Circuit's reversal of the *Unigard* district court's "cap" ruling reflected a fundamental misunderstanding of the reinsurance risk-transfer mechanism. It ignored the presumption of concurrency between insurance and reinsurance coverage. Perhaps most remarkably, it enforced a contract interpretation that had been proved at trial to be contrary to the parties' *actual contractual intent*. Relying on *Bellefonte*, this Court reasoned that, where the reinsurance is "subject to" the limit or amount of liability shown in Item 4, the "follow-the-liability" provision is *always overridden* by the dollar amount found in Item 4 because the Item 4 dollar amount "provides otherwise." 4 F.3d. at 1070-71. Instead of a presumption of concurrency, it created a presumption of expense-inclusiveness *regardless* of the reinsured policy's terms. The Court reasoned that

"*Bellefonte*'s gloss" was conclusive and that "idiosyncratic factors in particular lawsuits" did not matter. According to the Court, the meaning of "identical standard contract provisions" was not an issue of fact to be litigated anew in each case. *Id*. But terms and conditions of the underlying policy–to which the reinsurance "follows form"–are anything but "idiosyncratic factors." They are the foundation of the reinsurance risk-transfer mechanism. Likewise, as is evident from the recent spate of "cap" cases, including this one, these terms are not boilerplate[9] and they are not "identical standard contract provisions."[10]

Subsequent "cap" cases followed *Unigard*'s reasoning, even where the courts purported to reach their conclusions independently.[11] In *Excess Insurance Company Ltd. v. Factory Mutual Insurance Company*, 822 N.E.2d 768 (N.Y. 2004), for example, the New York Court of Appeals articulated the presumption of expense-inclusiveness implicitly created by *Unigard.* It suggested that an express

---

[9] The *Unigard* court's reliance on *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982), was misplaced. *Sharon Steel* concerned boilerplate successor obligor provisions. Even there, the court recognized that custom and practice evidence may be admissible in appropriate cases. *See id.*

[10] *Compare* (A-88 to 89 ("subject to . . . amount of liability set forth herein" in preamble; follow-the-form clause requires specific exception)) *with Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 594 F. App'x at 703 ("subject to" applies only to "losses or damages"); *Century Indem. Co., et al. v. OneBeacon Ins. Co.*, No. 02928 (Pa. Com. Pl. Mar. 27, 2015) (preamble states "subject to the general conditions set forth on the reverse side hereof").

[11] *See, e.g., Pac. Emps. Ins. Co. v. Global Reins. Corp. of Am.*, No. 09-6055, 2010 WL 1659760, at *5 (E.D. Pa. Apr. 23, 2010); *Cont'l Cas. Co. v. Midstate Reins. Corp.*, 24 N.E.3d 122 (Ill. Ct. App. 2014); *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, No. 6:13-cv-1178, 2014 WL 6610915, at *1 (N.D.N.Y., Nov. 20, 2014); *Excess Ins. Co. Ltd.*, 822 N.E.2d at 771.

exception of expense from the Item 4 dollar amount or a separately negotiated expense limit might be required to render the reinsurance expense-in-addition, again without regard to the terms of the reinsured policy. *Id.* at 772. Neither differences in contract wording nor the reinsured policy's terms and conditions were deemed relevant so long as there was any "subject to limit"-type wording in the contract. The certificates routinely were found to be unambiguous. *See* Fn. 11; *but see* 822 N.E.2d at 773 (Read, J. dissenting) (case history "betokens ambiguity"). They were construed without evidence of industry custom and practice. *Id.* The courts ignored the fact that experienced reinsurance industry arbitrators disavowed *Unigard* and applied custom and practice.[12]

This Court's *Utica* summary decision[13] calls into question the continued applicability of a blanket presumption. The *Utica* decision distinguished *Unigard*, but a fair reading of its analysis casts doubt on the continued validity of *Unigard*'s "cap" ruling. In *Utica*, the Court reasoned that facultative reinsurance contracts, like any other, bind the parties only to the terms they have agreed. 594 F. App'x at 704. It explained that "[a] contract is ambiguous when its terms could suggest

---

[12] *See, e.g.*, *Arbitration Panel Finds Expenses in Excess of Limits Covered*, Mealey's Litigation Reports: Reinsurance, Vol. 4, No. 18, Jan. 27, 1994; Handbook at § 2.05[A] (arbitrators "come down firmly for custom and practice, and the Second Circuit be damned"); *see also Pac. Empl. Ins. Co. v. Global Reins. Corp.*, No. 11-cv-6301 (S.D.N.Y. Dec. 9, 2011) (confirming arbitration award).

[13] *Utica* is a summary opinion which, while not precedential, is instructive. *See Myers ex rel. C.N. v. Astrue*, 993 F. Supp. 2d 156, 163 (N.D.N.Y. 2012).

'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id.* at 703 (citation omitted). This statement is important for two reasons. First, the Global reinsurance contracts are not integrated agreements; they incorporate the terms and conditions of the reinsured policy. (A-89; A-116 at ¶F); *see also Travelers,* 392 F. Supp. 2d at 664. Second, *Utica* makes plain that evidence of industry-specific customs, usages and terminology is proper in deciding whether a contract is ambiguous in the first instance. Thus, even though there was no express exclusion of expense from the limit in *Utica*, the Court held that the contract was ambiguous and remanded for consideration of extrinsic evidence. *Utica*, 594 F. App'x at 705.

"Cap" decisions rendered after *Utica* uniformly have declined to apply a presumption of expense-inclusiveness to reinsurance certificates.[14] Each of the certificates in these cases contained somewhat different language, but none state an express exclusion of expense from the limit. Each contract was determined to be ambiguous and the courts concluded that extrinsic evidence should be considered.

With this context in mind, we turn to the subject contracts.

---

[14] *See Utica Mut. Ins. Co. v. R&Q Reins. Co.*, No. 6:13-cv-1332, 2015 WL 4254074 (N.D.N.Y. June 4, 2015); *see also Century Indem. Co., et al.*, No. 02928; *but see Utica v. Clearwater*, No. 6:13-cv-1178, 2015 WL 4496374, at *1 (N.D.N.Y. July 23, 2015) (Utica's motion for reconsideration based on *Utica v. Munich Re* denied).

**B.    The District Court's "Cap" Ruling was Incorrect Under New York Contract Interpretation Principles as Clarified by *Utica*.**

**1.    The District Court Incorrectly Applied the Item 4 Dollar Amount as an Absolute "Cap" Without Considering the Entire Contract and Industry Custom and Practice.**

Granting Global's motion for partial summary judgment, the district court relied on *Bellefonte* and *Unigard* to conclude only two contract provisions – the "subject to" clause in the preamble and the *dollar amount* in Item 4 – mattered and, as those cases held, "[a]ll other contractual language must be construed in light of that cap." (SPA-10 to 12.) It reasoned that language in the Global certificates was "nearly identical" to that relied on in *Bellefonte*. (*Id.* at 12.) The district court, however, failed to acknowledge that many of the *Bellefonte* certificates contained endorsements explicitly providing for expense within limits. Further, the court pointedly ignored relevant contract terms not considered in *Bellefonte* and *Unigard* despite Century's proffered evidence. Particularly, Century's expert and fact-witness affidavits explained that the terms "part of," "as original," "loss" and Paragraph F were material to construing the Global certificates and that the follow-the-liability provision applied unless the contract *specifically* stated otherwise. (A-139 at ¶¶19-21; A-149 at ¶¶31-36.) The district court concluded (incorrectly) that the contract could be interpreted properly without considering these terms. *Accord Niagara Frontier Transp. Auth. v. Euro-United Corp.*, 303 A.D. 920, 921 (4th

Dep't 2003) ("Effect and meaning must be given to each and every term of the contract . . . .").

Instead, the district court should have considered Century's custom and practice evidence pertinent to the specialized reinsurance industry even without first determining ambiguity. *See, e.g., Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.,* 225 F.3d 270, 275 (2d Cir. 2000) (agreement must be examined by person "cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business"); *Lightfoot v. Union Carbide Crop.,* 110 F.3d 898, 906 (2d Cir. 1997) (same). Even if the district court concluded, after hearing Century's custom, practice and meaning evidence, that the contract was unambiguous, it was required to consider the possibility of a latent ambiguity. *Teig v. Suffolk Oral Surgery Assocs.,* 2 A.D.3d 836, 837 (2d Dep't 2003) (latent ambiguity may be exposed through extrinsic evidence).

Ignoring these basic cannons of construction and interpretation, the district court followed this Court and other courts which previously had reached a "*Bellefonte* result" based on a "four-corners" approach even though those cases considered "somewhat different language and circumstances." (SPA-11.) The district court concluded that the certificates' limits were unambiguously expense-inclusive because "[n]othing in the Certificates at issue expressly states that expenses are to be excluded from the Certificate Limit." (SPA-12.) But, as

explained in *Utica*, an express exclusion of expense from the limit is not required. *See* 594 F. App'x at 703-04.

### 2. Case Law, Custom and Practice and the Risk Transfer Mechanism Require a Presumption of Concurrency.

Industry custom and practice demonstrate that the *specific wordings* of Global's certificates evidence a presumption of concurrency. This Court has concluded (post-*Unigard*) that, even without industry evidence, the presumption of concurrency is correct as a matter of contract construction where the certificate includes "follow-the-form" or "follow-the-liability" wording. *Travelers Cas. & Sur. Co.*, 201 F. App'x at 40.

In *Travelers*, the reinsurer argued, relying on *Bellefonte* and *Unigard*, that a "four corners" construction was proper and that its liability was "capped" by, for example, a $1,250,000 dollar amount in its version of Item 4. 392 F. Supp. 2d at 664. The district court explained that, where the certificate contains a "follow-the-form" or "follow-the-liability" clause, a "four corners" interpretation is not proper because these clauses "necessarily expand the letter of the certificate beyond its four corners." *Id.* Instead, the certificates incorporate the underlying policy terms "except where explicitly provided to the contrary." *Id.* Thus, the *Travelers*' court reasoned that its task was to determine when and to what extent it could "look behind the certificate's plain language and consider the underlying insurance policy itself . . . ." *Id.*

-27-

The *Travelers*' district court cited *Bellefonte* and *Unigard* for the proposition that "only where the liability terms of the certificate differ from those in the underlying policy can the presumption of concurrence between the two policies be overridden." *Id.* It differentiated *Bellefonte*, stating that the "[reinsurer] cannot be held liable for the insurer's *actions* in excess of the agreement." *Id.* (emphasis added). It reasoned that both the First and Second Circuits have held that an exception to the presumption of concurrency created by a "follow-the-form" clause is overridden only "through the placement of *explicit* liability limitations in the certificate itself." *Id.* at 665 (emphasis added); *see also Comm. Union Ins. Co. v. Swiss Reins. Am. Corp.*, 413 F.3d 121, 128 (1st Cir. 2005) (presumption of concurrency applies "subject only to any clear limitation to the contrary in [the facultative certificates themselves].")

In *Travelers*, as here, the language used in Item 4 to describe the reinsurance risk tracked the language used in Item 2 to describe the policy risk. *Travelers*, 392 F. Supp. 2d at 665. Thus, the court found it necessary to look to the reinsured policy's terms and conditions to determine how the Item 4 reinsurance limit applied. *Id.* Notably, this Court affirmed in a summary decision without reference to *Bellefonte* or *Unigard.* 201 F. App'x at 41. It held that, because Items 2 and 4 of the certificate used the same terms to describe how the limits applied, Item 4 did

not "specifically provide" for non-concurrence. *Id.* at 40. Accordingly, "the presumption of concurrency created by the follow form clause is not rebutted." *Id.*

*Travelers'* analysis applies equally to this case. It does not matter if the question is whether limits are annualized (as in *Travelers*) or whether the reinsurer must pay expense in addition to the limits (as here). In both cases, the question is, *"How do these limits apply?"* In both cases the reinsurer pays more than the dollar amount stated in Item 4 if the reinsurance is concurrent and, thus, follows the policy's terms and conditions. Because, in both cases, there is no provision in the reinsurance certificate that explicitly renders it non-concurrent with the reinsured policy, the presumption of concurrency is not rebutted. And, in both cases, concurrency supports the bargained-for risk-transfer mechanism necessary for the industry to function.

### 3. The Court Should Consider Extrinsic Evidence to Determine the Contracts' Meaning.

Absent a perfunctory application of *Unigard* and complete disregard of differences in contract wording, the actual contract wording and industry evidence proffered by Century demonstrate that the Global certificates are, at minimum, ambiguous. Thus, Century's evidence of the parties' contractual intent should have been considered. That evidence included that policy SRL 5023, for example, was 100% reinsured (A-157 at ¶¶27-28; A-193.) One hundred percent (100%) of the net (risk) premium associated with that policy was transferred to the reinsurers.

-29-

(*Id.*) Century intended (and evidence confirms) that, with the transfer of 100% of the risk premium, the parties intended to transfer 100% of the risk. (A-150 at ¶37.) Accordingly, Century should be permitted to complete discovery pertaining to the "cap" issue, present experts and otherwise fully develop and submit such evidence. (*See* A-367; A-373; A-383.)

## VII.  CONCLUSION

As explained above, the subject reinsurance agreements are, at the very least, ambiguous with respect to the question whether loss and expense combined are "capped" by the dollar amount in the certificates' "Reinsurance Accepted" provisions. The specific contract wording, industry custom and practice and other evidence of the parties' intent make plain that, where the reinsured policy pays expense in addition to limits, the reinsurance concurrently pays expense in addition to limits. Therefore, Century respectfully requests this Court to reverse the district court's August 15, 2014 summary judgment ruling and its June 3, 2015 Final Order and Judgment and to remand for the consideration of extrinsic evidence.

Respectfully submitted,

/s/    Daryn E. Rush
_____
**WHITE AND WILLIAMS LLP**
Daryn E. Rush
Ellen K. Burrows
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA  19103

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times Roman proportional font and contains 7,343 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(8)(B) of the Federal Rules of Appellate Procedure.

Dated October 28, 2015

/s/ Daryn E. Rush

**WHITE AND WILLIAMS LLP**
Daryn E. Rush
Ellen K. Burrows
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA  19103
(215) 864-6360/7028

# SPECIAL APPENDIX

# <u>TABLE OF CONTENTS</u>

Docket Text Order, filed July 22, 2014 ................................................................... SPA-1

Opinion and Order, filed August 15, 2014 ........................................................... SPA-3

Opinion and Order, filed April 15, 2015 ............................................................. SPA-15

Final Order and Judgment, filed June 3, 2015 ..................................................... SPA-19

*Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.,* No. 85 Civ. 2706, 1989 WL
106469 (S.D.N.Y. Sept. 5, 1989) ......................................................................... SPA-21

*Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*, No. 85 CIV. 2706, 1989 WL
146248 (S.D.N.Y. Nov. 22, 1989) ....................................................................... SPA-24

*Century Indem. Co., et al. v. OneBeacon Ins. Co.*, No. 02928 (Pa. Com. Pl. Mar.
27, 2015) ............................................................................................................. SPA-26

*Pac. Emps. Ins. Co. v. Global Reins. Corp. of Am.*, No. 09-6055, 2010 WL
1659760 (E.D. Pa. April 23, 2010) ...................................................................... SPA-35

March 7, 2011 Final Award, Arbitration Between *Pac. Empl. Ins. Co. and Global
Reins. Corp., confirmed at Pac. Empl. Ins. Co. v. Global Reins. Corp.*, No. 11-cv-
6301 (S.D.N.Y. Dec. 9, 2011) ............................................................................. SPA-40

*Penn Re, Inc. v. Aetna Cas. & Sur. Co.*, No. 85-385-Civ-5, 1987 WL 909519
(E.D.N.C. June 30, 1987) .................................................................................... SPA-41

*Utica Mut. Ins. Co. v. Clearwater Ins. Co.,* No. 6:13-cv-1178, 2014 WL 6610915
(N.D.N.Y., Nov. 20, 2014) ................................................................................. SPA-48

*Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, No. 6:13-cv-1178, 2015 WL 4496374
(N.D.N.Y. July 23, 2015) .................................................................................... SPA-53

*Utica Mut. Ins. Co. v. R&Q Reins. Co.*, No. 6:13-cv-1332, 2015 WL 4254074
(N.D.N.Y. June 4, 2015) ..................................................................................... SPA-56

*Arbitration Panel Finds Expenses in Excess of Limits Covered*, Mealey's
Litigation Reports: Reinsurance, Vol. 4, No. 18, Jan. 27, 1994 .......................... SPA-65

i

B. Ostrager and M. Vyskocil, *Modern Reinsurance Law and Practice*, §§2.01(b); 5.03 (1996) ........................................................................................................... SPA-66

Eugene Wollan, *Handbook of Reinsurance Law*, §§1.02; 1.04(A); 2.05 (2003) . SPA-75

| From: | NYSD_ECF_Pool@nysd.uscourts.gov |
|---|---|
| Sent: | Tuesday, July 22, 2014 6:01 PM |
| To: | CourtMail@nysd.uscourts.gov |
| Subject: | Activity in Case 1:13-cv-06577-LGS Global Reinsurance Corporation of America v. Century Indemnity Company Order on Motion for Extension of Time to Complete Discovery |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## U.S. District Court

### Southern District of New York

**Notice of Electronic Filing**

The following transaction was entered on 7/22/2014 at 6:01 PM EDT and filed on 7/22/2014

**Case Name:** Global Reinsurance Corporation of America v. Century Indemnity Company

**Case Number:** 1:13-cv-06577-LGS

**Filer:**

**Document Number:** 76(No document attached)

**Docket Text:**
ORDER granting in part [74] Letter Motion for Extension of Time to Complete Discovery: Application granted in part. Fact discovery shall be completed no later than August 25, 2014. No further extensions will be granted absent extraordinary circumstances. The conference currently scheduled for August 11, 2014, is adjourned to September 4, 2014, at 11:50 a.m. Any parties seeking to file or oppose motions for summary judgment shall treat the September 4 conference as a pre-motion conference and file pre-motion letters in accordance with the Court's Individual Rule III.A.1. If the parties wish to conduct expert discovery, they are directed to file a joint letter-motion describing what expert discovery is anticipated, proposing a date by which expert discovery shall be completed and seeking an adjournment of the pre-motion conference. (HEREBY ORDERED by Judge Lorna G. Schofield)(Text Only Order) (Schofield, Lorna)

1:13-cv-06577-LGS Notice has been electronically mailed to:

David Louis Pitchford dpitchford@pitchfordllc.com

1

SPA-1

Ellen K. Burrows burrowse@whiteandwilliams.com, bryerb@whiteandwilliams.com, kauffmanm@whiteandwilliams.com

Daryn E. Rush rushd@whiteandwilliams.com, bryerb@whiteandwilliams.com

Daniel Steven Brower dbrower@pitchfordllc.com

Brendan D. McQuiggan mcquigganb@whiteandwilliams.com, bryerb@whiteandwilliams.com

Zareef Jalal Nurul Ahmed ahmedz@whiteandwilliams.com

**1:13-cv-06577-LGS Notice has been delivered by other means to:**

SPA-2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  08/15/2014
```

-------------------------------------------------------- X

GLOBAL REINSURANCE CORPORATION OF
AMERICA,

                              Plaintiff,

          -against-

CENTURY INDEMNITY COMPANY,
                           Defendant.

13 Civ. 06577 (LGS)

OPINION AND ORDER

-------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

      Plaintiff Global Reinsurance Corporation of America brings this action against Defendant Century Indemnity Company seeking a declaration of its rights and obligations under nine certificates of reinsurance ("Certificates") issued by its predecessor-in-interest, Constitution Reinsurance Corporation, to Defendant's predecessor-in-interest, the Insurance Company of North America.[1]  Before the Court is Plaintiff's motion for partial summary judgment seeking a declaration that the dollar amount stated in the "Reinsurance Accepted" section of each of the nine Certificates caps the maximum amount that Global can be obligated to pay for combined loss and expenses.  For the reasons discussed below, Plaintiff's motion is granted.

**I.**    **Facts**

      The facts are taken from the parties' summary judgment submissions and, as required, viewed in the light most favorable to the nonmoving party.

---

[1] "Reinsurance is a mechanism by which one insurer insures the risk of another insurer." *Travelers Cas. and Sur. Co. v. Insurance Co. of North America*, 609 F.3d 143, 148-49 (3d Cir. 2010) (internal quotation marks omitted).  "The insurer pays the reinsurer a premium in exchange for which the reinsurer assumes a portion of the [insurer's] potential financial exposure under certain direct insurance policies it has issued to its insured." *Id.* at 149 (internal quotation marks omitted) (alteration in original).

### A. Background

Plaintiff Global is an insurance company organized under the laws of New York, with its principal place of business in New York, New York. Defendant Century is an insurance company organized under the laws of Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania.

From 1962 to 1981, Century issued various primary and excess liability policies to Caterpillar Tractor Company, some of which were reinsured by Global ("Policies"). Since 1988, thousands of lawsuits have been brought against Caterpillar by various plaintiffs alleging bodily injury resulting from exposure to asbestos ("Claims"). In January 2001, Caterpillar requested coverage and the defense of these Claims from Century.

In 2004, Caterpillar and Century commenced declaratory judgment actions against each other to resolve coverage issues concerning the Policies. As a result, Century became obligated to reimburse Caterpillar for defense expenses in addition to the indemnity limits of the Policies. Subsequently, Century has paid more than $60 million to Caterpillar, most of which was for expenses as opposed to loss. In 2013, Century settled the remainder of its past indemnity and expense costs owed to Caterpillar. Century continues to incur indemnity and expense costs for new asbestos-related suits brought against Caterpillar.

### B. The Certificates

Each Certificate provides that Global reinsures Century "subject to" either the "amount of liability" or "limits of liability" set forth in the Certificate. The "Reinsurance Accepted" section of each of the Certificates provides a specific dollar amount ranging from $250,000 to $2,000,000 ("Certificate Limits"). Global maintains that the Certificate Limits are the maximum amounts it

must pay under each Certificate, while Century maintains that the Certificate Limits apply only to loss; therefore, Global must pay expenses above and beyond that amount.

Certificate E89-91, also named Certificate 60589 ("Certificate X"), contains a Certificate Limit of $250,000. Century has already billed Global in excess of $250,000 under Certificate X. Century has not yet billed Global under any of the other Certificates. Global expects further billings from Century under Certificate X as well as billings under other of the Certificates in excess of their respective Certificate Limits.

The first page of Certificate X states that the reinsurance is "in consideration of the payment of premium and subject to the terms, conditions and amount of liability set forth herein . . ." (the "Subject To Clause"). All of the Certificates contain this language or substantially similar language, stating that the reinsurance is "in consideration of the payment of premium and subject to the terms, conditions and limits of liability set forth herein   . . ."

The first page of Certificate X also lists 5 "Items": Item 1 is "Type of Insurance" and is described as "Blanket General Liability, excluding Automobile Liability as original"; Item 2 is "Policy Limits and Application" and is described as "$1,000,000. each occurrence as original"[2]; Item 3 is "[Century] Retention" and is described as "The first $500,000. of liability as shown in Item #2 above"; Item 4 is "Reinsurance Accepted" and is described as "$250,000. part of $500,000. Each occurrence as original excess of [Century's] retention as shown in Item #3 above"; and Item 5 is "Basis" and is described as "Excess of Loss." Each of the Certificates contains Item 4, "Reinsurance Accepted," with a listed dollar amount.

The second page of Certificate X provides that "the liability of the Reinsurer specified in Item 4 above shall follow that of [Century] and, except as specifically provided herein, shall be

---

[2] Century claims that the $1 million is a misstatement and that the policy limit is in fact $500,000. This discrepancy does not affect the issue before the Court in this motion.

subject in all respects to all the terms and conditions of [Century's] Policy" (the "Follow the

Fortunes Clause"). This page also provides:

> All claims involving this reinsurance, when settled by [Century], shall be binding
> on the Reinsurer, who shall be bound to pay its proportion of such settlements, and
> in addition thereto, in the ratio that the Reinsurer's loss payment bears to
> [Century's] gross loss payment, its proportion of expenses, other than [Century]
> salaries and office expenses, incurred by [Century] in the investigation and
> settlement of claims or suits . . .

(the "In Addition Thereto Clause"). All of the certificates have language similar to the

Follow the Fortunes Clause and the In Addition Thereto Clause.

Certificate X was placed through a reinsurance intermediary, Towers, Perrin,

Forster & Crosby, Inc. ("TPF&C"), located in Philadelphia, Pennsylvania. The

negotiations concerning Certificate X also took place through TPF&C. These

negotiations, as well as agreement upon the key terms, took place at an in-person meeting

at Plaintiff's offices in New York, New York. All of the Certificates were prepared in,

countersigned in and issued from offices located in New York, New York. All payments

which may be due in performance of the Certificates will be issued from offices located in

New York, New York.

## II.    Standard of Review

Summary judgment is appropriate where the record before the court establishes that there

is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of informing the court

of the basis for the summary judgment motion and identifying those portions of the record that

demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *see*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must construe the evidence in the

light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

If the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See Celotex*, 477 U.S. at 322-23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  In other words, summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party carries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material fact. *See id.* at 322.  In satisfying this burden, the non-moving party cannot rely merely on allegations or denials of the factual assertions of the moving party. *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 324.  Moreover, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).  The non-moving party must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. *See Celotex*, 477 U.S. at 324.  Furthermore, to demonstrate a genuine dispute as to the material facts, the non-moving party must come forward with sufficient evidence to permit a reasonable jury to return a verdict in his favor. *See Anderson*, 477 U.S. at 242, 248.

SPA-7

### III.   Discussion

#### A.   Choice of Law

The parties dispute whether New York or Pennsylvania law applies to this case, and no contractual choice-of-law provision exists.  Under a choice-of-law analysis, New York law applies in this case because New York has the most significant relationship with the dispute.

"A federal court sitting in diversity must apply the choice-of-law rules of the forum state, in this instance New York." *Tri-State Employment Services, Inc. v. Mountbatten Sur. Co., Inc.*, 295 F.3d 256, 260 (2d Cir. 2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)).  "Courts in New York . . . apply a 'center of gravity' or 'grouping of the contacts' approach to choice-of-law issues in contract cases." *Id.* at 260-61; *accord In re Allstate Ins. Co. and Stolarz*, 81 N.Y.2d 219, 226 (1993).  "Under this approach, courts may consider a variety of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Tri-State Employment Services*, 295 F.3d at 261.

In applying New York choice-of-law rules in the context of reinsurance disputes, courts have repeatedly selected the law of the state where the reinsurer is located, as that is usually where the certificates were issued and where claims would be made or performance would occur. *See, e.g., Arkwright–Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 887 F.2d 437, 439 (2d Cir. 1989) (applying the law of the state where "[the reinsurer] was organized . . . , the reinsurance certificate was issued . . . and any obligation to perform on the reinsurance contract would seem to arise"); *TIG Premier Ins. Co. v. Hartford Acc. & Indem. Co.*, 35 F. Supp. 2d 348, 350, 350 n.3 (S.D.N.Y. 1999) (applying the law of the state where "the Reinsurance Certificate

6

SPA-8

was issued and . . . claims on that certificate would be expected to be made" and declining to apply the law of the state where the direct insurer was located).

Here, Global, the reinsurer, is located in New York; therefore, claims are expected to be made and performance is expected to occur in New York. Additionally, Global presents evidence that all of the Certificates were issued in New York. Century maintains that some of the Certificates were negotiated and placed through a reinsurance intermediary, TPF&C, located in Pennsylvania; however, Century provides no evidence that TPF&C was involved with any of the Certificates other than Certificate X. For the majority of the Certificates, the only connection to Pennsylvania apparent from the evidence is that Pennsylvania is Century's state of incorporation and principal place of business. Moreover, even for Certificate X, the evidence shows that it was negotiated and agreed upon in New York, not Pennsylvania.

Century requests discovery on the choice of law issue. This discovery is unnecessary. The record shows that the reinsurer is located in New York and that the Certificates were issued in New York. Even if "the precise place of contracting is somewhat unclear . . . New York certainly had a more significant relationship to the Certificate[s'] formation than Pennsylvania did." *Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America*, 693 F.3d 417, 437 (3d Cir. 2012). While Pennsylvania has some interest in the dispute at issue, "New York has the most significant relationship to the Certificate[s] and the greater interest in having its law applied." *Id.* at 439 ("New York has an interest in protecting the rights of . . . New York reinsurers . . . who operate out of New York offices, to enter into contracts and to have their terms enforced predictably"). Accordingly, New York law applies.[3]

---

[3] It is probable that if Pennsylvania law were to be applied, the result of this motion would be the same. *See Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America*, No. 09–6055, 2010 WL 1659760, at *5 (E.D.Pa. April 23, 2010) (following the same Second Circuit precedent discussed and applied below); *see also Pacific Employers Ins. Co. v. Global Reinsurance Corp.*

7

**B.  Merits**

Global moves for partial summary judgment seeking a declaration that the Certificate

Limits stated in the "Reinsurance Accepted" section of each of the Certificates caps the

maximum amount that Global can be obligated to pay for combined loss and expenses.  Based on

the plain language of the Certificates and the Second Circuit's binding precedent, Global's

motion is granted.  *See Bellefonte Reinsurance Co. v. Aetna Cas. and Sur. Co.*, 903 F.2d 910, 913

(2d Cir. 1990); *see also Unigard Security Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049, 1070-71

(2d Cir. 1993).

In *Bellefonte*, the Second Circuit affirmed the judgment of the district court, which held

that the reinsurers were not obligated to pay the direct insurer any additional sums for defense

costs over and above the limits on liability stated in the reinsurance certificates at issue.

*Bellefonte*, 903 F.2d at 910-11.  The *Bellefonte* court held that the reinsurers' total liability, for

both loss and expenses, under the reinsurance certificates at issue, was capped at the dollar

amount stated in the "Reinsurance Accepted" section of each certificate.  *Id.* at 913.  The *Unigard*

court held the same and followed the reasoning of *Bellefonte*.  *Unigard*, 4 F.3d at 1070-71.

The *Bellefonte* court based its decision on the plain language of the reinsurance

certificates at issue, focusing on two provisions.  *Bellefonte*, 903 F.2d at 911.  The first provision

stated that the reinsurance was "in consideration of the payment of the premium and subject to

the terms, conditions and amount of liability set forth herein . . . ."  *Id.*  The second provision was

the "Reinsurance Accepted" section, which stated the dollar amount of liability.  *Id.*  The Second

Circuit reasoned that this dollar amount "capped the reinsurers' liability under the certificates"

and that "[a]ll other contractual language must be construed in light of that cap."  *Id.* at 914.  The

---

*of America*, No. 09–6055, 2010 WL 2376131, at *6-7 (E.D.Pa. June 9, 2010) (denying motion for
reconsideration and declining to consider extrinsic evidence of alleged industry custom).

8

Second Circuit further reasoned that construing the reinsurance certificates any other way "would negate the phrase '. . . subject to the . . . amount of liability set forth herein.'" *Id.*

Here, the relevant language in Global's Certificates is nearly identical to the language relied on by the Second Circuit in *Bellefonte*. The Certificates at issue in this case contain the Subject To Clause (stating that the reinsurance is "in consideration of the payment of premium and subject to the terms, conditions and amount [or limits] of liability set forth herein") and state a dollar amount of liability in the "Reinsurance Accepted" section. Consequently, just as in *Bellefonte*, here, Global's total liability for both loss and expenses is capped at the dollar amount stated in the "Reinsurance Accepted" section of each Certificate.

Century argues that the result in the instant case should differ from that in *Bellefonte* because, here, the underlying Policies pay expenses above and beyond the limits for loss, where the underlying policies in *Bellefonte* did not. This argument fails, as the Second Circuit has followed the reasoning of *Bellefonte* when dealing with underlying policies that pay expenses above and beyond the limits for loss. *See Unigard*, 4 F.3d at 1070-71.

Century also argues that the result in the instant case should differ from that in *Bellefonte* because, here, the language of the Certificates is different from that in *Bellefonte* and the Certificates here contain language that may not have been included in the certificates in *Bellefonte*. This argument also fails because the Second Circuit, as well as other federal and New York courts, have followed the reasoning of *Bellefonte* when analyzing somewhat different contractual language and circumstances. *See, e.g., id.; Allendale Mut. Ins. Co. v. Excess Ins. Co .., Ltd.*, 992 F. Supp. 271, 277 (S.D.N.Y. 1997); *Pacific Employers*, 2010 WL 1659760, at *5; *Excess Ins. Co. Ltd. v. Factory Mut. Ins. Co.*, 3 N.Y.3d 577, 584-85 (2014).

SPA-11

Moreover, as discussed, the relevant language in the Certificates at issue is nearly identical to the language relied on by the Second Circuit in *Bellefonte*. The *Bellefonte* and *Unigard* courts made it clear that "'*[a]ll other contractual language* must be construed in light of'" the Certificate Limit. *Unigard*, 4 F.3d at 1071 (quoting *Bellefonte*, 903 F.2d at 914) (emphasis added).

Standing on its own, the unambiguous language in the "Reinsurance Accepted" sections of the Certificates does not differentiate between reinsurance accepted for loss versus reinsurance accepted for expenses, but simply provides a total cap on liability. If the parties intended to exclude expenses from the total liability cap, they could have made that clear in the language of the Certificates. The New York Court of Appeals held that in order for costs to be excluded from the liability cap in a reinsurance certificate, language in the certificate must "expressly stat[e] that [such] costs were excluded from the indemnification limit." *Excess Ins.*, 3 N.Y.3d at 584-85. Nothing in the Certificates at issue expressly states that expenses are to be excluded from the Certificate Limits.

Century argues that the Follow the Fortunes Clause (stating that "the liability of the Reinsurer . . . shall follow that of [Century]") means that Global is obligated to pay for expenses above the Certificate Limit in the same manner that Century is obligated to pay for expenses above the limits of the underlying Policies. Century further argues that this is consistent with the "follow the fortunes" doctrine common in the insurance industry, which burdens the reinsurer with the same risks undertaken by the direct insurer. These arguments fail.

The *Bellefonte* court was unpersuaded by the argument that the "follow the fortunes" doctrine was common in the insurance industry and therefore created liability for the reinsurer above and beyond the liability cap stated in each Certificate. *Bellefonte*, 903 F.2d at 912-13.

10

SPA-12

Moreover, the certificates in *Bellefonte* contained a substantially identical provision to the Follow the Fortunes Clause here, stating that "the liability of the Reinsurer specified . . . shall follow that of the Company." *Id.* at 911.  The Second Circuit held that these provisions were "structured so that they coexist with, rather than supplant, the liability cap." *Id.* at 913.  The Second Circuit reasoned that "allowing the 'follow the fortunes' clause to override the limitation on liability . . . would strip the limitation clause . . . of all meaning" and "would be contrary to the parties' express agreement and to the settled law of contract interpretation." *Id.*

Century also argues that the In Addition Thereto Clause (stating that Global "shall be bound to pay its proportion of . . . settlements, and in addition thereto, in the ratio that [Global's] loss payment bears to [Century's] gross loss payment, its proportion of expenses") demonstrates that Global's liability for expenses is above and beyond the Certificate Limit, which is Global's liability for loss.  This argument also fails.

The certificates in *Bellefonte* had a substantially identical provision to the In Addition Thereto Clause here, stating that "the Reinsurer . . . shall be bound to pay its proportion of . . . settlements, and in addition thereto, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment, its proportion of expenses." *Id.* at 911.  The Second Circuit held that "the phrase 'in addition thereto' merely . . . differentiate[s] the obligations for losses and for expenses" and  "in no way exempts defense costs from the overall monetary limitation in the certificate." *Id.* at 913.  The Second Circuit reasoned that "the 'subject to' clause . . . makes the 'in addition thereto' language 'subject to' the cap on liability." *Id.* at 914.

The *Bellefonte* court held that neither the "follow the fortunes" doctrine nor the "in addition thereto" language in the reinsurance certificates exempted defense costs from the clauses limiting the reinsurers' overall liability under the certificates, as all costs were "subject to" the

11

SPA-13

express caps on liability set forth in the certificates. *Id.* Likewise, here, neither the Follow the Fortunes Clause nor the In Addition Thereto Clause exempts expenses from the Certificate Limits due to the Subject To Clause.

These, as well as all of Century's other arguments, have been made before and rejected by the Second Circuit and the New York Court of Appeals. The Second Circuit in *Unigard* stated:

> *Bellefonte*'s gloss upon the written agreement is conclusive. The efficiency of the reinsurance industry would not be enhanced by giving different meanings to identical standard contract provisions depending upon idiosyncratic factors in particular lawsuits. The meaning of such provisions is not an issue of fact to be litigated anew each time a dispute goes to court.

*Unigard*, 4 F.3d at 1071. The dollar amount indicated in each of the Certificate Limits is the maximum amount that Global can be obligated to pay for loss and expenses, combined.

Accordingly, Global's Motion for summary judgment is granted.

**IV.   Conclusion**

For the reasons discussed above, Plaintiff's motion is GRANTED.

In light of the parties' joint letter submitted to the Court on August 16, 2014, which states that "Global has advised that it will be formally dropping all defenses to payment of Century's claims other than its 'cap' defense based on the *Bellefonte* line of cases," the parties are directed to submit another joint letter by August 22, 2014, explaining how they intend to proceed with this case and/or stipulating dismissal.

The Clerk of Court is directed to close the motion at docket number 30.

Dated: August 15, 2014
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

12

SPA-14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                   :

GLOBAL REINSURANCE CORPORATION OF  :
AMERICA,
                          Plaintiff,    :
                                     :

           -against-                 :
                                     :

CENTURY INDEMNITY COMPANY,      :
                        Defendant.  :
                                   :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____4/15/15____

13 Civ. 06577 (LGS)

OPINION AND ORDER

LORNA G. SCHOFIELD, District Judge:

      By Opinion and Order dated August 15, 2014 (the "Opinion"), Plaintiff Global

Reinsurance Corporation of America's ("Global") motion for partial summary judgment was

granted.[1]  The Opinion concluded that the reinsurance limits set forth in each of the certificates of

reinsurance at issue in this case (the "Certificates") were inclusive of costs and expenses, and

created an overall cap of liability on the Certificates.  By notice of motion filed December 22,

2014, Defendant Century Indemnity Company ("Century") moves for reconsideration of the

Opinion on account of the Second Circuit's intervening unpublished opinion, not to be cited as

precedent, in *Utica Mutual Insurance Company v. Munich Reinsurance America, Inc.*, 594 F.

App'x 700 (2d Cir. 2014) ("*Utica*").  For the following reasons, the motion is denied.

      The standard for granting a motion for reconsideration is "strict, and reconsideration will

generally be denied unless the moving party can point to controlling decisions or data that the

court overlooked." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir.

2012) (citation and internal quotation marks omitted).  "A motion for reconsideration should be

granted only when the defendant identifies an intervening change of controlling law, the

---

[1] Familiarity with the Opinion, the underlying facts and procedural history is assumed. *See
Global Reinsurance Corp. of Am. v. Century Indem. Co.*, No. 13 Civ. 6577, 2014 WL 4054260
(S.D.N.Y. Aug. 15, 2014).

availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (citation and internal quotation marks omitted). A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Surveys*, 684 F.3d at 52 (citation and internal quotation marks omitted). The decision to grant or deny a motion for reconsideration rests within "the sound discretion of the district court." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (citation omitted).

Century has pointed to no change in controlling law or any new evidence. In fact, Century concedes that *Utica* "represents an important clarification of *existing law*" and is "not in itself an intervening change in law." (emphasis added). Century argues that reconsideration is nonetheless warranted on account of a "clarification in law [because it] 'might reasonably be expected to alter the conclusion reached by the court.'" (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (alteration added)). By selectively quoting from *Shrader*, Century invents a standard for reconsideration based on "clarification" that has no support in the law. The complete quote from *Shrader* states: "The standard for granting such a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to *controlling decisions* or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." 70 F.3d at 257 (emphasis and alterations added). When read in context, the second clause of the quote that Century uses in its argument only adds color to the recognized factors that justify reconsideration listed in the first clause, namely changes in controlling law or overlooked data; the second clause

2

does not allow litigants to come up with new categories that in their view "might reasonably be expected to alter the conclusion reached by the court," as Century attempts to do.

Century also suggests in a parenthetical citation that in *Shrader*, the Second Circuit approved a district court's decision to grant a motion for reconsideration based on "introduction of additional, non-precedential case law." The district court in *Shrader*, which "had originally examined only two of the circuit court decisions on the issue before it," was presented with contrary case law from four different circuit courts on reconsideration. *Id.* By contrast, and by its own argument, Century has presented (at most) one case clarifying existing law.[2] In any case, in *Shrader*, the Second Circuit did not approve of the district court's decision to reconsider. Rather, the *Shrader* court merely noted that "in light of [the defendant's] introduction of additional relevant case law and substantial legislative history," it could not "say that the district court's decision to reconsider its earlier ruling was *an abuse of discretion*." *Id.* (emphasis added).

Accordingly, sufficient cause exists to deny Century's motion for reconsideration without reaching the merits of its argument. Even if the merits were considered, however, the outcome would be the same because Century misunderstands *Utica*.

The holding in *Utica* was based on the language of the particular reinsurance certificate at issue there, which differs from the Certificates here. *Utica* held that where a reinsurance certificate made "losses and damages" expressly "subject to" the certificate's limit of liability but did not similarly expressly cabin the provision for "loss expenses," the limit of liability did not

---

[2] By letter dated March 27, 2015, Century submitted "supplemental authority" in the form of a decision from the Court of Common Pleas for Philadelphia County. Needless to say, that case, which applies Pennsylvania law rather than New York law, does not represent any change in controlling law, and therefore does not provide support for Century's motion.

necessarily cap expenses as well. *See* 594 F. App'x at 703. As the Opinion explained, the Certificates at issue here do not specify that only losses and damages are "subject to" the liability cap: "Standing on its own, the unambiguous language in the 'Reinsurance Accepted' sections of the Certificates does not differentiate between reinsurance accepted for loss versus reinsurance accepted for expenses, but simply provides a total cap on liability." 2014 WL 4054260, at *6. *Utica* confirms that where, as here, "a provision in the policies at issue . . . expressly ma[kes] all of the reinsurers' obligations 'subject to' the limit of liability," those policies "are unambiguously expense-inclusive." 594 F. App'x at 704 (citing *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1071 (2d Cir. 1993); *Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910, 914 (2d Cir. 1990)). Because *Utica* does not counsel a different result, Century's remaining arguments based on *Utica* need not be considered.

Finally, in footnote number 18 of 24 in its 15 page brief, Century "submits" that the Opinion's "choice of law analysis also should be reviewed and revised in light of *Utica*." Because "[a]rguments which appear in footnotes are generally deemed to have been waived," this additional argument, which in any event is meritless, is not addressed. *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007) (citing *City of Syracuse v. Onondaga Cnty.*, 464 F.3d 297, 308 (2d Cir. 2006)).

For the foregoing reasons, Century's motion for reconsideration is DENIED. The Clerk of Court is directed to close the motion at Docket No. 98. The parties shall file a joint status letter no later than April 23, 2015, explaining how they plan to proceed with this case.

SO ORDERED.

Dated: April 15, 2015
New York, New York

4

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED : 06 | 3 | 15
```

| | |
|---|---|
| GLOBAL REINSURANCE CORPORATION OF: AMERICA as successor-in-interest to CONSTITUTION REINSURANCE CORPORATION, | : : : |
| *Plaintiff/Counter-Defendant* | : : : |
| v. | : |
| CENTURY INDEMNITY COMPANY, as successor-in-interest to INSURANCE COMPANY OF NORTH AMERICA, | : : : : |
| *Defendant/Counter-Plaintiff.* | : : |

Civil Action No.  1:13-cv-6577
(LGS)

## FINAL ORDER AND JUDGMENT

      **AND NOW**, this 3rd day of June 2015, upon consideration of the Stipulation for Entry of Final Order and Judgment submitted jointly by Plaintiff/Counter-Defendant Global Reinsurance Corporation of America ("Global") and Defendant/Counter-Plaintiff Century Indemnity Company ("Century"), and as a final resolution of all claims and counterclaims herein, it is hereby **ORDERED, ADJUDGED AND DECREED** that

          1.     the dollar amount stated in the "Reinsurance Accepted" section of Certificate Nos. E89-191 (*a/k/a* No. 60589), 61875, 62496, 62497, 63350, 63351, 64748, 65717, and 66786 caps the maximum amount that Global can be obligated to pay for loss and expenses combined;

3

      2.      All other claims and counterclaims of the parties are dismissed without prejudice.

BY THE COURT:

Lorna G. Schofield
United States District Judge

4

SPA-20

1989 WL 106469
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

BELLEFONTE REINSURANCE COMPANY, Mission
Insurance Company, the Insurance Company
of the State of Pennsylvania, North American
Company for Property and Casualty Insurance,
Constitution Reinsurance Corporation and Gerling
Global Reinsurance Corporation, Plaintiffs,
v.
The AETNA CASUALTY AND
SURETY COMPANY, Defendant.

No. 85 CIV. 2706 (JFK).  |  Sept. 5, 1989.

**Attorneys and Law Firms**

Nixon, Hargrave, Devans & Doyle, New York City, for
plaintiffs; William S. Brandt, Frank M. Nicoletti, Vincent J.
Vitkowsky, Robert B. Calihan, of counsel.

Kornstein, Veisz & Wexler, New York City, for defendant;
Howard S. Veisz, Richard Lubarsky, of counsel.

Pepper, Hamilton & Schultz, Philadelphia, Pennsylvania, for
defendant; Deborah F. Cohen, Henry M. Justi, David Castro,
Susan B. Hoekema, of counsel.

### OPINION and ORDER

KEENAN, District Judge.

### INTRODUCTION

**\*1**  This action revolves around the reinsurance of losses paid
by defendant Aetna Casualty and Surety Company ("Aetna")
to its insured A.H. Robins Company, Inc. ("Robins")
arising out of the well-known Dalkon Shield litigation.
From 1968 through 1977, Aetna issued primary and excess
insurance policies which insured Robins, among other things,
against liability for personal injury arising out of use of
Robins' products, including the Dalkon Shield intrauterine
contraceptive device. From 1971 through 1976, plaintiffs
issued certificates of facultative reinsurance which would
reinsure specified portions of the excess insurance policies
issued by Aetna for Robins. Facultative reinsurance refers to
reinsurance which is issued as to a particular risk and which

is specifically negotiated by the reinsurer before the issuance
of a certificate of reinsurance.

As a result of disputes between Aetna and Robins over
the extent of coverage in the underlying policies, Robins
instituted a declaratory judgment action against Aetna in the
Chancery Court in Richmond, Virginia, seeking, *inter alia,* a
ruling that claims expenses and defense costs were to be paid
by Aetna regardless of whether they exceeded the limitations
of liability in the excess insurance policies. By Settlement
Agreement of October 31, 1984, the parties resolved the
litigation and Aetna agreed to pay Robins' defense costs and
expenses.

Plaintiffs now bring the present action seeking the resolution
of a discrete question of interpretation of the plaintiffs'
reinsurance policies. The parties do not dispute the underlying
facts nor do plaintiffs dispute their obligation to pay Aetna
for approximately $31 million in liability on the policies.
The central question is whether plaintiffs are obligated to pay
additional monies for defense costs and claim expenses over
and above the reinsurance policy limitations. Plaintiffs filed
this declaratory judgment action and defendant has asserted
counterclaims, all of which seek a determination of this issue.
All parties have moved for summary judgment on this issue.

### DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary
judgment will be granted "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together
with the affidavits, if any, show that there is no genuine issue
as to any material fact and that the moving party is entitled
to judgment as a matter of law." The moving party bears
the burden of showing the absence of evidence which would
support the nonmoving party's claim, *Celotex v. Catrett,* 106
S.Ct. 2548, 2554 (1986), and all inferences should be drawn
in favor of the party opposing the motion. *United States v.
Diebold, Inc.,* 369 U.S. 654, 655 (1962).

All the reinsurance policies at issue contain relevant
provisions which are substantially the same. They are as
follows:

*Provision 1*

[Reinsurer] ... [d]oes hereby reinsure Aetna ... (herein
called the Company) in respect of the Company's contract

SPA-21

hereinafter described, in consideration of the payment of the premium and subject to the terms, conditions and amount of liability set forth herein....

**\*2** *Provision 2*

The Company warrants to retain for its own account ... the amount of liability specified in Item 3 [Company's retention] and the liability of the Reinsurer specified in Item 4 above [*i.e.* amount of reinsurance accepted] shall follow that of the Company....

*Provision 3*

All claims involving this reinsurance, when settled by the Company, shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlements, and in addition thereto, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment, its proportion of expenses ... incurred by the Company in the investigation and settlement of claims or suits....

Defendant argues that the phrase "in addition thereto" indicates that liability for defense costs and claim expenses is separate from liability for the loss and should not be capped by the policy limitation. Plaintiffs counter that the phrase above merely differentiates the obligations for loss and for expenses, but in no way excepts expenses from the overall policy limitation.

The Court agrees with plaintiffs. It is well-settled that insurance contracts are to be construed in the same manner as other contracts and if the plain meaning of the contract can be discerned, a court will give effect to that meaning. *See American Home Products Corp. v. Liberty Mutual Ins. Co.,* 565 F.Supp. 1485, 1492 (S.D.N.Y.1983), *modified on other grounds,* 748 F.2d 760 (2d Cir.1984). It is also imperative that a specific provision be read in the context of the insurance policy as a whole. *See American Home,* 565 F.Supp. at 1492. The Court can find no indication in the policies at issue that expenses are to be excluded from the policy limitations. Indeed, the limitation is a "policy" limitation, rather than a "loss" limitation, indicating that the limitation is to be a cap on all payments by the reinsurer under the policy. The Court notes that the cases cited by defendant do not support its position and are distinguishable either because they focus on an insurer's duty to defend, which is inapplicable here, or because they involve policies which specifically exclude expenses from the policy limitation. The Court also notes

that it is not bound by the decision in *Penn Re, Inc. v. Aetna Casualty and Surety Co.,* 85–385–Civ.–5 (E.D.N.C. June 29, 1987) and declines to follow it. In the Court's view, provision 3 merely outlines the different components of potential liability under the policy, namely actual loss and expenses, and in no way indicates that either component is not to come within the policy limitation. Thus, the Court finds that expenses paid by the reinsurer are to be included within policy limitations.

Defendant also argues that the "follow the fortunes" clause in the policies dictates that plaintiffs must pay all expenses even if they are over and above policy limitations. That clause states:

the liability of the Reinsurer [under this Certificate] shall follow that of the Company and except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of the Company's contract.

**\*3** It has been held that such a clause will permit liability of the reinsurer but not beyond the scope of the reinsurance policy, unless there is a genuine ambiguity over whether a certain sum is covered by the policy. *See American Ins. Co. v. North Am. Co. for Property and Casualty Insurance,* 697 F.2d 79, 81 (2d Cir.1982). Since the Court has found no ambiguity as to whether expenses are with policy limitations, this clause will not support a contrary conclusion. Defendant relies on the case of *Peerless Ins. Co. v. Inland Mutual Ins. Co.,* 251 F.2d 696 (4th Cir.1958), which held the reinsurer was obligated to the insurer for settlement funds paid by the insurer over and above the reinsurance policy limitation, primarily because the reinsurer did not oppose the settlement between the insurer and the insured. The Court, however, specifically indicated that it expressed no opinion as to a situation where the reinsurer would not consent to a settlement. In the present case, plaintiffs indicate and defendant does not dispute that plaintiffs opposed Aetna's settlement with Robins in which Aetna agreed to pay Robins' costs and expenses above Aetna's policy limitations. Thus, *Peerless* is inapplicable.

It is also clear that the "follow the fortunes" provision is expressly subject to the other conditions in the policy, namely the policy limitation. The Court can find no indication that that provision was intended to override the policy limitation and if, in fact, it was as broad as defendants argue, the policy limitation and other conditions would serve no purpose if the reinsurer was merely obliged to reimburse the insurer for any and all funds paid. For these reasons, the Court concludes

1989 WL 106469

that the "follow the fortunes" provision does not warrant a finding that plaintiffs must pay expenses which would exceed the policy limitation.

#### CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is granted and defendant's motion for summary judgment is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1989 WL 106469

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Bellefonte Reinsurance Co. v. Aetna Cas. And Sur. Co., Not Reported in F.Supp. (1989)

1989 WL 146248

1989 WL 146248
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

BELLEFONTE REINSURANCE COMPANY, Mission
Insurance Company, the Insurance Company
of the State of Pennsylvania, North American
Company for Property and Casualty Insurance,
Constitution Reinsurance Corporation and Gerling
Global Reinsurance Corporation, Plaintiffs,

v.

The AETNA CASUALTY AND
SURETY COMPANY, Defendant.

No. 85 CIV. 2706(JFK).  |  Nov. 22, 1989.

**Attorneys and Law Firms**

Clarkson S. Fisher, Jr., Ober, Kaler, Grimes & Shriver, New
York City, for plaintiffs.

Kornstein, Veisz & Wexler, New York City (Howard S.
Veisz, Richard Lubarsky, of counsel), Pepper, Hamilton &
Scheetz, Philadelphia, Pa. (Deborah F. Cohen, Henry M.
Justi, David Castro, Susan B. Hoekema, of counsel), for
defendant.

**OPINION**

KEENAN, District Judge:

**\*1** On September 5, 1989, this Court issued an Opinion
and Order granting plaintiffs summary judgment. Before
the Court now is the motion of defendant The Aetna
Casualty and Surety Company (hereinafter "Aetna") for
reconsideration of this Court's decision. Defendant moves
pursuant to Fed.R.Civ.P. 59(e)[1] and Local Rule 3(j),[2] and
bases its motion on the ground that "the Court failed to
consider that a genuine issue of material fact exists regarding
the interpretation of the reinsurance contracts at issue." Mem.
at 1.

Plaintiffs argue that this motion was not timely filed in that
it was filed on September 19, 1989, and this Court's decision
was entered on September 5, 1989. Plaintiffs argue, then,
that since the motion was filed more than ten days after the
decision was rendered, both Rule 59 and Rule 3(j) dictate

that the motion has no effect. The Court finds, however,
that the motion was timely filed. Pursuant to Fed.R.Civ.P.
6(a), "When the period of time prescribed or allowed is less
than 11 days, intermediate Saturdays, Sundays, and legal
holidays shall be excluded in the computation." According to
the Court's calculations, the motion was properly filed on the
last possible day.

Plaintiffs also argue that because defendant filed a notice
of appeal on October 4, 1989, this Court no longer has
jurisdiction over this motion. The Court finds, however,
that pursuant to Fed.R.App.P. 4(a)(4), if a motion for
reconsideration is timely filed, as we have found this motion
to be, "A notice of appeal filed before the disposition of [a
Rule 59 motion] shall have no effect." Defendant's notice
of appeal, therefore, has no effect, and this motion for
reconsideration is properly before this Court.

In its September 5, 1989 Opinion and Order, this Court
determined that defendant, as reinsurer, was obligated to
pay claim expenses of the reinsured party. In addition, the
Court found the reinsurance policy to be unambiguous and
determined that the "follow the fortunes" clause did not
support a contrary conclusion. The defendant was thus found
obligated to pay plaintiffs' expenses.

Defendant now argues that the Court failed to consider
an "argument" which was set forth in footnote two of
its brief in response to plaintiffs' Motion for Summary
Judgment. Defendant asserts that, according to footnote two,
the "meaning of the 'follow the fortunes' clause ... [is a]
factual issue which must be decided after full development ...
of the practices and customs in the insurance industry."
*Reliance Insurance Co. v. Ocaso, S.A.,* 1987 U.S. Dist.
LEXIS 7349 (E.D.Pa. August 13, 1987). In support of its
motion for reconsideration, defendant cites several insurance
treatises and relies mainly on two cases considered by the
Court in its prior decision, *American Insurance Co. v. North
American Co. for Property and Casualty Insurance,* 697 F.2d
79 (2d Cir.1982) and *Peerless Insurance Co. v. Inland Mutual
Insurance Co.,* 251 F.2d 696 (4th Cir.1958). Defendant
argues that these treatises and cases are "evidence" that
contradict plaintiffs' position that a "reinsurer's liability is
fixed solely by its direct contract." Mem. at 6.

**\*2** The Court finds that defendant has merely reiterated its
previous argument. Defendant has conceded that it presents
no controlling decisions, Reply Mem. at 8, and merely argues
that "The Court seemingly overlooked the significance of the

Bellefonte Reinsurance Co. v. Aetna Cas. And Sur. Co., Not Reported in F.Supp. (1989)

1989 WL 146248

'follow the fortunes' clause." Reply Mem. at 1. Defendant's argument is without merit. The Court did indeed consider the "follow the fortunes" clause in the policies and found that, because the underlying policy was unambiguous, the "follow the fortunes" clause did not "warrant a finding that plaintiffs must pay expenses which would exceed the policy limitation." Opinion at 7.

The Court finds, therefore, that defendant has not met the requirements of Rule 3(j) and has failed to present matters or controlling decisions which were not previously considered by the Court in issuing its September 5, 1989 Opinion

and Order. *See Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989); *United States v. International Business Machines Corp.,* 79 F.R.D. 412, 414 (S.D.N.Y.1978). The Court thus adheres to its decision, and defendant's motion for reconsideration is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1989 WL 146248

Footnotes

1  Fed.R.Civ.P. 59(e) provides: "A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment."

2  Local Rule 3(j) provides:
    A notice of motion for reargument shall be served within ten (10) days after the docketing of the court's determination of the original motion and shall be served at least the same number of days before the return day as was required for the original motion. There shall be served with the notice of motion a memorandum setting forth concisely the *matters or controlling decisions which counsel believes the court has overlooked.*
    (emphasis added).

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

SPA-25

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| CENTURY INDEMNITY COMPANY, et al | : | JULY TERM, 2012 |
| | : | |
| Plaintiffs | : | NO. 02928 |
| | : | |
| v. | : | COMMERCE PROGRAM |
| | : | |
| ONEBEACON INSURANCE COMPANY | : | CONTROL NO. 15012312 |
| | : | |
| Defendant | : | |

DOCKETED

MAR 2 7 2015

R. POSTELL
DAY FORWARD

## ORDER

**AND NOW**, this 27th day of March, 2015, upon consideration of the motion for summary judgment of defendant, OneBeacon Insurance Company, and any response thereto, it is hereby

## ORDERED

that the said motion is **DENIED**.

BY THE COURT:

_____

GLAZER, J.

Century Indemnity Compa-ORDOP

12070292800172

SPA-26

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| CENTURY INDEMNITY COMPANY, et al | : | JULY TERM, 2012 |
| | : | |
| Plaintiffs | : | NO. 02928 |
| | : | |
| v. | : | COMMERCE PROGRAM |
| | : | |
| ONEBEACON INSURANCE COMPANY | : | CONTROL NO. 15012312 |
| | : | |
| Defendant | : | |

### OPINION

GLAZER, J.

March 27, 2015

Before the court is the motion for summary judgment of defendant, OneBeacon Insurance Company

## I. PROCEDURAL AND FACTUAL HISTORY

Defendant, OneBeacon Insurance Company ("OneBeacon), has filed the instant motion for summary judgment against plaintiffs, Century Indemnity Company ("Century") and Pacific Employers Insurance Company ("PEIC"). The heart of this case involves facultative reinsurance certificates—whereby insurance companies shift all or a part of its risk from the underlying policy to other insurance companies. It is insurance for insurance companies. The parties entered into the following three certificates:

> 1. Century's predecessor-in-interest, Insurance Company of North America ("INA"), issued a liability policy (number X153672) to J-M Manufacturing Company, Inc., a subsidiary of Formosa Plastics Corporation ("Formosa"), which was subsequently renewed (number XBC 540715).

1

2. OneBeacon's predecessor, General Accident, issued to INA a Certificate of Facultative Reinsurance FC 4513 reinsuring Formosa Policy XBC 153672. The certificate was renewed by endorsement to cover Formosa Policy XBC 540715.

3. PEIC issued a liability policy (number XMO 014527) to Gould Pumps, Inc. General Accident issued Certificate of Facultative Reinsurance FC 4233 to PEIC, reinsuring the Gould Policy. General Accident also issued a second issued Certificate of Facultative Reinsurance to PEIC, FC 6025, reinsuring the renewal of the Gould Policy.

Plaintiff's Response to Defendant's Motion for Summary Judgment, at 4-8; Defendant's Motion for Summary Judgment, Ex. 1-3. In essence, these policies stipulate that plaintiffs agreed to defend the underlying policy holders up to a certain amount, and defendant would then reinsure a portion of plaintiffs' losses. See id.

Essentially, the relevant provisions of the aforementioned facultative reinsurance certificates (hereinafter collectively referred to as "facultative certificates" or "certificates") are identical. The only differences among the certificates, which do not impact the court's decision, include the amounts of the Reinsurance Accepted, the names of the insured and reinsured, the reinsurance premiums, the dates of the reinsurance and details regarding the underlying insurance policies and underlying reinsurance. Since the language in question is identical in each certificate, the three certificates shall be analyzed together.

The front page of the facultative certificates provide the amount of "Reinsurance Accepted" in Section IV, and further states: "In consideration of the payment of the net premium and subject to the general conditions set forth on the reverse side hereof, the reinsurer does

2

hereby reinsure [Name of the Company's Insured]."[1] Defendant's Motion for Summary Judgment, Ex. 1-3. The relevant portions of the "general conditions" on the back page of the certificates convey the following terms:

> General Condition 1
>> [T]he liability of the Reinsurer specified in Section IV shall follow that of the Company and, except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of the Company's policy....

> General Condition 3
>> All claims involving this reinsurance, when settled by the Company, shall be binding on the Reinsurer, who shall be bound to pay its proportionate share of such settlements, and in addition thereto, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment, its proportionate share of expenses ... incurred by the Company in the investigation and settlement of claims or suits....

Id. Defendant filed the instant motion for summary judgment on two grounds: (1) that the limit stated in Section IV "Reinsurance Accepted" places a total cap on defendant's liability, which includes in its calculation the expenses referred to in Condition 3, and (2) that plaintiffs are not entitled to an award of interest on payments. Conversely, plaintiffs contend that it is entitled to recover its expenses in addition to the stated "Reinsurance Accepted" limits and is entitled to an award of interest on the payments received. For the reasons stated herein, defendant's motion is denied.

## II. DISCUSSION

### A.    Standard of Law

Once the relevant pleadings have closed, any party may move for summary judgment "in cases where there are no genuine issues of material fact and the moving party is entitled to

---

[1] Again, while the amount of "Reinsurance Accepted" varies between the certificates, the specific figures are irrelevant for purposes of deciding the instant motion.

3

judgment as a matter of law." Lance v. Wyeth, 85 A.3d 434, 449 (Pa. 2014) (citations omitted);
Pa.R.C.P. No. 1035.2. When considering the merits of the motion, a court shall view the record
in the light most favorable to the non-moving party, and all doubts as to the existence of a
genuine issue of material fact must be resolved against the moving party. Fine v. Checcio, 870
A.2d 850, 857 (2005). Summary judgment may be granted only when the judgment is "clear and
free from doubt." Id. at 857 (citations omitted).

      B.    Interpreting the Terms Governing Expenses

      Defendant first requests the court to grant summary judgment on the issue that it does not
owe payments—including expenses—in excess of the stated Reinsurance Accepted limits
provided in the facultative certificates. Terms and conditions of facultative certificates
incorporated within Reinsurance Accepted limits and whether the calculation of expenses are
included, or separate and apart, from the stated limit has been interpreted by our federal courts
and neighboring states. However, this is a case of first impression for Pennsylvania courts.[2] The
court has examined relevant cases published by other courts as persuasive authority, but is left to
conduct its own analysis under Pennsylvania law without the guidance of binding authority.

      When tasked with interpreting the meaning of a contract, the principle rule is to ascertain
and give effect to the intent of the contracting parties. Murphy v. Duquesne Univ. Of The Holy
Ghost, 777 A.2d 418, 429 (Pa. 2001). A provision in a contract is ambiguous "if it is reasonably
susceptible of different constructions and capable of being understood in more than one sense."
Id. at 430.

      1.    Distinguishing Bellefonte case

---

[2] Defendant conducted a choice of law analysis in its motion for summary judgment, but the parties do not dispute
that the Reinsurance Accepted limits shall be governed by Pennsylvania law. The court agrees that Pennsylvania
law applies.

Defendant suggests that this court adopt the reasoning of Bellefonte Reinsurance Co v. Aetna Cas. & Sur. Co., 903 F.2d 910 (2d Cir. 1990) and its progeny as controlling in the case at bar. In Bellefonte, the Second Circuit Court of Appeals held that the "in addition thereto" language for expenses remained limited to the reinsurers' overall liability cap. The court specifically focused on a clause in the certificate that stated, "in consideration of the payment of the premium and *subject to the* terms, conditions and *amount of liability* set forth herein…" (emphasis added). Because the "in addition thereto" provision governing expenses was a term "subject to" the amount of liability, the court reasoned that defense costs were not exempt from the limitation. See id. at 913-14. However, the Second Circuit recently clarified that Bellefonte did not establish a blanket rule that all limits of liability are presumptively expense-inclusive. See Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc., No. 13-4170-CV, 2014 WL 6804553, at *4 (2d Cir. Dec. 4, 2014). The court emphasized that the wording of a "subject to" clause plays a key role in creating such a presumption. Id. This presumption can still be overcome. Even if a condition mirrors the language used in Bellefonte, a court must still analyze the certificate as a whole in order to discern its meaning and conclude whether expenses are included, or in addition, to the limit of liability. Id. (noting the ability to overcome a presumption of expense-inclusiveness by means other than explicit language or the presence of a separate limit for expenses).

The language of the certificates in this case, while similar to Bellefonte, contains slight variations which leads to a different conclusion. First, language on the front side of the certificates states the premium is "subject to the general conditions set forth on the reverse side hereof…." General Condition 1 reinforces this premise as it states that "[t]he liability … shall be subject …to all the terms and conditions of the Company's policy." The difference between this

5

SPA-31

language and that of <u>Bellefonte</u> cannot be ignored. Instead of the terms being subject to the liability as in <u>Bellefonte</u>, the liability is subject to the terms and conditions. This places greater emphasis on the conditions themselves, which may trump other aspects of the certificates. As a result, a condition that excludes expenses in calculating the total loss limit holds more weight than the amount of "Reinsurance Accepted" when interpreting these certificates.

<u>Bellefonte</u> highlighted the importance of the "subject to" clause, and <u>Utica</u> demonstrated the ability of a court to reach a different interpretation. If anything, the terms of the certificates may have created a presumption of expense-*exclusiveness*. Having scrutinized the precise terms on their own, and then viewing the certificate as a whole, this court finds that defendant is not entitled to summary judgment on this issue.

2.     <u>Use of Extrinsic Evidence</u>

*Assuming arguendo* this court interpreted the certificate as being analogous to <u>Bellefonte</u>, the court would still have denied defendant's motion on the grounds that a latent ambiguity exists. In order to fully discern the intent of the parties, courts should not wear blinders and analyze the document in a vacuum. <u>Id.</u> An ambiguity may appear in the form of a "latent ambiguity" which "arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." <u>Steuart v. McChesney</u>, 444 A.2d 659, 663 (Pa. 1982).

Defendant claims that it is inappropriate to use extrinsic evidence when interpreting the certificates because they are facially unambiguous. In general, unless a contract explicitly prohibits its use, "custom or usage, once established, is considered a part of a contract and binding on the parties though not mentioned therein, the presumption being that they know of and contracted with reference to it." <u>Resolution Trust Corp. v. Urban Redevelopment Auth. of</u>

6

Pittsburgh, 638 A.2d 972, 976 (Pa. 1994); See also Sunbeam Corp. v. Liberty Mut. Ins. Co., 781

A.2d 1189, 1193 (Pa. 2001) (asserting that "custom in the industry or usage in the trade is always

relevant and admissible in construing commercial contracts and does not depend on any obvious

ambiguity in the words of the contract."). Such evidence would be particularly useful for

facultative certificates, which consist of bare-bone terms—far from the exhaustive nature of

typical insurance policies. See Koken v. Legion Ins. Co., 831 A.2d 1196, 1209-10 & n. 25 (Pa.

Commw. Ct. 2003) (describing the agreements between ceding companies and their reinsurers as

casual in nature and operating on "the handshake rather than the 'get in writing' principle."); see

also Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc., No. 13-4170-CV, 2014 WL 6804553,

at *4 (2d Cir. Dec. 4, 2014) (holding the conditions regarding the limit of loss liability was

ambiguous, which required the consideration of extrinsic evidence).

Plaintiffs argue that extrinsic evidence is not only permitted, but necessary, in order to

construe the terms of the contract in its entirety, and use of such evidence permits reasonable

minds to interpret the terms in a different manner than defendant. This court agrees. The

application of industry custom and usage influences the meaning of the certificates, and

highlights the existence of genuine issues of material fact which are to be determined by the

finder of fact.

    C.    Collateral Estoppel

Defendant also moves for summary judgment on the grounds that plaintiffs are

collaterally stopped from arguing their case due to the holdings in Pacific Employers Ins. Co. v.

Global Reinsurance Corp., No. Civ. A. 09-6055, 2010 WL 1659760 (E.D. Pa. Apr. 23, 2010),

and Global Reinsurance Corp. v. Century Indemnity Co., No. 13 Civ. 06577, 2014 WL 4054260

(S.D.N.Y. Aug. 15, 2014). However, these cases do not hold the necessary weight of final

7

judgments at this juncture in order to apply collateral estoppel against plaintiffs.[3]  Also, this court shall not apply collateral estoppel on the basis that the slightly different wording of the "subject to" clause may prove to be an influential factor in the interpretation of the certificate.

      D.    <u>Defendant's Motion on Payments of Interest</u>

      Finally, defendant has sought summary judgment on the same issue that plaintiffs filed their own partial motion for summary judgment on—payments of interest.  This court granted plaintiffs' motion (Control No. 15012313), and for the reasons provided therein, defendant's motion is denied.

## III. CONCLUSION

      Based on the foregoing, defendant's motion for summary judgment is denied in whole.

                                    **BY THE COURT:**

                                    GLAZER, J.

---

[3] In <u>PEIC v. Global</u>, due to its finding on another issue, the Third Circuit chose not to consider the "limit-of-liability" issue and dismissed it as moot. <u>PEIC</u>, 693 F.3d at 425 n. 3.  The court in <u>Global v. Century</u> referred the matter to a Magistrate judge so the parties could negotiate the terms of a final order. <u>Global</u>, 2014 WL 4054260; <u>see also</u> Defendant's Motion for Summary Judgment, at 27. Since the finding remains subject to a motion for reconsideration and has not been appealed, it does not qualify as a final judgment.

8

2010 WL 1659760
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

PACIFIC EMPLOYERS
INSURANCE COMPANY, Plaintiff,
v.
GLOBAL REINSURANCE CORPORATION OF
AMERICA (Formerly Known as Constitution
Reinsurance Corporation), Defendant.

Civil Action No. 09–6055.  |  April 23, 2010.

**Attorneys and Law Firms**

Christine Gellert Russell, Brendan D. McQuiggan, White and
Williams, Philadelphia, PA, for Plaintiff.

Bonny S. Garcha, Mark G. Sheridan, Bates & Carey
LLP, Chicago, IL, William F. McDevitt, Christie Pabarue
Mortensen & Young, Philadelphia, PA, for Defendant.

*MEMORANDUM*

ROBERT F. KELLY, Senior District Judge.

 **\*1** Presently before the Court are Cross–Motions for
Judgment on the Pleadings filed by Defendant Global
Reinsurance Corporation of America ("Global") and Plaintiff
Pacific Employers Insurance Company ("PEIC") as to Count
II of Global's Counterclaim for Declaratory Judgment. For
the following reasons, Global's Motion is granted and PEIC's
Motion is denied.

## I. BACKGROUND

The claims in this case relate to a reinsurance contract.[1] For
the period June 1, 1980 to June 1, 1981, PEIC entered into a
facultative reinsurance contract[2] ("Facultative Certificate")
with Global, Certificate No. 68224, through which Global,
as the reinsurer, agreed to reinsure an umbrella commercial
liability policy (No. XMO–003649) ("Direct Policy") that
PEIC issued to the Buffalo Forge Company ("Buffalo
Forge").

The first page of the Facultative Certificate (the "Declarations
page") sets forth specific information regarding the

reinsurance agreement between PEIC and Global, including
the names of the parties, the dollar amount of risk retained
by PEIC ($1 million), and the dollar amount of reinsurance
accepted by Global. Specifically, "Item 3" and "Item 4" of
the Declarations page states:

ITEM 3–COMPANY [PEIC] RETENTION

THE FIRST $1,000,000 SUBJECT TO FACULTATIVE
REINSURANCE.

ITEM 4–REINSURANCE ACCEPTED

$1,000,000 ANY ONE OCCURRENCE AND IN
THE AGGREGATE WHERE APPLICABLE PART OF
$4,000,000 WHICH IS EXCESS OF $1,000,000 WHICH
IN TURN IS EXCESS OF UNDERLYING INSURANCE.

(Compl., Ex. A at 1.)

The second page of the Facultative Certificate is titled
"Reinsuring Agreements and Conditions." Significantly, the
preamble on this page states:

> In consideration of the payment of the
> premium, ***and subject to the terms,***
> ***conditions and limits of liability set***
> ***forth herein and in the Declarations***
> ***made a part thereof,*** the Reinsurer
> does hereby reinsure the ceding
> company named in the Declarations
> (herein called the Company) in respect
> of the Company's policy(ies) as
> follows:

(*Id.* at 2 (emphasis added).) Following this first sentence, the
second page of the Facultative Certificate outlines conditions
A through L, which in relevant part, provide:

> A.... The liability of the Reinsurer, as specified in Item
> 4 of the Declarations, shall follow that of the Company
> and shall be subject in all respects to all the terms
> and conditions of the Company's policy ***except when***
> ***otherwise specifically provided herein*** or designated as
> non-concurrent reinsurance in the Declarations ....

> E. All loss settlements made by the Company, provided
> they are within the terms and conditions of this
> Certificate of Reinsurance, shall be binding on the
> Reinsurer. ***Upon receipt of a definitive statement of***
> ***loss, the Reinsurer shall promptly pay its proportion of***

SPA-35

*such loss as set forth in the Declarations. In addition thereto, the Reinsurer shall pay its proportion of expenses (other than office expenses and payments to any salaried employee) incurred by the Company in the investigation and its proportion of court costs and interest on any judgment or award, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment ....*

**\*2** (*Id.* (emphasis added).)

At some point after the Facultative Certificate was executed, Buffalo Forge and its corporate successors were named as defendants in numerous asbestos products personal injury lawsuits. PEIC participated in the defense and indemnity of Buffalo Forge pursuant to the Direct Policy.

By September 2009, PEIC's payments on behalf of Buffalo Forge exceeded the $1 million retention on the Facultative Certificate. On or around September 2, 2009, PEIC billed Global pursuant to the Facultative Certificate. Along with the billing, PEIC submitted supporting information and portions of its investigative claim file to Global. In response, Global requested additional documentation to support the billing. According to PEIC, Global has not paid the amounts billed pursuant to the Facultative Certificate. Specifically, at the time of PEIC's Complaint, Global allegedly "owe[d] PEIC $559,072 under the Facultative Certificate for its share of defense and indemnity payments in connection with the underlying asbestos claims against Buffalo Forge." (Compl.¶ 27.)

PEIC filed its Complaint against Global in this Court on December 18, 2009. Count I of the Complaint alleges breach of contract and Count II seeks declaratory relief for a declaration of its rights under the Facultative Certificate. On February 24, 2010, Global filed its Answer, Affirmative Defenses, and Counterclaim. In Count II of its Counterclaim, Global seeks a declaration that the $1 million limit of liability set forth in the Facultative Certificate is the maximum that PEIC could potentially recover under the Facultative Certificate in connection with the asbestos litigation liabilities. On February 25, 2010, PEIC filed its Answer to Global's Counterclaim.

On February 26, 2010, Global filed its Motion for Judgment on the Pleadings regarding Count II of its Counterclaim. On March 19, 2010, PEIC filed its Response in Opposition to Global's Motion and a Cross–Motion for Judgment on

the Pleadings regarding Count II of Global's Counterclaim. Specifically, PEIC requests that the Court find that as a matter of law Global is obligated for up to $1 million of loss and, in addition thereto, a pro rata share of expenses pursuant to the language of the Facultative Certificate. On April 2, 2010, Global filed a Response to PEIC's Cross–Motion for Judgment on the Pleadings. On April 8, 2010, PEIC filed a Reply.

The issue raised by the instant Motions is whether expenses are subject to the $1 million limit stated in the "Reinsurance Accepted" section of the Facultative Certificate. PEIC alleges that the $1 million cap does not apply to the expenses and Global claims that it does.

## II. *STANDARD OF REVIEW*

Federal Rule of Civil Procedure 12(c) allows any party to move for judgment on the pleadings after the pleadings have closed, but not within such time as to delay trial. In order to prevail on such a motion, the movant must show "that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law." *Mele v. Fed. Reserve Bank of N.Y.,* 359 F.3d 251, 257 (3d Cir.2004). In considering a motion for judgment on the pleadings, this Court views the facts alleged in the pleadings as true and any inferences to be drawn therefrom in the light most favorable to the non-movant. *Id.*

## III. *DISCUSSION*

### A. General Contract Interpretation Principles

**\*3** The basic rule of contract interpretation is to ascertain and give effect to the intent of the contracting parties. *Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 429 (Pa.2001). "When the terms of a contract are clear and unambiguous, then intent of the parties is to be ascertained from the document itself." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.,* 588 Pa. 470, 905 A.2d 462, 481 (Pa.2006). The issue of whether contractual language is ambiguous is a question of law. *Trombetta v. Raymond James Fin. Servs., Inc.,* 907 A.2d 550, 561 (Pa.Super.Ct.2006).

As a general matter, contractual terms that are ambiguous are to be construed against the drafter. *Meeting House Lane, LTD. v. Melso,* 427 Pa.Super. 118, 628 A.2d 854, 858 (Pa.1993). Ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law. *Mellon Bank, N.A. v. Aetna Bus. Credit,*

*Inc.,* 619 F.2d 1001, 1011 n. 10 (3d Cir.1994). "A contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible to different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." *Metzger v. Clifford Realty Corp.,* 327 Pa.Super. 377, 476 A.2d 1, 5 (Pa.Super.Ct.1984) (citation omitted). [3]

**B. The Unambiguous Facultative Certificate Language**

"Item 4" on the Declarations page of the Facultative Certificate outlines the "REINSURANCE ACCEPTED": "$1,000,000 ANY ONE OCCURRENCE AND IN THE AGGREGATE ...." (Compl., Ex. A at 1.) The parties do not dispute that the language in "Item 4" of the Facultative Certificate sets some type of $1 million cap. The issue in dispute is whether that cap encompasses expenses or excludes them.

The Court finds that this broad and unambiguous language clearly encompasses expenses because it defines Global's maximum exposure under the Facultative Certificate. Notably, as argued by Global, the clause does not differentiate between reinsurance accepted for "losses" versus reinsurance accepted for "expenses." The language simply provides a $1 million total cap on liability for loss payments, expense payments, or any combination thereof. Indeed, if the parties intended to exclude expenses from the total liability limit, they could have made that clear through Item 4's language or another part of the Facultative Certificate. They did not do so. [4]

PEIC argues that Paragraph E of the second page of the Facultative Certificate (titled "Reinsuring Agreements and Conditions") parses out expenses from this $1 million cap. As mentioned, Paragraph E states:

> E. All loss settlements made by the Company, provided they are within the terms and conditions of this Certificate of Reinsurance, shall be binding on the Reinsurer. *Upon receipt of a definitive statement of loss, the Reinsurer shall promptly pay its proportion of such loss as set forth in the Declarations. In addition thereto, the Reinsurer shall pay its proportion of expenses (other than office expenses and payments to any salaried employee) incurred*

> *by the Company in the investigation and its proportion of court costs and interest on any judgment or award, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment ....*

**\*4** (*Id.* at 2 (emphasis added).)

PEIC claims that the two bolded sentences above create two separate obligations and exclude the payment of expenses from the liability limit set forth in Item 4 of the Declarations. In regard to the first sentence, PEIC argues that it establishes an obligation for Global to pay a "proportion" of loss as set forth in Item 4 of the Declarations. It argues that the sentence makes clear—by linking "loss" to the Declarations—that the cap in Item 4 exclusively relates to Global's loss payments. PEIC emphasizes that there is a period before the second sentence where expenses are discussed. Further, PEIC argues that the second sentence includes the language "[i]n addition thereto" and adds a second obligation for Global to pay its proportion of expenses without any reference to the Declarations. Thus, PEIC contends that the cap in Item 4 of the Declarations does not apply to Global's payment of expenses pursuant to the Facultative Certificate.

PEIC's arguments are without merit. Paragraph E does not outline limits of liability, but merely outlines the two separate proportions of losses and expenses that Global is obligated to pay pursuant to the Facultative Certificate. The loss proportion just happens to originate from the Declarations page and that is why the Declarations are referenced in the first bolded sentence. The paragraph merely outlines that Global will reimburse PEIC's losses pursuant to one proportion and that "in addition" it will reimburse PEIC's expenses according to a different proportion. Paragraph E does not mention a separate limit for expenses. Further, it says nothing about excluding expenses from the $1 million cap delineated in Item 4 of the Declarations. Again, if the parties intended to exclude expenses from this total liability limit, they could have made that clear in some section of the Reinsurance Certificate—including Paragraph E.

Moreover, as previously noted, Paragraph E is preceded by a preamble paragraph—which is applicable to all paragraphs of the "Reinsuring Agreements and Conditions" page—which states: "In consideration ... of the premium, *and subject to the terms, conditions and limits of liability set forth herein and in the Declarations made apart thereof,*

the Reinsurer does hereby reinsure the ceding company named in the Declarations ... in respect of the Company's policy(ies) as follows." (*Id.* at 2 (emphasis added).) This sentence makes clear that Global's reinsurance obligations, including those outlined in Paragraph E, are "subject to" the "terms, conditions, and *limits of liability"* contained in the Declarations and on the "Reinsuring Agreements and Conditions" page. The only limit of liability in the Facultative Certificate is the $1 million limit found in Item 4 of the Declarations. Thus, this limit applies notwithstanding any language in Paragraph E.

This case is similar to *Bellefonte Reinsurance Company v. Aetna Casualty and Surety Company* where the Second Circuit held that reinsurers were not liable for defense costs beyond the policy limits outlined in the reinsurance certificates. 903 F.2d 910, 914 (2d Cir.1990). In *Bellefonte,* the court also considered an argument from a reinsured that an "in addition thereto" expense clause in certain reinsurance certificates indicated that liability for defense costs was separate from liability for underlying losses and, thus, not subject to the overall liability limitation. *Id.* at 913. The court disagreed and found:

> **\*5** We read the phrase "in addition thereto" merely to differentiate the obligations for losses and for expenses. *The phrase in no way exempts defense costs from the overall monetary limitation in the certificate. This monetary limitation is a cap on all payments under the certificate.* In our view, the "in addition thereto" provision merely outlines the different components of potential liability under the certificate. It does not indicate that either component is not within the overall limitation.

*Id.* (emphasis added). The court further noted: "Here, the limitation on liability provision capped the reinsurers' liability under the certificates. All other contractual language must be construed in light of that cap." *Id.* at 914.

Other federal courts considering this issue in reinsurance cases have agreed with and followed the Second Circuit's reasoning in *Bellefonte*—even when analyzing different contractual language and circumstances. *See e.g., Unigard Security Ins. Co. v. North River Ins.* Co., 4 F.3d 1049,

1071 (2d Cir.1993) ("Provision 1 of the Certificate, like the certificate in *Bellefonte,* provides that Unigard agreed to reinsure North River 'in consideration of the payment of the reinsurance premium and subject to the terms, conditions, limits of liability, and Certificate provisions set forth herein. In *Bellefonte,* we stated, 'the limitation on liability provision capped the reinsurers' liability under the [Certificate]. All other contractual language must be construed in light of that cap.' "); *Allendale Mut. Ins. Co. v. Excess Ins. Co. ., Ltd., 992 F.Supp. 271, 277 (S.D.N.Y.1997)* ("Thus *Bellefonte* and *Unigard's* holdings that the limit clauses define the reinsurers' bargained-for-maximum exposure to liability inclusive of all costs and expenses are applicable even where the underlying insurance policy does not oblige the insurer to cover the insured's defense costs."). [5]

The parties dispute the authoritative impact of *Bellefonte* and its progeny because the contractual language of each reinsurance contract is different and due to the fact that there is a disagreement over the controlling law in this case. At a minium, however, *Bellefonte* and its progeny are well-reasoned, persuasive authority. [6] 1A Couch on Insurance § 9:29 (3d ed.2009) (insurance treatise citing *Bellefonte* for the proposition that "the liability for defense costs will not extend beyond the limit of liability as stated in the reinsurance agreement"). In addition to its own interpretation of the language of the Facultative Certificate in this case, this Court agrees with and follows the reasoning of *Bellefonte, Allendale,* and *Unigard.* The cap in Item 4 of the Facultative Certificate encompasses expenses and defines Global's maximum exposure.

For the reasons set forth above, the Court finds that there are no material issues of fact and judgment as a matter of law is appropriate, in favor of Global, as to Count II of its Counterclaim for Declaratory Judgment. Global's maximum exposure pursuant to the Facultative Certificate is $1 million —inclusive of expenses. Accordingly, Global's Motion for Judgment on the Pleadings will be granted and PEIC's Motion will be denied.

**\*6** An appropriate Order follows.

### ORDER

**AND NOW,** this 23rd day of April, 2010, upon consideration of Defendant Global Reinsurance Corporation of America's Motion for Judgment on the Pleadings (Doc. No. 18) and

Plaintiff Pacific Employers Insurance Company's Cross–Motion for Judgment on the Pleadings (Doc. No. 20) as to Count II of Global's Counterclaim for Declaratory Judgment, and all the Responses and Replies thereto, it is hereby **ORDERED** that Defendant's Motion is **GRANTED** and Plaintiff's Motion is **DENIED.**

It is **ADJUDGED** and **DECLARED** that Global's maximum liability to PEIC under the reinsurance contract, Certificate Number 68224, is $1 million, inclusive of expenses.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1659760

Footnotes

1    As described in PEIC's Complaint, "[i]n a reinsurance contract, a reinsurer agrees to indemnify the reinsured against all or part of the loss that the reinsured may sustain under an insurance policy or policies the company has issued, in exchange for a portion of the premium paid to the reinsured for the insurance policies." (Compl.¶ 7.)

2    "A 'facultative' reinsurance contract reinsures a specific insurance policy or risk, as opposed to 'treaty' reinsurance, which reinsures multiple insurance policies or an entire book of business written by the reinsured." (Compl.¶ 8.)

3    The parties briefly raise a conflicts of law issue despite overwhelmingly citing Pennsylvania law for the contractual interpretation issues. Nevertheless, both parties agree that resolution of any conflicts of law issue is not needed to dispose of the instant Motions. (*See* Global's Mem. of Law in Opp. to PEIC's Cross–Mot. at 12 ("However, the Court need not even undertake the foregoing [conflicts of law] analysis in order to apply New York law here because there is no conflict between New York and Pennsylvania law in the first instance.... In fact, there is no conflict between the laws of any state on this issue ...."); *see also* PEIC's Reply Mem. at 6 ("Myriad of facts remain unknown and/or unproven which bear on the question of what state's law governs the Facultative Certificate .... Such a determination is not necessary for the Court to rule on the pending cross-motions, however, because the basic tenets of contract construction which must be applied do not differ state-to-state.").)

4    As noted by Global, any agreement to treat expenses differently and/or not limit them under the Facultative Certificate would have most likely led to a higher premium for PEIC.

5    The only case that PEIC identifies that directly supports its position is *Penn Re, Inc. v. Aetna Casualty and Surety Company.* No. 85–385–CIV–5, 1987 WL 909519 (E.D.N.C. June 30, 1987). In this 1987 case, after analyzing a reinsurance contract and a similar "in addition thereto" expense clause, a court from the Eastern District of North Carolina found that the reinsurers' payment obligations were "not limited to [the] liability for the risks which the underlying insurance policies covered, but require[d] that, in addition thereto, reinsurers pay their proportion of suit costs and expenses." *Id.* at 9. As an initial matter, *Penn Re* was decided before *Bellefonte* and is a lower court decision. Moreover, as the Second Circuit noted in *Bellefonte,* "the [Penn Re] court did not consider the 'subject to' [preamble] clause ... which makes the 'in addition thereto' language 'subject to' the cap on liability...." *Bellefonte,* 903 F.2d at 914. For these reasons, the Court will not follow the reasoning in *Penn Re.*

6    PEIC cites various commentators that have criticized the *Bellefonte* case. The Court finds these secondary authorities unconvincing and agrees with the sound reasoning of the decision as described above.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:11-cv-06301-JGK   Document 9   Filed 12/12/11   Page 1 of 1

United States District Court
Southern District of New York

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: _____10-12-11____

---

PACIFIC EMPLOYERS INSURANCE CO.,

                              Plaintiff,          11 Civ. 6301 (JGK)

        - against -                                    ORDER

GLOBAL REINSURANCE CORP. OF AM.,

                              Defendant.

---

JOHN G. KOELTL, District Judge:

        The petitioner brought this action to confirm an

arbitration award issue on March 7, 2011.

        The respondent does not dispute that the arbitration award

should be confirmed and contends that it has paid the award.

The petitioner responds that the past billings have been paid

but that the declaratory component of the award remains in

effect and has not been fully performed.

        Because there is no dispute that the arbitration award

should be confirmed, the motion to confirm the arbitration award

is granted.

        The Clerk is directed to enter judgment and to close this

case.

SO ORDERED.

Dated:    New York, New York
          December 9, 2011

                                        John G. Koeltl
                                   United States District Judge

SPA-40

KeyCite Yellow Flag - Negative Treatment
**Declined to Follow by** Pacific Employers Ins. Co. v. Global Reinsurance
Corp. of America, E.D.Pa., April 23, 2010

1987 WL 909519
Only the Westlaw citation is currently available.
United States District Court,
E.D. North Carolina.

PENN RE, INC. and Calvert
Insurance Company, Plaintiffs,
v.
THE AETNA CASUALTY AND
SURETY COMPANY, Defendant

No. 85–385–CIV–5. | June 30, 1987.

**ORDER**

FOX, J.

**\*1** This diversity action is presently before the court on objections to the Magistrate's Memorandum and Recommendation filed on March 4, 1987, which recommended that defendant's motion for summary judgment be allowed. Plaintiffs filed such objections on March 16, 1987, n1 and defendant responded thereto on April 2, 1987. A hearing was held before the court on April 6. On April 7, a conference call was held during which the court indicated that summary judgment in favor of defendant was appropriate, at least insofar as plaintiffs' liability was concerned. Thus, the court indicated that partial summary judgment would be entered and the trial as to the extent of plaintiffs' liability would be continued. This order memorializes such oral grant of partial summary judgment as well as the reasons therefor.

> n1 Defendant also filed an objection to the memorandum and recommendation which will be discussed infra pp. 17–18.

**BACKGROUND**
This dispute has its origin in the now well-known Dalkon Shield litigation. See, e.g., *A.H. Robins Company, Inc. v. Piccinin, 788 F.2d 994* (4th Cir.), cert. denied, *U.S., 107 S.Ct. 251 (1986)*. The Dalkon Shield is an intrauterine contraceptive device on which A.H. Robins Company

(hereinafter "Robins" or "insured") acquired all patent and marketing rights in the mid–1970s. For several years thereafter, Robins engaged in the manufacture and marketing of the device until the manufacture and sale was discontinued due to complaints and lawsuits charging injuries allegedly arising out of its use.

The facts underlying the instant suit have been stipulated to by the parties and are reflected in the pretrial order filed with the court on March 9, 1987. In relevant part, the facts are as follows:

Plaintiff Penn Re, Inc. (hereinafter "Penn Re") is a corporation organized and existing under and by virtue of the laws of the State of North Carolina, having its principal place of business in Burlington, North Carolina. At all times relevant to this action, Penn Re has been engaged in the business of reinsurance management. Plaintiff Calvert Insurance Company (hereinafter "Calvert" or, in conjunction with Penn Re, "plaintiffs" or "reinsurer") is an insurance company incorporated under the laws of the State of Pennsylvania, having its principal place of business in New York, New York. Calvert is admitted to transact insurance business within the State of North Carolina. At all times relevant to this action, Calvert was member of the Penn Re reinsurance group and authorized Penn Re to issue, under specified circumstances, certificates of reinsurance in its name. Defendant The Aetna Casualty and Surety Company (hereinafter "Aetna" or "defendant" or "reinsured") is a corporation organized and existing under and by virtue of the laws of the State of Connecticut, having its principal place of business in Hartford, Connecticut.

From approximately 1968 until 1978, Aetna was the principal liability insurer for Robins, a manufacturer and distributor of pharmaceutical products. During most of the period that Aetna insured Robins, Aetna's liability policies were renewed or rewritten annually. The policies generally were effective from March of one calendar year until March of the next year. With respect to policies issued covering the Dalkon Shield, Aetna's practice for each policy year was to issue two policies to Robins—a primary policy and an excess policy. For most of the policy years, including the two policy years during which plaintiffs reinsured Aetna, the primary policy provided Robins with $ 5,000,000 in coverage, over and above a self-insured retention. The excess policies, which provided coverage over and above the primary policies, had aggregate limits of liability that ranged from $ 5,000,000 to $ 50,000,000.

1987 WL 909519

**\*2** Aetna issued its first liability policy to Robins in 1968. This policy had a three-year term. In 1970, a few months before this policy was due to expire, Robins notified Aetna that it intended to acquire a small Connecticut-based company, Dalkon Corp., that had been licensed to manufacture the Dalkon Shield. Because the product was new and because the anticipated sales volume during the remaining term of the policy then in effect was very small, Aetna endorsed its policy to include liability coverage for the product and did not require Robins to pay any additional premium. In subsequent years, the Dalkon Shield was included in the list of Robins' products covered by Aetna's primary and excess policies. Aetna structured reinsurance that covered substantially all of the risk insured by the excess policies issued to Robins.

Under cover of letter dated June 20, 1975, plaintiffs received a copy of Aetna's Excess Policy Number 58 XN 16 SCA. On September 1, 1975, plaintiffs issued certificate of reinsurance number 15,634. Certificate number 15,634 was effective from March 31, 1975, to March 1, 1976. (This 11–month period is sometimes referred to as "the 1975 policy year.") Certificate number 15,634 reinsured a portion of Aetna's excess policy number 58 XN 16 SCA. The coverage provided by certificate number 15,634 was applicable to a $ 10 million layer of Aetna's risk, over and above $ 40,000,000, i.e., from $ 40,000,000 to $ 50,000,000. Other reinsurers shared the reinsurance of this $ 10 million layer with the plaintiffs.

On July 9, 1976, plaintiffs issued their second certificate of reinsurance to Aetna—number 16,987C. Certificate number 16,987C was effective from March 1, 1976, to March 1, 1977 ("the 1976 policy year"). As with the earlier certificate, number 16,987C reinsured a portion of an Aetna excess policy—number 58 XN 19 SCA. This policy, which was a renewal of 58 XN 16 SCA, had an aggregate limit of $ 50,000,000. This time, however, plaintiffs' liability attached at a much lower point; it was applicable to a $ 15 million layer of Aetna's risk between $ 5,000,000 and $ 20,000,000. Effective June 30, 1976, plaintiffs ceased accepting new submissions for reinsurance from defendant reinsuring Robins' coverage.

Aetna utilized the services of reinsurance intermediaries to place reinsurance for the excess policies that it issued to Robins. The largest amount of reinsurance was placed with London reinsurers or directly with the General Reinsurance Company. For 1975 and 1976, there were 18 companies,

each year, reinsuring the risk of the excess policies issued to Robins in respect of the risk of the Dalkon Shield. For the 1975 policy year, when plaintiffs' first certificate was issued, the reinsurance was arranged through Herbert Clough, Inc. For the 1976 policy year, the placement was made through Guy Carpenter & Co.

By 1975, the Dalkon Shield had begun to generate substantial product liability litigation against Robins across the country.

**\*3** In the present litigation, plaintiffs do not dispute their obligation to reimburse Aetna for expenses and indemnities, but contend that this obligation is limited by the certificate limit of liability, which is Item number 4 under their certificates, i.e., $ 1.5 million per certificate. Plaintiffs have reimbursed Aetna, to date, in a manner consistent with such opinion.

In 1979, as the result of a dispute between Aetna and Robins over the proper methodology for assigning Dalkon Shield claims to the various policy years, Robins instituted a declaratory judgment action against Aetna in chancery court in Richmond, Virginia ("the coverage litigation").

On July 11, 1980, Robins filed its Second and Amended Bill of Complaint in the coverage litigation. Therein Robins alleged for the first time that Aetna erroneously had charged its costs of defending Dalkon Shield suits against the limits of the excess insurance policies. On August 8, 1980, Aetna denied this allegation. Robins, however, did not dispute Aetna's position that expense payments were included within the limits of the primary policies (as opposed to the excess policies).

The two Aetna employees who were assigned principal responsibility for coordinating Aetna's response to Robins' suit, and for negotiating with Robins, were Judge John Shea, a former Connecticut Superior Court judge, and Mr. William McGehee, an experienced claims manager.

After more than three years of litigation, Aetna reached a tentative settlement with Robins. By letter dated August 29, 1983, Judge Shea explained the proposed settlement with Robins to Aetna's reinsurance intermediaries. Judge Shea instructed the intermediaries to distribute copies of the letter to all reinsurers and request the reinsurers to advise whether or not they would support the settlement. Plaintiffs received copies of Judge Shea's letter via both Herbert Clough and Guy Carpenter.

Plaintiffs responded to this request, in the negative, by letters from its counsel dated September 27, 1983. By letter dated August 28, 1984, to Herbert Clough, Inc., Aetna reasserted its contention that if the coverage litigation were settled, its reinsurers would be expected to make expense payments in addition to their certificate amounts. Plaintiffs received the foregoing letter. By letter dated October 5, 1984, from Penn Re's corporate counsel, plaintiffs again responded, again in the negative, to Aetna's letter of August 28, 1984. Aetna, which was tabulating its reinsurers' responses in order to determine which consented and which did not, categorized plaintiffs as "holdouts" insofar as an agreement to the settlement was concerned. Plaintiffs were not named parties in the coverage litigation and made no attempt to intervene therein. Aetna and Robins entered into a Settlement Agreement on October 31, 1984. At that time the only responses Aetna had received from plaintiffs concerning the proposed settlement were plaintiffs' letters of September 27, 1983, and October 5, 1984. The Court of the City of Richmond, Virginia, entered a final order on November 9, 1984, regarding such Settlement Agreement.

*4 Paragraph 1 of the Settlement Agreement reflected that the two excess policies plaintiffs reinsured were "amended by an agreement between Aetna and Robins entered into on March 9, 1987...." Further, paragraph 8 of the Settlement Agreement provided that the aggregate limits of the excess policies, 58 XN 16 SCA and 58 XN 19 SCA, were increased by $ 6,240,000 each. n2

> n2 The contents of the Settlement Agreement were not contained in the pre-trial stipulations.

Thereafter, Aetna informed plaintiffs that plaintiffs were responsible for an additional $ 312,000.00 on each certificate —such amount to cover plaintiffs' share of defense expenses as liquidated in the October 31, 1984, Settlement Agreement. n3 On March 5, 1985, plaintiffs responded by instituting the instant declaratory judgment action.

> n3 Aetna's settlement agreement with Robins plainly cited that an area of controversy between them was whether expenses incurred in defending the Dalkon Shield cases must be paid by Aetna in addition to the aggregate limits of the excess policies. The settlement Robins and Aetna reached ultimately provided for the payment of those expenses along with damage claims by increasing the

aggregate policy limits $ 6,240,000.00 for each year 1975 and 1976.

The effect of this modification was to allow for substantial payments from Aetna for the purpose of investigation, defense or settlement costs including attorneys' fees, experts' fees, and costs incurred in the defense of Dalkon Shield cases and claims exclusive of damage payments. Damage payments were separately defined to include only compensatory damage payments to claimants whether by settlement or in satisfaction of judgment. Thus, while separate, substantial expense payment was provided for each year 1975 and 1976, the settlement had the effect of liquidating those payments with the stipulated amounts for those respective years (i.e., $ 6,240,000.00 per year). (Continued)

Applying the appropriate proportional percentages to the aggregate increase and allowing for an incentive deduction, Aetna arrived at the additional $ 312,000.00 claimed of plaintiff's for each year.

In essence, the above modification entered into by and between Aetna and Robins was a compromise of their respective positions. Such compromise resulted in Aetna's agreeing to pay for suit costs and expenses ($ 6,240,000.00) in addition to being liable for the $ 50,000,000.00 face amount of each excess policy (for a total liability of $ 56,240,000.00) and, Robins' agreeing that Aetna's liability for suit costs and expenses would be within the (new $ 56,240,000.00) excess policy limits and therefore would be capped by such new limits.

This compromise gives rise to two positions taken by plaintiffs herein, to wit, (1) that Aetna should be judicially estopped herein because it has asserted all along vis-a-vis Robins that the policy limits cap the liability to Robins for both damage payments and suit costs (a position Robins agreed to in the 1981 Settlement Agreement); and (2) that Aetna could not agree with Robins to increase plaintiffs' liability on the excess policies without plaintiffs' assent to such increase. These contentions are discussed infra at 18–20.

## ANALYSIS

*5 Initially, the court agrees with the Magistrate's assessment as regards the issue presented for resolution herein,

SPA-43

to wit, whether plaintiffs' obligation to Aetna is capped by the stated limits of liability on the face of the reinsurance certificates (i.e., $ 1.5 million on each certificate) or whether plaintiffs are obligated to pay amounts representing suit costs and expenses in addition to the face amounts of the certificates. For the reasons set out below, the court holds that plaintiffs are obligated to pay amounts representing the actual suit costs and expenses incurred in addition to the face amounts of the certificates.

The parties here agree that their dispute is determined by the language of the reinsurance contracts, that the contracts were made in North Carolina, and that the North Carolina rules of construction of contracts apply. See *Fortress Re, Inc. v. Central National Insurance Company of Omaha, 595 F.Supp. 334, 337 and n. 3 (E.D.N.C.1983),* aff'd in relevant part, *766 F.2d 163, 165 (4th Cir.1985); Calvert Fire Insurance Company v. Yosemite Insurance Company, 573 F.Supp. 27, 29 (E.D.N.C.1983).*

According to North Carolina substantive law, it is "well settled ... that an insurance policy is a contract and its provisions govern the rights and duties of the parties thereto."*Fidelity Bankers Life Insurance Company v. Dortch, 318 N.C. 378, 348 S.E.2d 794, 796 (1986)* (citations omitted). A court is not permitted to rewrite the contract or disregard the express language used therein. Id. Rather, the court's duty is to construe and enforce insurance policies as written, determining the intention of the parties from the language the contract employs. Id.;*Lineberry v. Trust Co., 238 N.C. 264, 77 S.E.2d 652 (1953).* Thus, unless the contract language is ambiguous, North Carolina follows the rule of strict construction. Dortch, 238 N.C. at , 348 S.E.2d at 796;*Duke v. The Mutual Life Insurance Company of New York, 286 N.C. 244, 210 S.E.2d 187, 189 (1974).*

The meaning of the language used in an insurance policy presents a question of law and uncertainties must be resolved against the insuring company.*Wachovia Bank & Trust Company v. Westchester Fire Insurance Company, 276 N.C. 348, 172 S.E.2d 518, 522 (1970).* n4 Although ambiguities must be construed against the insurer, "no ambiguity ... exists unless, in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend."*Id. at 354, 172 S.E.2d at 522* (citation omitted). Otherwise, the contract must be enforced as the parties have made it. Plain language used in the contract is to be interpreted according to its meaning and usage in ordinary speech, unless a contrary definition appears.

Id."Each word is deemed to have been put into the policy for a purpose which will be given effect, if that can be done by any reasonable construction in accordance with [these] principles."*Id. at 355, 172 S.E.2d at 522* (citation omitted); see also *Woods v. Nationwide Mutual Insurance Co., 295 N.C. 500, 246 S.E.2d 778 (1978).*

*\*6 n4 Plaintiffs argue, instead, that this rule of construction, applicable to disputes between a sophisticated insurance company and its individual policyholder, is not applicable in a reinsurance dispute between insurance companies on equal footing. Plaintiffs' Objections filed March 16, 1987, at 3 n. 1. In this regard, plaintiffs rely on *Vera Democrazia Society v. Banker's National Life Ins. Co., 10 N.J.Misc. 632, 633, 160 A. 767, 768 (1932)* ("certainly there is no reason for applying the rule regarding forfeitures to a reinsurance contract, nor the rule that insurance policies should be construed most strictly against the insurance company."). Plaintiffs also rely on a North Carolina Court of Appeals recent decision wherein it held that "the policy considerations applicable to ... contracts of primary insurance between individual consumers are inapplicable in policies of reinsurance between insurance carriers standing on equal footing."*Stonewall Insurance Co. v. Fortress Reinsurers, 83 N.C.App. 263, 269, 350 S.E.2d 131, 134–35 (1986).* Plaintiffs contend that Stonewall teaches that, in North Carolina, parties on equal footing are now to be bound equally by the contracts they sign. However, the court concludes that the general rule of contract construction which has uncertainties in a contract resolved against the drafter thereof is applicable to reinsurance contracts as well as to contracts of insurance between insurance companies and individual policyholders. In any event, as discussed infra, the court finds that no ambiguities exist to be construed either for or against plaintiffs' position.

The language with which the court is concerned sub judice is contained in the provisions portion of each certificate of reinsurance issued for the policy years 1975 and 1976. In relevant part the provisions provide that:

The company warrants to retain for its own account the amount of liability specified in Item 3 unless otherwise provided herein, and the liability of the Reinsurer specified in Item 4 shall follow that of the Company, except as otherwise specifically provided herein, and shall be subject in all respects to all the terms and conditions of the Company's policy. The Company shall furnish the Reinsurer with a copy of its policy and all endorsements thereto, and shall

SPA-44

make available for inspection and place at the disposal of the Reinsurer's authorized representatives at reasonable times any of its records relating to this reinsurance or claims in connection therewith.

Prompt notice shall be given to the Reinsurer by the Company of any occurrence or accident which appears likely to involve this reinsurance and while the Reinsurer does not undertake to investigate or defend claims or suits it shall nevertheless have the right and be given the opportunity to associate with the Company and its representatives at the Reinsurer's expense in the defense and control of any claim, suit or proceeding involving this reinsurance, with the full cooperation of the Company.

**\*7** All claims involving this reinsurance, when settled by the Company, shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlements, and in addition thereto, in the ratio that the Reinsurer's loss payment bears to the company's gross less [loss ?] payment, with respect to business accepted on an excess of loss basis and in the ratio that the Reinsurer's limit of liability bears to the Company's gross limit of liability with respect to business accepted on a pro rata basis, its proportion of expenses, other than Company salaries and office expenses, incurred by the Company in the investigation and settlement of claims or suits and, with the prior consent of the Reinsurer to trial court proceedings, its proportion of court costs and interest on any judgment or award. n5

> n5 Each certificate of reinsurance was issued on a form routinely used by Penn Re.

In objecting to the magistrate's memorandum and recommendation, which would subject plaintiffs to liability for costs and expenses in addition to the specified liability amount (i.e., $ 1.5 million specified in Item 4) plaintiffs contend that an opposite holding was reached by Judge Dupree in *Calvert Fire Insurance Company v. Yosemite Insurance Company, supra.*Arguing that Yosemite must either be followed or distinguished, plaintiffs contend that Yosemite must be followed to the end that the first paragraph of the certificate provisions quoted above (hereinafter "Provision 1") "must be construed to mean that only the liability [amount] 'specified in Item 4' [is] 'subject in all respects to all terms and conditions of [Aetna's] policy.'" ' Plaintiff's Objections at 6 (emphasis in original). The court disagrees with plaintiffs' position inasmuch as the ruling in

Yosemite was concerned with the meaning of Provision 1 as it related to a different factual predicate and is therefore distinguishable.

Yosemite involved the issuance of insurance to Yellow Cab Company, under the terms of which "Yosemite insured Yellow Cab against the liability imposed upon it by law arising out of the operation of its taxi cabs subject to a self-insured retention or deductible of $ 25,000 to be applied against losses under Yosemite's policy."*573 F.Supp. at 28.*Plaintiffs herein were also plaintiffs in Yosemite, and they had agreed to reinsure Yosemite for "fifty percent of each loss that was greater than $ 25,000 up to a limit of $ 300,000."*Id.* (footnote omitted). After issuance of the policy, Yellow Cab went into bankruptcy and Yosemite became liable under its policy to pay claims within Yellow Cab's self-insured retention of $ 25,000. Id. Yosemite then made demand that plaintiffs pay under their reinsurance contract the claims of less than $ 25,000 which had been made against Yosemite. Plaintiffs refused to pay. Id.

As defined by Judge Dupree, "the issue raised by the cross-motions for summary judgment [was] whether [plaintiffs] agreed under [their] contract of reinsurance to be liable under any circumstances for a loss of less than $ 25,000."*Id.* In addressing this issue, Judge Dupree made reference to Provision 1 of the reinsurance contract which contained a warranty relating to the self-insured retention.

**\*8** [Yosemite] warrants to retain for its own account the amount of liability specified in Item 3 unless otherwise provided herein, and the liability of [Calvert] specified in Item 4 shall follow that of the company, except as otherwise specifically provided herein, and shall be subject in all respects to all the terms and conditions [Yosemite's] policy.

Id.; see supra at 11–12.Based on this clause, Judge Dupree looked under Items 3 and 4, which collectively provided "that the respective liability limits of Yosemite and Calvert are 'excess S.I.R.' meaning in insurance parlance that the limits are applicable in excess of a self-insured retention, in this case $ 25,000, to be paid on each claim by Yosemite's insured, Yellow Cab."*Id at 28–29.*Because Yosemite's primary policy obligated it to pay claims of any amount (subject to the policy's maximum limit), in the event of Yellow Cab's bankruptcy, Yosemite paid out claims all of which fell within Yellow Cab's self-insured retention limit. *Id. at 29.*

Thus, Judge Dupree was faced with the question of whether the "shall follow" language could be used to begin

reinsurance coverage at a lower amount in the face of another certificate provision stating that coverage did not begin until after the "self-insured retention had been reached." Id. Because the self-insured retention warranty would be read out of existence (meaning that reinsurance would start at a point which was not reinsured by definition), the court held that the "shall follow" language would not result in reinsurance taking effect before the limits expressed in Item 4: "To construe the clause otherwise would effectively eliminate the provision in Item 4 that plaintiffs' liability begins after the self-insured retention has been exhausted ."Id.

Yosemite is thus distinguishable from the instant case where the issue to be decided is whether plaintiffs' liability for costs and expenses falls within the $ 1.5 million cap on each certificate or whether such responsibility lies even if such payment would cause the total of payments to exceed $ 1.5 million. In answering this question, the court relies, primarily, upon the language of the contract provisions inter se.

It is apparent upon a reading of the above-quoted contract provisions (Provisions 1, 2 and 3), that Provision 1 is addressing plaintiffs' liability to Aetna with regard to Aetna's liability to Robins for the risks which the underlying insurance policy covered, i.e., claims asserted by users of Robins' products against Robins, for which Aetna insured Robins and for which Aetna sought reinsurance from, among others, plaintiffs. In addition, Provision 2 also addresses such insured risks and provides for prompt notice to plaintiffs of claims against Robins by third parties and gives plaintiffs the right to join in the defense of Robins in such a suit. Finally, the third provision provides that as to all claims involving the reinsurance policies, when settled by Aetna, the settlement thereof shall be binding on plaintiffs and plaintiffs are thereby bound to pay their proportion of such settlements.

**\*9** However, Provision 3 is much broader than either Provision 1 or Provision 2 in that it addresses plaintiffs' obligation for "costs" incurred in settling claims brought by a third person alleging to have been injured by a Robins' product covered by the reinsurance certificate. In this regard, Provision 3 provides that "in addition [to plaintiffs' obligation to pay its proportion of such settlements] ... [plaintiff shall be bound to pay] its proportion of expenses, other than [defendant's] salaries and office expenses, incurred by [defendant] in the investigation and settlement of claims or suits and, with the prior consent of [plaintiffs] to trial court proceedings, its proportion of court costs and interest on any judgment or award."See supra at 12.Thus, Provision 3

is not limited to Aetna's liability for the risks which the underlying insurance policies covered, but requires that, in addition thereto, plaintiffs pay their proportion of suit costs and expenses. Accordingly, the court concludes that the contract language found in Provision 3 obligates plaintiffs to pay their proportion of settlements involving insured risks and it further obligates plaintiffs to pay their proportion of suit costs and expenses in addition to such "settlement" amounts.

Plaintiffs raise an objection to the Magistrate's Memorandum and Recommendation as regards the conclusion that a principle of reinsurance law, known as "follow-the-fortunes" doctrine, binds them to follow Aetna's fortunes as they relate to Aetna's obligations to Robins. Basically, the doctrine burdens the reinsurer (plaintiffs) with those risks which the direct insurer (Aetna) bears under the direct insurer's (Aetna's) policy covering the original insured (Robins). K. Gerathewohl, I Reinsurance Principles and Practice, 466 (J. LaBonte trans.1980). Thus, while the reinsurer does not bear the commercial misfortunes of the reinsured, e.g., the failure of the original insured to pay the premium or losses sustained by the reinsured on account of employee theft or fraud, the reinsurer must bear his part of the reinsured's payment under the original insurance contract. Grossman, The Limits of the Reinsurer's Obligation to 'Follow the Fortunes' of the Reinsured, Reinsurance (March, 1970). Agreeing with plaintiffs, the court concludes that the "follow-the-fortunes" doctrine is inapplicable to the instant case.

Defendant herein argues that due to the follow-the-fortunes doctrine, when it agreed with Robins to increase the aggregate limits of the excess policies, 58 XN 16 SCA and 58 XN 19 SCA, by $ 6,240,000 each, plaintiffs were thereby obligated to pay their proportional share of such increase. See supra, n. 3 and accompanying text. While plaintiffs are obligated to pay their proportional share of suit costs and expenses, as the same relate and are in addition to the face limits of the certificates, such obligation is predicated on the fact that plaintiffs expressly agreed to be liable therefor and not because Aetna agreed with Robins in 1981 that plaintiffs would be so bound. Aetna could not increase the amount of the policies and bind plaintiffs unless plaintiffs assented thereto. The follow-the-fortunes doctrine, which would apply as regards Aetna's and plaintiffs' liability under the excess policies (prior to amendment), is not support for the proposition that Aetna could unilaterally increase plaintiff's liability by agreeing with Robins to do so. In short, the doctrine does not allow (nor does it contemplate) a reinsured, such as Aetna, to agree with the insured to increase the limits of the insurance policies and

SPA-46

Penn Re, Inc. v. Aetna Cas. and Sur. Co., Not Reported in F.Supp. (1987)

1987 WL 909519

thereby bind the reinsurer, such as plaintiffs (all without the reinsurer's (plaintiff's) assent).

*10 Since plaintiffs are not bound by the 1981 Settlement Agreement between Aetna and Robins, they are not bound to pay the $ 312,000.00 per certificate Aetna seeks herein. As a result, such suit costs and expenses are not liquidated and must be shown by Aetna to have been incurred before plaintiffs are obligated therefor. Thus, to the extent Aetna has objected to the Magistrate's recommendation, see supra, n. 1, to the effect that the Magistrate was in error because he did not recommend summary judgment as to the dollar amount for which plaintiffs are obligated to Aetna, summary judgment is inappropriate and Aetna's request for such a ruling will be denied.

Finally, turning to plaintiffs' argument that Aetna should be judicially estopped from asserting against them that the liability to pay for suit costs and expenses is not included within the face amounts of the excess policies because Aetna has asserted all along, vis-a-vis Robins, that such liability is capped by the policy limits, see supra n. 3, upon review of the record, the court finds correct the Magistrate's conclusions finding judicial estoppel inapplicable. Basically judicial estoppel comes into play in circumstances when "a party may properly be precluded as a matter of law from adopting a legal position in conflict with one earlier taken in the same or related litigation."*Allen v. Zurich Insurance Company, 667 F.2d 1162, 1166 (4th Cir.1982).*

For the same reasons why Aetna cannot unilaterally bind plaintiffs to be liable for $ 312,000.00 per certificate, plaintiffs cannot bind Aetna to the position that the face amounts of the excess policies are the caps of all liabilities to Robins. Simply put the 1981 Settlement Agreement did not involve Aetna and these plaintiffs. In addition, as pointed out in note 3 supra, Aetna did not completely prevail in its position but had to reach a compromise with Robins.

Furthermore, simply because the new contract between Robins and Aetna contains a provision which is similar to a position asserted by plaintiffs herein, plaintiffs are not entitled to rely thereon. Indeed, plaintiffs herein take a contrary position and seek a declaration that they are not bound by the terms of the "new" Aetna/Robins agreement. Thus, the obligations between plaintiffs and Aetna are to be determined from the agreements reached by and between them and not by compromises and agreements by and between Aetna and Robins. Suffice it to say that plaintiffs obligated themselves, contractually, to pay for suit costs and expenses and should not be heard to argue that Aetna is now estopped from asserting such contractual provision because Aetna initially tried to limit its (and all of its reinsurers') ultimate responsibility to Robins.

In sum then, Aetna's motion for summary judgment as to plaintiff's liability for suit costs and expenses in addition to the face amount of the reinsurance certificates is GRANTED; Aetna's motion for summary judgment as to the dollar amount of such liability is DENIED; and plaintiffs' motion for summary judgment is DENIED. Because trial as to the dollar amount of plaintiffs' obligation for suit costs and expenses is still pending before the court, and is currently scheduled for trial during this court's July 27, 1987, session of civil court in New Bern, North Carolina, and due to the complexity of such issue, counsel for the parties are DIRECTED to report to the court within ten (10) days hereof the status of the trial preparation and the feasibility for holding a pretrial conference with regard to the pending issue in early July, 1987.

*11 SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1987 WL 909519

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

SPA-47

2014 WL 6610915
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

UTICA MUTUAL INSURANCE
COMPANY, Plaintiff,

v.

CLEARWATER INSURANCE
COMPANY, Defendant.

No. 6:13–cv–1178 (GLS/
TWD). | Signed Nov. 20, 2014.

**Attorneys and Law Firms**

Cooper, Erving Law Firm, Phillip G. Steck, Esq., Albany, NY, Sidley, Austin Law Firm, William M. Sneed, Esq., of Counsel, Chicago, IL, for the Plaintiff.

Chadbourne, Parke Law Firm, David M. Raim, Esq., Washington, DC, John F. Finnegan, Esq., Melissa K. Depetris, Esq., of Counsel, New York, NY, for the Defendant.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff Utica Mutual Insurance Company commenced this diversity action against defendant Clearwater Insurance Company, alleging breach of contract claims and seeking declaratory relief. (Compl., Dkt. No. 1.) Pending is Clearwater's motion for partial summary judgment. (Dkt. No. 35.) For the reasons that follow, the motion is granted.

### II. *Background*

Before delving into the relevant facts, it is useful first to provide a brief overview of the subject matter of this dispute, including definitions of industry jargon used below. This case involves reinsurance—a transaction in which "one insurer ... 'cedes' all or part of the risk it underwrites, pursuant to a policy or group of policies, to another insurer." *Unigard Sec. Ins. Co. v. N. River Ins. Co.* (*Unigard II* ), 4 F.3d

1049, 1053 (2d Cir.1993) (citations omitted). In other words, reinsurance is insurance of insurance, the purpose of which "is to diversify the risk of loss." *Id.* The insurance company that issues a policy to a policyholder—here, Utica—is called the insurer, the ceding insurer, or the reinsured. *See generally id.*Logically, the insurance company that insures the insurer for a share of its liability under a policy—here, Clearwater—is called the reinsurer. *Id.*

As pertinent here, one type of reinsurance policy is a facultative reinsurance policy, whereby "a[n] ... insurer purchases reinsurance for a part, or all, of a single insurance policy."*Id.* at 1054. While there are many types of insurance policies, this case concerns liability insurance policies, which typically include a duty on the insurer to both defend and indemnify its policyholder for liability claims. *See generally Seaboard Sur. Co. v. Gillette Co.,* 64 N.Y.2d 304, 310 (1984). Below, the court refers to amounts an insurer pays to defend its policyholder as "expenses," and amounts an insurer pays to indemnify its policyholder as "losses."

### A. *Facts* [1]

Utica, the insurer, issued a number of primary insurance policies, including general and commercial general liability insurance policies, to Goulds Pumps Inc. (Def.'s Statement of Material Facts (SMF) ¶ 5, Dkt. No. 35, Attach. 3.) Utica also issued umbrella policies to Goulds; specifically, as relevant here, Utica issued an umbrella policy effective during the calendar year 1978 (the "1978 Umbrella") and an umbrella policy effective during the calendar year 1979 (the "1979 Umbrella"). (*Id.* ¶ 6.) The umbrella policies each have an indemnity liability limit of $25 million excess of primary limits, per occurrence and in the aggregate. (*Id.* ¶ 8.)

Clearwater, the reinsurer, then agreed to issue facultative reinsurance certificates (the "Certificates") to Utica, and thereby reinsure a portion of Utica's exposure under both the 1978 Umbrella and the 1979 Umbrella. (*Id.* ¶¶ 9, 10.) The preamble of both of the Certificates provides that, "[Clearwater], [2] in consideration of the payment of premiums, statements contained in the declarations, and subject to the terms and General Conditions of this certificate does hereby reinsure [Utica as follows]"; the Certificates then go on to state the terms and conditions. (Dkt. No. 35, Attach 2. at 4, 8.) Notably, the Certificates contain a clause titled "Section D [Clearwater]'s Liability and Basis of Acceptance" (the "Liability Clause"), which identifies the portion of Utica's exposure that Clearwater agreed to reinsure.

SPA-48

(*Id.*) Specifically, for the 1978 Umbrella, and pursuant to certificate N–21163 (the "1978 Certificate"), Clearwater agreed to reinsure 100 percent of the $5 million layer that exceeds $20 million of the underlying policy limit. (Def.'s SMF ¶¶ 9; Dkt. No. 35, Attach. 2 at 4.) For the 1979 Umbrella, and pursuant to certificate N–22001 (the "1979 Certificate"), Clearwater agreed to reinsure 16.6 percent (or $2.5 million) of the $15 million layer that exceeds $10 million of the underlying policy limit. (Def.'s SMF ¶ 10; Dkt. No. 35, Attach. 2 at 8.)

**\*2** In or about March 2003, Goulds, which had been named as a defendant in asbestos claims, commenced an action against Utica, seeking a declaration as to Utica's coverage obligations. (Def.'s SMF ¶ 14.) Around February 2007, Goulds and Utica settled the declaratory judgment action, and, thereafter, Utica began making payments to Goulds, which continue today. (*Id.* ¶ 15.) At some point in 2012, Utica began billing Clearwater. (*Id.* ¶ 16.)

**B. *Procedural History***
Utica commenced this action on September 20, 2013, alleging that Clearwater has breached its contractual obligations to Utica under, among other contracts, the 1978 and 1979 Certificates. (*See generally* Compl.) Following joinder of issue, (Dkt. No. 17), Clearwater filed the now-pending motion for partial summary judgment, seeking a declaration that its liability, if any, under the 1978 and 1979 Certificates is capped at $5 million and $2.5 million, respectively, (Dkt. No. 35).

### III. *Standard of Review*

The standard of review pursuant to Fed.R.Civ.P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts,* 827 F.Supp.2d 85, 92 (N.D.N.Y.2011), *aff'd sub nom.Wagner v. Sprague,* 489 F. App'x 500 (2d Cir.2012).

### IV. *Discussion* [3]

The sole issue presented by Clearwater's motion is whether Utica can recover defense costs and/or other expense payments in excess of the sums stated in the Liability Clauses in the 1978 and 1979 Certificates—$5 million and $2.5

million, respectively. Relying on Second Circuit and New York Court of Appeals case law, Clearwater contends that the Liability Clauses establish absolute "limits" on its liability, and "caps the reinsurer's overall liability for both indemnity and expenses."(Dkt. No. 35, Attach. 1 at 6–8.) Utica, however, argues that the court should deny Clearwater's motion because the case law relied upon by Clearwater is inapposite, and Utica has presented an alternative and reasonable interpretation of the Certificates that conflicts with Clearwater's interpretation. (Dkt. No. 42 at 6–14.) In the alternative, Utica requests that the court defer ruling on the motion because the language in the Certificates is ambiguous, thus necessitating further discovery and consideration of extrinsic evidence. (*Id.* at 14–17.) The court agrees with Clearwater.

Under New York law, if contractual language is clear and unambiguous, the court, as a matter of law, enforces the provisions in accordance with their plain and ordinary meaning. *See Vintage, LLC v. Laws Constr. Corp.,* 13 N.Y.3d 847, 849 (2009). Where ambiguity is absent from the contract, extrinsic evidence generally cannot be considered in its interpretation. *See W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162 (1990)."Ambiguity is present if language was written so imperfectly that it is susceptible to more than one reasonable interpretation."*Brad H. v. City of N.Y.,* 17 N.Y.3d 180, 186 (2011). Whether an agreement is ambiguous is a question of law answered by the court. *See Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.,* 13 N.Y.3d 398, 404 (2009). And "[w]hen the interpretation of an ambiguous contract depends on extrinsic evidence, it presents a question of fact for a jury."*Arrow Commc'n Labs., Inc. v. Pico Prods., Inc.,* 219 A.D.2d 859, 860 (4th Dep't 1995); *see Sutton v. E. River Sav. Bank,* 55 N.Y.2d 550, 554 (1982). Unlike liability insurance policies, reinsurance contracts are not construed against the drafter. *See British Int'l Ins. Co. v. Seguros La Republica, S.A.,* 342 F.3d 78, 81–82 (2d Cir.2003).

**\*3** Importantly, the exact question now before the court has been considered and decided by both the Second Circuit and the New York Court of Appeals. In *Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.,* 903 F.2d 910, 914 (2d Cir.1990), *Unigard II,* 4 F.3d at 1070–71, and *Excess Ins. Co. v. Factory Mut. Ins. Co.,* 3 N.Y.3d 577, 583–85 (2004), certificate limit-of-liability provisions that were silent as to whether they were expense-inclusive or—exclusive were deemed to be unambiguously expense-inclusive. In *Bellefonte,* the Second Circuit reasoned that, where the certificate contained prefatory language reciting that the reinsurer's coverage

SPA-49

for losses and expenses was "subject to" the certificate's stated limit, "[a]ny other construction of the reinsurance certificate[ ] would negate the ...*subject to* " provision. 903 F.2d at 914; *accord Unigard II,*4 F.2d at 1070–71. Further, in *Excess Insurance,* the New York Court of Appeals held that reinsurers "cannot be required to pay loss adjustment expenses in excess of the stated limit in the reinsurance policy," and, in so holding, "follow[ed] the decisions of the United States Court of Appeals for the Second Circuit as expressed in [*Bellefonte* and *Unigard II* ]."3 N.Y.3d at 583. The New York Court of Appeals went even further than the Second Circuit, however, and noted that a facultative reinsurance certificate's stated limit provides an overall cap on the reinsurer's liability unless it expressly states that expenses are excluded from the certificate's limit. *Id.* at 583–84.

Here, as noted above, the preamble of both Certificates provides that Clearwater would reinsure Utica "subject to the terms and General Conditions of th[e] certificate."(Dkt. No. 35, Attach. 2 at 4, 8.) Additionally, both Certificates then go on to identify their terms and conditions. (*Id.*) Importantly, both Certificates contain a Liability Clause, which identifies the portion of Utica's exposure that Clearwater agreed to reinsure—in the 1978 Certificate, "100 [percent] of the layer $5 [million] excess of $20 [million] of the [underlying policy] limit," and in the 1979 Certificate, "16.6 [percent] ($2[.5 million] ) of the layer $15 [million] excess of $10 [million] of the [underlying policy] limit."(*Id.*) Further, nowhere in either Certificate does it state that expenses or other costs are excluded from Clearwater's liability. Thus, Clearwater argues, (Dkt. No. 35, Attach. 1 at 6–8), and the court agrees, that the holdings of *Bellefonte, Unigard II,* and *Excess Insurance* are directly applicable to the language in the 1978 and 1979 Certificates. *See Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.,* 976 F.Supp.2d 254, 263–68 (N.D.N.Y.2013). Nevertheless, the court addresses some of Utica's arguments below.

### A. *Absence of the Word "Limit"*

Utica contends that, because the Certificates do not specifically use the word "limit," but instead use the phrase "[Clearwater]'s Liability and Basis of Acceptance" and describe Clearwater's liability as a "share," *Bellefonte, Unigard II,* and *Excess Insurance* do not apply, because, in each of those cases, the certificates at issue used the word "limit." (Dkt. No. 42 at 7–11 .) This argument is unpersuasive.

*4 Clearwater's liability is described as a percentage share *of the underlying policy limit.*(Dkt. No. 35, Attach. 2 at

4, 8.) Thus, it logically follows that a percentage share of a policy limit is itself a limit on liability, despite the absence of the word "limit." At least one other court has rejected a similar argument to the one advanced by Utica here. In *Continental Casualty Co. v. Midstates Reinsurance Co.,* the insured argued that the certificate's " 'reinsurance assumed' [provision] represents a share of losses, but not a limit on expenses," and that "because there is no mention of the word 'limit' ... there is no reason to find that a limit on expenses is clearly and unambiguously provided for in the reinsurance certificate."No.2012–CH–42911, 2013 WL 4807551, at *4–5 (Ill.Cir.Ct. Aug. 29, 2013). In rejecting the insured's arguments, the court stated that, "[i]n the reinsurance certificates in [*Bellefonte, Unigard II,* and *Excess Insurance* ] ... there is a negotiated maximum amount of liability provided for on the face of the reinsurance certificates," and describing the maximum amount of liability in terms of shares of losses, or failing to specifically use the word "limit" does not alter the conclusion that total liability is capped. *Id.* Similarly, the Liability Clauses here, titled "[Clearwater]'s Liability and Basis of Acceptance," represent the maximum amount of liability that Clearwater agreed to insure, and the fact that the 1978 and 1979 Certificates do not specifically use the word "limit" is of no moment. [4]

### B. *The Follow–the–Form Clause and the Claims Clause*

Next, Utica relies on two clauses set forth in the general conditions section of the Certificates, and argues that its interpretation of those clauses "[h]armonizes" all of the provisions in the Certificates. (Dkt. No. 42 at 7–9, 11–14.) The court briefly discusses each clause in turn below.

### 1. *The Follow–the–Form Clauses*

First, Utica argues that limiting Clearwater's liability ignores the follow-the-form clauses in the Certificates, "which provide[ ] the ceding company with reinsurance coverage that matches its policy obligations."(*Id.* at 11–14.) Because the Second Circuit has already addressed, and rejected, this same argument, little discussion of this point is warranted.

The follow-the-form clauses state that "[Clearwater]'s liability ... shall follow [Utica]'s liability in accordance with the terms and conditions of the policy reinsured hereunder *except with respect to those terms and/or conditions as may be inconsistent with the terms of this Certificate.*" (Dkt. No. 35, Attach. 2 at 5, 9 (emphasis added).) In *Unigard II,* the Second Circuit held that a follow-the-form clause—which, like the follow-the-form clause here, stated that the liability of

SPA-50

the reinsurers was subject to all of the terms and conditions of underlying excess policy, "except as otherwise provided by th[e] Certificate'—did not override the limitation on liability provision in the reinsurance certificate; instead, all other contractual language in the certificate had to be construed in light of the liability cap. 4 F.3d at 1070–71; *see Global Reins. Corp. of Am. v. Century Indem. Co.,* No. 13 Civ. 06577, 2014 WL 4054260, at *6 (S.D.N.Y. Aug. 15, 2014) (noting that follow-the-form clauses are " ' "structured so that they co-exist with, rather than supplant, the liability cap," and " 'allowing [these clauses] to override the limitation on liability ... would strip the limitation clause ... of all meaning" (quoting *Bellefonte,* 903 F.2d at 913)). Accordingly, Utica's argument fails.

### 2. The Claims Clause

**\*5** Utica also contends that the formula set forth in general condition three, the claims clause, demonstrates that Clearwater's liability should not be capped. (Dkt. No. 42 at 4–5, 7–9.) The claims clauses explain how Clearwater's share of losses and expenses are to be calculated. (Dkt. No. 35, Attach. 2 at 5, 9.) Again, Utica's argument is unavailing.

First, in support of its argument that Clearwater's liability should not be capped at $5 million under the 1978 Certificate, Utica employs an example, whereby it calculates what Clearwater's liability would be if there was a hypothetical $22 million loss. (Dkt. No. 42 at 5.) After performing various calculations, Utica concludes that, in its fictional scenario, Clearwater's total liability would be $3 million, with $2 million representing its share of loss, and $1 million representing its share of expenses. (*Id.*) The court, however, fails to see how this scenario proves Utica's point or otherwise demonstrates that Clearwater's liability could ever exceed $5 million under the 1978 Certificate. Indeed, the court is enlightened only to the extent that it now understands how Clearwater's share of expenses are to be calculated compared to how its share of loss is to be calculated—which, frankly, is irrelevant to the question presented.

More importantly, the Second Circuit has already rejected this argument.

> We read the [certificate's claims clause] merely to differentiate the obligations for losses and for expenses. The phrase in no way exempts defense costs from the overall monetary limitation in the certificate.

> This monetary limitation is a cap on all payments under the certificate. In our view, the ... provision merely outlines the different components of potential liability under the certificate. It does not indicate that either component is not within the overall limitation.

*Bellefonte,* 903 F.2d at 913. Accordingly, Utica's argument, again, fails.

### C. Further Discovery

Finally, Utica argues, alternatively, that the court should deny or defer ruling on Clearwater's motion pending further discovery, including the introduction of custom and practice evidence. (Dkt. No. 42 at 14–17.) In support of its argument, Utica cites out-of-Circuit case law for the proposition that "[c]ourts have recognized the need for extrinsic evidence to understand facultative reinsurance contracts, and in particular[,] provisions similar to [the Liability Clause]." (*Id.*)

As discussed above, however, when a contract is unambiguous, as the Certificates are here, extrinsic evidence generally cannot be considered in its interpretation. *See Katel Ltd. Liab. Co. v. AT & T Corp.,* 607 F.3d 60, 66 (2d Cir.2010); *W.W.W. Assocs.,* 77 N.Y.2d at 162. Further, consideration of custom or practice evidence is also inappropriate. Indeed, Utica offered the same argument in a recent case in this District, which the court rejected for two reasons. *See Munich,* 976 F.Supp.2d at 269. First, *"Bellefonte, Unigard II,* and *Excess Insurance* did not consider evidence of custom or practice, thereby suggesting that, at least with respect to a limit-of-liability provision silent as to its coverage of expenses, such evidence should not be relied upon."*Id.* (citations omitted). And second, "Utica's customs-and-practice evidence ... purports to demonstrate that *Bellefonte, Unigard II,* and *Excess Insurance* were erroneously decided, because they established a presumption of cost-inclusiveness at odds with the reinsurance industry's customs and practices."*Id.* However, it is this court's obligation to follow, not second-guess, controlling precedent, which *Bellefonte, Unigard II,* and *Excess Insurance* undoubtedly are. *See Cowen & Co. v. Tecnoconsult Holdings Ltd.,* No. 96 CIV. 3748, 1996 WL 391884, at *4 n. 3 (S.D.N.Y. July 11, 1996). Accordingly, because the Certificates are unambiguous, the court will not consider extrinsic evidence, or defer ruling on Clearwater's motion pending further discovery.

SPA-51

Utica Mut. Ins. Co. v. Clearwater Ins. Co., Slip Copy (2014)

2014 WL 6610915

### V. *Conclusion*

**\*6 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Clearwater's motion for summary judgment (Dkt. No. 35) is **GRANTED;** and it is further

**ORDERED** that Clearwater's liability, if any, under the 1978 Certificate and 1979 Certificate cannot exceed $5 million or $2.5 million, respectively; and it is further

**ORDERED** that the parties contact Magistrate Judge Therèse Wiley Dancks to schedule further proceedings in this matter; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2014 WL 6610915

Footnotes

1    Unless otherwise noted, the facts are not in dispute.

2    Clearwater was previously known as Skandia America Reinsurance Corporation. (*See generally* Dkt. No. 35, Attach. 2 at 4–6.) Utica does not dispute the authenticity of either certificate.

3    Clearwater contends, and Utica does not disagree, that New York law governs this dispute. (Dkt. No. 35, Attach. 1 at 3 & n. 1.) The court agrees. Utica is organized under the laws of New York and has a principal place of business in New York.(Compl.¶ 2.) Further, the 1978 and 1979 Certificates were underwritten and issued by Clearwater from its New York offices, and were then delivered to Utica at its offices in New York. (Def.'s SMF ¶¶ 4, 11.) Finally, the 1978 and 1979 Certificates reinsure a risk underwritten by Utica for Goulds, which was, at the time, a New York-domiciled insured. (*Id.* ¶¶ 6, 7.) Thus, New York has the most significant relationship to the transactions at issue here, which compels application of New York law. *See St. Paul Fire & Marine Ins. Co. v. Emp'rs Reins. Corp.,* 919 F.Supp. 133, 136 (S.D.N.Y.1996); *In re Liquidation of Midland Ins. Co.,* 16 N.Y.3d 536, 543–44 (2011).

4    Notably, Shakespeare succinctly resolved a failure to call by name that which something is when he penned, "a rose by any other name would smell as sweet."William Shakespeare, Romeo and Juliet, act 2, sc. 2.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

SPA-52

2015 WL 4496374
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

UTICA MUTUAL INSURANCE
COMPANY, Plaintiff,
v.
CLEARWATER INSURANCE
COMPANY, Defendant.

No. 6:13–cv–1178 (GLS/
TWD).    |    Signed July 23, 2015.

**Attorneys and Law Firms**

Phillip G. Steck, Cooper, Erving Law Firm, Albany, NY, William M. Sneed, Daniel R. Thies, Thomas D. Cunningham, Sidley, Austin Law Firm, Chicago, IL, for Plaintiff.

David M. Raim, Chadbourne, Parke Law Firm, Washington, DC, John F. Finnegan, Melissa K. Depetris, Chadbourne & Parke LLP, New York, NY, for Defendant.

### *SUMMARY ORDER*

GARY L. SHARPE, Chief Judge.

**\*1** Pending is plaintiff Utica Mutual Insurance Company's motion for reconsideration, (Dkt. No. 54), of this court's November 20, 2014 Memorandum–Decision and Order, which granted defendant Clearwater Insurance Company's motion for partial summary judgment,[1] (Dkt. No. 54). Also pending is Clearwater's motion to strike certain exhibits attached to Utica's motion for reconsideration. (Dkt. No. 78.) For the following reasons, Utica's motion is denied and Clearwater's motion is denied as moot.

In its November 20, 2014 decision, this court granted Clearwater's motion for partial summary judgment, holding that the Liability Clauses in the facultative reinsurance Certificates that Clearwater issued to Utica established limits on Clearwater's liability, and capping Clearwater's overall liability for both losses[2] -amounts an insurer pays to indemnify its policyholder-and expenses-amounts an insurer pays to defend its policyholder-at $5 million under the 1978 Certificate and $2.5 million under the 1979 Certificate. (*See generally* Dkt. No. 54.) In arriving at that conclusion, the court relied primarily on two Second Circuit cases, *Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.,* 903 F.2d 910 (2d Cir.1990) and *Unigard Security Insurance Co. v. North River Insurance Co. (Unigard II* ), 4 F.3d 1049 (2d Cir.1993).

In its now-pending motion, Utica seeks reconsideration of that decision and implores the court to deny Clearwater's motion for partial summary judgment, arguing that a recent Second Circuit summary order, *Utica Mutual Insurance Co. v. Munich Reinsurance America, Inc. (Munich II* ), 594 F. App'x 700 (2d Cir.2014), "represents an intervening change in controlling law."(Dkt. No. 66, Attach. 2 at 3.) In response, Clearwater contends that Utica has failed to satisfy the standard for reconsideration, as *Munich II* does not constitute an intervening change in controlling law, and, even if it does, *Munich II* does not compel a different outcome. (*See generally* Dkt. No. 77.) The court agrees with Clearwater.

Under this District's Local Rules, "a party may file ... a motion for reconsideration ... no later than **FOURTEEN DAYS** after the entry of the challenged judgment, order, or decree."N.D .N.Y. L.R. 7.1(g). Substantively, the standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked."*Analytical Surveys, Inc. v. Tonga Partners, L.P.,* 684 F.3d 36, 52 (2d Cir.2012) (internal quotation marks and citation omitted)."A court may justifiably reconsider its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent manifest injustice."*Johnson v. Lynn–Caron,* No. 9:11–CV–0386, 2012 WL 3888175, at \*4 (N.D.N.Y. Sept.7, 2012) (citations omitted); *see also Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust,* 729 F.3d 99, 104 (2d Cir.2013). A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple."*Analytical Surveys,* 684 F.3d at 52 (internal quotation marks and citation omitted). The decision to grant or deny a motion for reconsideration rests within "the sound discretion of the district court."*Aczel v. Labonia,* 584 F.3d 52, 61 (2d Cir.2009) (internal quotation marks and citation omitted).

**\*2** Here, Utica's motion must be denied for three reasons. First, Utica's motion is untimely. As noted above, Clearwater's motion for partial summary judgment was

SPA-53

granted on November 20, 2014. (Dkt. No. 54.) Any motion for reconsideration, therefore, should have been filed by December 4, 2014. *See* N.D.N.Y. L.R. 7.1(g). Utica, however, did not file its motion for reconsideration until April 20, 2015, (Dkt. No. 66), over four months after the fourteen-day deadline set forth in this District's Local Rules. Coincidentally, *Munich II*—the foundation of Utica's pending motion-was decided on December 4, 2014, the same day as Utica's deadline for filing a motion for reconsideration. While the court may have been more receptive to an untimely motion for reconsideration filed shortly after *Munich II* was issued, Utica, instead, waited over four months after *Munich II* was decided to file its motion and, in it, failed to even acknowledge the court's Local Rules or provide any explanation for its delay. Given that Utica is represented by sophisticated counsel who are more than capable of reading and appreciating this District's rules, coupled with the even more egregious fact that Utica was the appellant in *Munich II*, and undoubtedly knew about the decision earlier than four months after it was issued, Utica's motion may properly be denied on timeliness alone. *See De Deo v. Brown,* No. 9:09–CV–0946, 2009 WL 3644253, at *1 (N.D.N.Y. Oct.28, 2009).

Second, and notwithstanding the fact that Utica's motion is untimely, the court is not satisfied that *Munich II* constitutes an intervening change in controlling law and, therefore, that the standard for reconsideration has been met. To the contrary, *Munich II* simply applied existing law to the special facts and circumstances of that case, including the specific language of the reinsurance policies at issue, and, in so doing, concluded that the reinsurance certificate was ambiguous and could be read to exclude expenses from the limit of liability. *See* 594 F. App'x at 703–05. In fact, in *Global Reinsurance Corp. of America v. Century Indemnity Co.,* No. 13 Civ. 06577, 2015 WL 1782206, at *1–2 (S.D.N.Y. Apr.15, 2015), the court denied a similar motion for reconsideration, in part, because *Munich II* could not reasonably be considered an intervening change in controlling law. Indeed, even though Utica claims that *Munich II* is an intervening change in controlling law, Utica also describes the decision as "an important *clarification* of law." (Dkt. No. 66, Attach. 2 at 1, 3 (emphasis added)); *see Global,* 2015 WL 1782206, at *1 (noting that a "clarification" of law does not meet the standard for a motion for reconsideration). Further, the court notes that *Munich II* is a summary order, which, as ordained by the Second Circuit's own Local Rules, "do[es] not have precedential effect." 2d Cir. R. 32.1.1(a). Thus, the court is skeptical that, if the Second Circuit intended to break new

ground with *Munich II,* it would have done so by summary order.

**\*3** Third, and finally, even if the court were to consider the merits of Utica's argument, the court agrees with Clearwater, (Dkt. No. 77 at 9–10, 15–20), that *Munich II* is readily distinguishable from the case at bar. In its November 20, 2014 decision, the court noted that, under Second Circuit precedent, "limit-of-liability provisions that [are] silent as to whether they [are] expense-inclusive or—exclusive [are] deemed to be unambiguously expense-inclusive," and that, "[i]n *Bellefonte,* the Second Circuit reasoned that, where the certificate contained prefatory language reciting that the reinsurer's coverage for losses and expenses was 'subject to' the certificate's stated limit, '[a]ny other construction of the reinsurance certificate[ ] would negate the ...*subject to'* provision."(Dkt. No. 54 at 8–9 (quoting *Bellefonte,* 903 F.2d at 914).)

Thus, the focus here is on the specific terms of the "subject to" provisions. By way of background, in *Bellefonte,* the "subject to" provision read: "[Reinsurer] ... [d]oes hereby reinsure [the insured] ... in consideration of the payment of the premium and subject to the terms, conditions and amount of liability set forth herein."903 F.2d at 911. Similarly, in *Unigard II,* the reinsurer agreed to reinsure the insured " 'in consideration of the payment of the reinsurance premium and subject to the terms, conditions, *limits of liability,* and Certificate provisions set forth herein.' " 4 F.3d at 1071 (emphasis in original). By contrast, in *Munich II,* the certificate stated that, "The Reinsurer [Munich] agrees to indemnify the Company [Utica] against *losses or damages* which the Company is legally obligated to pay ... subject to the reinsurance limits shown in the Declarations." 594 F. App'x at 703 (emphasis added). The court in *Munich II* reasoned that, because the reinsurance certificate made only "losses or damages" expressly "subject to" the certificate's limit of liability, and did not similarly expressly restrict the provision for "expenses," the limit of liability did not necessarily cap expenses as well, and the certificates were ambiguous. *Id.; see Global,* 2015 WL 1782206, at *2 (outlining the significance and extent of the *Munich II* holding).

Here, the certificates provide that, "[Clearwater], in consideration of the payment of premiums, statements contained in the declarations, and subject to the terms and General Conditions of this certificate does hereby reinsure [Utica as follows]"; the Certificates then go on to state the terms and conditions, including the Liability Clauses. (Dkt.

Utica Mut. Ins. Co. v. Clearwater Ins. Co., Slip Copy (2015)

2015 WL 4496374

No. 35, Attach 2. at 4, 8.) Although the "subject to" provisions here are not identical to those in *Bellefonte* and *Unigard II,* in that they do not expressly make reinsurance subject to the "limits of liability," that difference is immaterial. The "subject to" provisions here make reinsurance subject to the "terms and General Conditions" of the Certificates, and the limits of liability are terms and/or conditions of the Certificates.[3] (*Id.*) Further, unlike the certificates held to be ambiguous in *Munich II,* the Certificates here *do not* specify that only "losses or damages" are subject to the liability cap. Instead, and more akin to those provisions in *Bellefonte* and *Unigard II,* the provisions here broadly and unambiguously specify that "reinsur[ance]" is subject to the Certificates' terms and conditions. In short, even considering the merits of Utica's arguments, the holding in *Munich II* was based on the language of the specific certificate at issue there, which differs from the Certificates here, and *Munich II,* therefore, does not mandate a different result than that reached in the court's November 20, 2014 Memorandum–Decision and Order.[4]

*4 Accordingly, for the foregoing reasons, it is hereby

**ORDERED** that Utica's motion for reconsideration of the court's November 20, 2014 Memorandum–Decision and Order (Dkt. No. 66) is **DENIED;** and it is further

**ORDERED** that Clearwater's motion to strike (Dkt. No. 78) is **DENIED** as moot; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2015 WL 4496374

Footnotes

1    The facts, procedural history, legal analysis, and previously defined terms set forth in the court's November 20, 2014 Memorandum–Decision and Order are fully incorporated herein.

2    Losses are sometimes also referred to as damages.

3    The court notes that Utica has submitted a letter brief directing the court's attention to supplemental authority, namely *Utica Mutual Insurance Co. v. R & Q Reinsurance Co.,* No. 6:12–CV–1332, 2015 WL 4254074 (N.D.N.Y. June 4, 2015), which, with similar facts and contractual terms, reached a different result than the court does here. (Dkt. No. 90; Dkt. No. 90, Attach. 1.) The court appreciates the nuance of this argument, and agrees that reasonable minds could differ on this point. Ultimately, however, decisions of other courts in this District, though persuasive, are not binding on this court, and, at least on this issue, the court chooses to go its own way.

4    Given that the court reaches this conclusion without having the need or occasion to review the documents attached to Utica's motion for reconsideration which Clearwater has moved to strike, Clearwater's motion to strike, (Dkt. No. 78), is denied as moot.

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

SPA-55

Utica Mut. Ins. Co. v. R&Q Reinsurance Co., Slip Copy (2015)

KeyCite Yellow Flag - Negative Treatment
**Declined to Follow by** Utica Mut. Ins. Co. v. Clearwater Ins. Co.,
N.D.N.Y., July 23, 2015

2015 WL 4254074
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

UTICA MUTUAL INSURANCE
COMPANY, Plaintiff,
v.
R & Q REINSURANCE COMPANY, Defendant.

No. 6:13–CV–1332 (BKS/
ATB). | Signed June 4, 2015.

**Attorneys and Law Firms**

Syed S. Ahmad, Esq., Hunton & Williams LLP, McLean, VA,
William P. Schmitt, Esq., Gorman, Waszkiewicz, Gorman &
Schmitt, Utica, NY, for Plaintiff.

John F. Finnegan, Esq., Melissa K. DePetris, Esq.,
Chadbourne & Parke LLP, New York, NY, for Defendant.

**MEMORANDUM–DECISION AND ORDER**

Hon. BRENDA K. SANNES, District Judge.

**I. INTRODUCTION**
*1 Plaintiff Utica Mutual Insurance Company ("Utica")
brings this diversity action against Defendant R & Q
Reinsurance Company ("R & Q") (1) alleging breach of
contract; and (2) seeking a declaratory judgment regarding
R & Q's obligation to make future payments under the
contract. (Dkt. No. 21, ¶¶ 21–30). Presently before the Court
is Defendant R & Q's motion for partial summary judgment.
(Dkt. No. 31). R & Q seeks judgment declaring that its
maximum liability cannot exceed $1 million. (Id., p. 1). For
the reasons that follow, the motion is denied.

**II. BACKGROUND**

**A. Facts** [1]
This case concerns the business of reinsurance, in which
"one insurer (the 'ceding insurer' or 'reinsured') 'cedes' all
or part of the risk it underwrites, pursuant to a policy ... to

another insurer [known as the 'reinsured']." *Unigard Sec.
Ins. Co., Inc. v. N. River Ins. Co.*, 4 F.3d 1049, 1053 (2d
Cir.1993). In a "facultative reinsurance" policy, the "ceding
insurer purchases reinsurance for a part, or all, of a single
insurance policy." *Id.* at 1054. Facultative reinsurance is
generally memorialized in a document called a "facultative
certificate." (Dkt. No. 21, ¶ 8; Dkt. No. 22, ¶ 8). In this case,
Plaintiff Utica is the ceding insurer, and Defendant R & Q is
the reinsurer. (Dkt. No. 21, ¶ 7; Dkt. No. 22, ¶ 7).

Plaintiff Utica issued primary insurance policies "providing
general, or commercial general liability ... coverage to
Buffalo Forge, Inc. ('Buffalo Pumps') from at least June 1,
1961 through May 31, 1981." (Dkt. No. 40, ¶ 5). Utica wrote
umbrella coverages for Buffalo Pumps as well, including one
umbrella policy, numbered LU 5423, which was effective
for some period of time between 1979 and 1980 (the
"Umbrella Policy"). (Id., ¶ 6). INA Reinsurance Company
("INA") agreed to reinsure a portion of Utica's liability
under the Umbrella Policy pursuant to a facultative certificate
numbered FRC 02 29 13 (the "Certificate"). (Id., ¶ 9; see Dkt.
No. 21–1). Under the Certificate, "INA agreed to reinsure a
$1 million part of the layer $3 million excess of $2 million
and underlying limits." (Dkt. No. 40, ¶ 9). Defendant R & Q
later assumed INA's liability under the Certificate. (Id., ¶ 10).

The Certificate's preamble states: "[INA] ... [i]n consideration
of the payment of the premium and subject to the terms hereon
and the general conditions set forth on the reverse side hereof,
does hereby reinsure [Utica]." (Dkt. No. 31–2, p. 19). Item
3 on the Certificate lists Utica's retained liability, and Item 4
lists the reinsurer's liability (called "Reinsurance Accepted")
at $1 million per occurrence. (Id. at 20).

There are eleven "general conditions" in the Certificate, three
of which Utica identifies as significant to determining R &
Q's liability for expenses in excess of the $1 million cap. (See
Dkt. No. 40–1, pp. 11–14). Those provisions are as follows:

*2 [1. Application of Certificate]: The Reinsurer agrees to
indemnify the Company against *loss or damage* which the
Company is legally obligated to pay under the Company's
policy reinsured, resulting from occurrences taking place
during the period this Certificate is in effect, *subject to
the Reinsurance Accepted limits* shown in the Declarations.
The liability of the Reinsurer shall follow that of the
Company and, except as otherwise specifically provided
herein or designated as non-concurrent reinsurance in the
Declarations, shall be subject in all respects to all of
the terms and conditions of the Company's policy except

SPA-56

such as may purport to create a direct obligation of the Reinsurer to the original insured. The Company shall furnish the Reinsurer with a full copy of its policy and all endorsements thereto which in any manner affect this Certificate, and shall make available for inspection at place at the disposal of the Reinsurer at reasonable times any of its records relating to this Reinsurance or claims in connection therewith.

....

[4. Loss Settlement]: All claims involving this reinsurance, when settled by the Company shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlements, and *in addition thereto,* in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment, with respect to business accepted on an excess of loss basis and in the ratio that the Reinsurer's limit of liability bears to the Company's gross limit of liability with respect to business accepted on a contributing excess basis, its proportion of *expenses,* other than Company salaries and office expenses, incurred by the Company in the investigation and settlement of claims or suits and, with the prior consent of the Reinsurer to trial court proceedings, its proportion of court costs and interest on any judgement or award. *However, should the Company's policy limit include expenses, the Reinsurer's maximum limit of liability shall be as stated in Item 4, of the Declaration.*

Payment of its proportion of the loss and expense paid by the Company, will be made by the Reinsurer to the Company promptly following receipt of proof of loss; provided, however, in the event of insolvency of the Company payment by the Reinsurer of its proportion of loss and expense which the Company has incurred or for which it is liable, shall be made to the liquidator, receiver or statutory successor of the Company in accordance with the provisions of Section 8 of these General Conditions.

....

[5. Definitions]: ... EXCESS OF LOSS—The limit(s) of liability of the Reinsurer, as stated in Item 4 of the Declarations, applies (y) only to that portion of loss, within the policy limits, in excess of the Company Retention as stated in Item 3 of the Declarations.

(Dkt. No. 21–1, p. 3) (emphasis added).

"In or about February 2001, Buffalo Pumps began to be named as a defendant in asbestos litigation," at least some

of which Utica defended on its behalf. (Dkt. No. 40, ¶ 14). [2] "Beginning in 2001, Utica began to present billings to R & Q under the Certificate. The billings reflect that Utica intends to bill R & Q for expense payments in addition to the limit of liability set forth on the face of the Certificate." (*Id.,* ¶ 16 (internal citations omitted)). R & Q argues that it is not liable to pay any amounts in excess of the Certificate's stated $1 million limit. (*Id.*).

**B. *Procedural History***

**\*3** Utica filed suit on October 25, 2013, and filed an amended complaint on March 6, 2014. (Dkt. Nos. 1 and 21). The amended complaint alleges that R & Q failed, beginning in 2011, to pay the billings that Utica issued. (Dkt. No. 21, ¶¶ 18–19). On June 27, 2014, R & Q moved for partial summary judgment, seeking a declaration that its maximum liability under the Certificate could not exceed $1 million. (Dkt. No. 31, p. 1). The motion for partial summary judgment has been fully briefed, and both parties have also submitted supplemental briefs addressing recent case law relevant to the motion. (Dkt. Nos. 31, 40, 45, 67, 69, 76, and 77).

**III. *STANDARD OF REVIEW***

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson,* 477 U.S. at 248, 250; *see also Celotex,* 477 U.S. at 323–24; *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas*

SPA-57

*Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003).

## IV. *DISCUSSION*

### A. *Choice of Law*

R & Q asserts that "New York is the state with the most meaningful relationship to the controversy" and that New York law should govern. (Dkt. No. 31–1, p. 8 n. 2).[3] It also argues that, in any event, there is no need for a conflicts analysis because "[t]here is no conflict between New York's and Pennsylvania's laws as respects the use of parol evidence where a contract's terms are unambiguous." *(Id.).* Utica asserts that "[n]o discovery has been conducted with respect to choice-of-law," and asks the Court not to rule in R & Q's favor "without permitting choice-of-law discovery followed by a complete and comprehensive choice-of-law analysis." (Dkt. No. 40–1, p. 19).

The Certificate does not include a choice-of-law provision. When a federal court's jurisdiction is based on diversity of citizenship, the court "applies the choice of law rule of New York, the forum state, in determining the applicable substantive law." *Globe Comm'ns Corp. v. R.C.S. Rizzoli Periodici, S.p.A.,* 729 F.Supp. 973, 975 (S.D.N.Y.1990). "In New York, the threshold inquiry in a choice of law analysis is whether there is an actual conflict between the laws of the jurisdictions involved." *Lumbermens Mut. Cas. Co. v. Flow Intern. Corp.,* 844 F.Supp.2d 286, 300 (N.D.N.Y.2012) (citing *Schwartz v. Liberty Mut. Ins. Co.,* 539 F.3d 135, 151 (2d Cir.2008)). "An actual conflict of laws exists where there are 'relevant substantive differences that could have a significant impact on the outcome of the case.' " *Id.* (quoting *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F .3d 325, 332 (2d Cir.2005)). Where there is no actual conflict, a choice-of-law analysis is unnecessary and the court will apply New York law. *See Lumbermens Mut. Cas. Co.,* 844 F.Supp.2d at 300. "Choice of law is decided on an issue by issue basis." *Id.* (citing Restatement (Second) of Conflict of Laws § 145(1)).

**\*4** Both Pennsylvania and New York law allow the court to consider extrinsic evidence when the terms of a contract are ambiguous. *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.,* 769 F.3d 807, 815–16 (2d Cir.2014) (quoting *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 443 (1990)); *Ins. Adj. Bureau, Inc. v. Allstate Ins. Co.,* 588 Pa. 470, 481, 905 A.2d 462, 469 (2006). Under Pennsylvania law, "[a] contract is ambiguous if it is reasonably susceptible

of different constructions and capable of being understood in more than one sense." *Ins. Adj. Bureau, Inc.,* 588 Pa. at 481, 905 A.2d at 468–69 (citing *Kripp v. Kripp,* 578 Pa. 82, 90, 849 A.2d 1159, 1163 (2004)). Similarly, a contract is ambiguous under New York law if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,* 595 F.3d 458, 466 (2d Cir.2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir.2002)). In both New York and Pennsylvania, the question of whether a contract is ambiguous is a question of law for the court. *See Fed. Ins. Co. v. Am. Home Assur. Co.,* 639 F.3d 557, 568 (2d Cir.2011); *Kripp,* 578 Pa. at 91 n. 5, 849 A.2d at 1164 n. 5. In this case, as set forth below, the Court has found that the Certificate is ambiguous, and R & Q has not submitted any extrinsic evidence in support of its interpretation. Thus, there is no conflict between New York and Pennsylvania law as it relates to R & Q's motion for summary judgment and a choice-of-law analysis is unnecessary at this time.[4] *See Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir.2001).

### B. *Bellefonte, Unigard, and Excess Insurance*

R & Q argues that it is entitled to a ruling that its liability is capped at $1 million based upon *"Bellefonte* and its progeny," citing to *Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.,* 903 F.2d 910 (2d Cir.1990), *Unigard Sec. Ins. Co. v. N. River Ins. Co .,* 4 F.3d 1049 (2d Cir.1993), and *Excess Ins. Co. Ltd. v. Factory Mut. Ins.,* 3 N.Y.3d 577, 789 N.Y.S.2d 461 (2004). (Dkt. No. 31–1, pp. 8–11).

In *Bellefonte,* the Second Circuit considered whether reinsurers were responsible for defense costs "over and above the limits stated in the reinsurance certificates." 903 F.3d at 910–11. In the certificates at issue the reinsurers agree to reinsure [the Company] ... in consideration of the payment of the premium and *subject to the* terms, conditions and *amount of liability set forth herein ...."* *Id.* at 911 (emphasis added). The certificates contained a "reinsurance accepted" amount. *Id.* Another provision in the certificates stated that "the liability of the Reinsurer specified ... above [i.e., amount of reinsurance accepted] shall follow that of the Company." *Id.* The certificates also contained a provision stating:

**\*5** All claims involving this reinsurance, when settled by the Company shall be binding on the Reinsurer, which

shall be bound to pay its proportion of such settlements, and *in addition thereto,* in the ratio that the Reinsurer's loss payments bears to the Company's gross loss payment, its proportion of expenses ... incurred by the Company in the investigation and settlement of claims or suits

....

*Id.* (emphasis added). The Second Circuit concluded that the initial provision, making reinsurance "subject to ... the amount of liability set forth" in the certificate, capped the reinsurer's liability; that any other interpretation "would negate" this provision; and that "[a]ll other contractual language must be construed in light of that cap." *Id.* at 914. The Second Circuit rejected the reinsured's argument that a "follow the fortunes" provision in the certificates, which required the reinsurers to accept reasonable settlements with the underlying insured, exposed the reinsurers to liability in excess of the reinsurance acceptance amount. *Id.* at 912–13.[5] The court concluded such a result "would strip the limitation clause and other conditions of all meaning; the reinsurer would be obliged merely to reimburse the insurer for any and all funds paid. Such a reading would be contrary to the parties' express agreement and to the settled law of contract interpretation." *Id.* at 913. The court further held that the provision requiring the reinsurer to pay expenses "in addition to" settlements did not exempt defense expenses and costs from the monetary limit on liability, and instead "merely outline[d] the different components of potential liability under the certificate." *Id.* at 913.

In *Unigard,* 4 F.3d 1049, the first provision in the certificate was like the certificate in *Bellefonte:* reinsurance was "subject to the terms, conditions, *limits of liability,* and Certificate provisions." *Unigard,* 4 F.3d at 1071 (emphasis added). The *Unigard* certificate contained a "follow the form clause,"[6] which stated "that the liability of the reinsurers, *'except as otherwise provided by this Certificate,* shall be subject in all respects to all the terms and conditions of [the underlying insurance policy].' " *Id.* at 1070–71. The reinsured argued that this "follow the form" provision made the reinsurer's liability concurrent with that of the reinsured, and that the reinsurer was therefore liable for expenses in excess of the policy in accord with a binding arbitration order imposed on the reinsured. *Id.* The Second Circuit rejected that argument, noting that the limitation on liability provision in *Unigard* was like the one in *Bellefonte;* that all of the contractual language had to be construed in light of that provision; and that the

arbitration order did "not alter the terms of the bargained-for agreement." *Id.* at 1071.

In *Excess,* the New York Court of Appeals held that a reinsurance policy with a policy limit of $7 million did not require reinsurers to pay expenses in excess of the stated limit, even though the certificate did not contain language stating that the certificate provisions were "subject to" that limit of liability. *Excess,* 3 N.Y.3d at 583, 789 N.Y.S.2d at 464. The court rejected the reinsured's argument that a "follow the settlements" clause required the reinsurers to reimburse the reinsured's expenses beyond the policy limit. *Id.* The court noted that it was following both *Bellefonte* and *Unigard,* and explained: "[T]he parties negotiated an indemnity limit of $7 million per occurrence. Thus, any obligation on the part of the reinsurers to reimburse [the reinsured] ... must be capped by the negotiated limit under the policy. Otherwise, the reinsurers would be subject to limitless liability." *Id.* The court also noted that the reinsured could have expressly excluded defense costs from the indemnification limit "or otherwise negotiat[ed] an additional limit for loss adjustment expenses that would have been separate and apart from the reinsurers' liability on the insured property. Failing this, the reinsurers were entitled to rely on the policy limit as setting their maximum risk exposure." 3 N.Y.3d at 584–85, 789 N.Y.S.2d at 465.

### C. Recent Decision in Utica v. Munich Reinsurance

**\*6** The Second Circuit recently considered the *Bellefonte* case law in a decision reversing a district court's interpretation of a reinsurance certificate. *See Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.,* 594 F. App'x 700, 701 (2d Cir.2014) (summary order) *("Utica v. Munich Re" ).* In that case Plaintiff Utica sued another of its reinsurers, Munich Reinsurance America, Inc. ("Munich") claiming that Munich was obligated to reimburse Utica for expense payments beyond the $5 million limit of liability. (Case No. 6:12–cv–196, Dkt. No. 1). The district court (Kahn, J.) granted Munich's motion for summary judgment, ruling that Munich was not obligated to pay for expenses in excess of the limit of liability when the limit-of-liability provision did not state whether it included expenses. *See Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.,* 976 F.Supp.2d 254, 269 (N.D.N.Y.2013). Citing to *Bellefonte, Unigard* and *Excess,* the Court presumed that the limit-of-liability provision was unambiguously cost-inclusive. *Id.* at 264. The Court noted that even assuming that Utica's umbrella policy was cost-exclusive, the certificate did not contain a "follow-the-form clause," subjecting the reinsurer to the terms and conditions

of the underlying insurance policy, like the certificates in *Unigard* and *Excess. Id.* at 266. Although the preamble in Munich's certificate did not contain language making reinsurance "subject to" the limit of liability, like the certificates in *Bellefonte* and *Unigard,* the Court noted that the certificate in *Excess* also did not contain the "subject to" language. *Id.* at 267.

The district court noted that Utica's "strongest argument" was that the certificate, "by omission, excludes expenses from the limit of liability." *Id.* at 267. Munich's obligation for "losses or damages" was expressly made subject to the reinsurance limits, while there was no such express limitation for Munich's liability for "allocated loss expenses." *Id.* at 267. The court, however, noted that this omission was not the express statement of exclusion contemplated by *Excess* and, absent that, "reinsurers are entitled to rely on the policy limit as setting their maximum risk exposure.' " *Id.* at 267 (quoting *Excess,* 3 N.Y.3d at 585, 789 N.Y.S.2d at 465) (internal punctuation omitted).

The Second Circuit vacated the ruling. *Utica v. Munich Re.,* 594 F. App'x at 701. The Second Circuit found that the certificate was ambiguous, and remanded the case, with instructions to consider extrinsic evidence. *Id.* at 702–704.[7] The Second Circuit concluded that the provision expressly making Munich's liability for *"losses or damages ... subject to the reinsurance limits"* rendered the certificate ambiguous. *Id.* at 703 (emphasis added). The Second Circuit explained:

The fact that Munich's obligation to indemnify Utica against "losses or damages" is expressly made "subject to" the Certificate's limit of liability suggests that the parties intended to exclude Munich's liability for expenses —which is *not* expressly made "subject to" the limit of liability—from that limit.

*7 However, [this] interpretation is not obviously correct. Munich's liability for settlement payments is not expressly made "subject to" the Certificate's $5 million limit of liability, yet Utica does not argue that the limit of liability excludes settlements. Thus, the first paragraph ... could operate as a general provision that limits *all* of Munich's liability under the Certificate to $5 million, whereas the subsequent paragraphs describe Munich's obligations more specifically, without removing them from the limit.... Accordingly, we conclude that the Certificate is ambiguous as to whether its limit of liability includes expenses.

*Id.* The Court stated that *Bellefonte* and *Unigard* were not dispositive because they "turned on a provision in the policies at issue that expressly made all of the reinsurers' obligations 'subject to' the limit of liability; they did not hold that a limit of liability, without such 'subject to' language, is presumptively expense-inclusive." *Id.* at 704. And the Court stated that although *Excess* "arguably extended the rationale of our earlier decisions and suggested that a limit of liability, standing alone, *is* presumptively expense-inclusive," it was not dispositive. *Id.* The Court reasoned:

[I]n the reinsurance context as in any other, a party is bound by the terms to which it has agreed. And unlike the district court, we do not read *Excess* as holding that any presumption of expense-inclusiveness can be rebutted only through express language or a separate limit for expenses. As we have explained, the Certificate's statement that "losses or damages" are "subject to" the limit of liability reasonably implies that expenses are not. Although this negative implication is not strong enough—in the context of the Certificate as a whole— to demonstrate that expenses are unambiguously excluded from the limit of liability, we think it is sufficient to render the Certificate ambiguous, even in light of *Excess.*

*Id.*

**D. Analysis**

R & Q argues that *Bellefonte, Unigard,* and *Excess* warrant partial summary judgment capping its liability at $1 million. (Dkt. No. 31–1, pp. 8–11). R & Q argues that *Utica v. Munich Re* "has no precedential effect" and "is limited to the specific language of a single contract." (Dkt. No. 69, p. 4). R & Q argues that because the Certificate here, "unlike the facultative reinsurance contract at issue in *Munich Re*, contains an overarching 'subject to' clause in its preamble," *Bellefonte* and *Unigard* are "directly on point" and "conclusive." (*Id.*).

Utica Mut. Ins. Co. v. R&Q Reinsurance Co., Slip Copy (2015)

Utica argues in opposition that the Certificate here "does not contain the language in the *Bellefonte* certificate that made the contract explicitly subject to the 'amount of liability.' " (Dkt. No. 40–1, p. 6). Utica argues that the decision in *Utica v. Munich Re* "confirms that R & Q cannot find refuge in prior Second Circuit rulings in *Bellefonte* or *Unigard* merely because the R & Q certificate and the certificates in those cases contain the words 'subject to' on the declarations page." (Dkt. No. 67, p. 7). Utica points out that the relevant language in *Bellefonte* and *Unigard,* as recognized in *Utica v. Munich Re,* was "a provision ... that expressly made *all* of the reinsurers' obligations 'subject to' the limit of liability." (*Id.* (citing *Utica v. Munich Re,* 594 F. App'x at 704) (emphasis added)). Utica argues that when read as a whole, the facultative certificate makes clear that expenses are not capped by the $1 million "Reinsurance Accepted" amount. (*Id.,* p. 4).

**\*8** The Court concludes that summary judgment is not warranted because the certificate in this case differs from the certificates at issue in *Bellefonte* and *Unigard,* and the language of the certificate here is ambiguous. While the Second Circuit's decision in *Utica v. Munich Re* is not precedential, it is instructive. *See Myers ex rel. C.N. v. Astrue,* 993 F.Supp.2d 156, 163 (N.D .N.Y.2012) (stating that an unpublished Second Circuit summary order, "while non-precedential, [was] nonetheless instructive); *Dutcher v. Astrue,* No. 09 Civ. 1161, 2011 WL 1097860, at \*6, 2011 U.S. Dist. LEXIS 29232, at \*17 (N.D.N.Y. Mar. 7, 2011) (same). As set forth below, the certificate in this case contains a condition which is virtually identical to the condition that the Second Circuit found ambiguous in *Utica v. Munich Re.* While, as R & Q notes, the preamble in the certificate in this case does have a "subject to" clause, reinsurance here is "subject to" the terms and conditions, not, as in *Bellefonte* and *Unigard,* expressly "subject to" the limits of liability. Moreover, R & Q's liability is not, as it argues, unambiguously *always* capped at $1 million because one of the conditions in the Certificate expressly caps its limit at $1 million in one specific instance—when Utica's underlying policy limit includes expenses.

**1. *Preamble***

R & Q argues that "[w]here there is an overarching 'subject to' clause, '[a]ll other contractual language must be construed in light of [the certificate's] cap.' " (Dkt. No. 69, p. 5 (citations omitted)). However, the preamble to the Certificate here, unlike the preamble in *Bellefonte* and *Unigard,* does not expressly make the reinsurer's obligations "subject to" the

reinsurer's "amount of liability." (Dkt. No. 31–2, p. 19). *See Bellefonte,* 903 F.2d at 911 (reinsurance is "subject to the terms, conditions and *amount of liability*" ) (emphasis added); *Unigard,* 4 F.3d at 1071 (reinsurance is "subject to the terms, conditions, *limits of liability* and Certificate provisions") (emphasis added); *cf. Utica v. Munich Re,* 976 F.Supp.2d at 266 (reinsurance is "subject to the general conditions set forth on the reverse side"). The preamble in this case makes the reinsurer's obligations "subject to the terms hereon and the general conditions" of the Certificate. (Dkt. No. 31–2, p. 19). This "subject to" clause is, as R & Q argues, *similar* to those in *Bellefonte* and *Unigard* because one of the "terms hereon" is the amount of reinsurance accepted. (Dkt. No. 31–2, p. 20). But the "subject to" clause in this case does not unambiguously cap R & Q's liability for expenses to that policy limit because it does not expressly refer to the liability limit and, as set forth below, two of the conditions in the Certificate can be interpreted to support Utica's claim that R & Q is liable for expenses in excess of the policy limit.

**2. *Condition 1***

**\*9** Condition 1 states: "The Reinsurer agrees to indemnify the Company against *loss or damage* which the Company is legally obligated to pay under the Company's policy reinsured, resulting from occurrences taking place during the period this Certificate is in effect, *subject to the Reinsurance Accepted limits* shown in the Declarations...." (Dkt. No. 21–1, p. 3) (emphasis added). This condition is nearly identical to the provision the Second Circuit found ambiguous in *Utica v. Munich Re,* 594 F. App'x at 703.[8] There, the court found that the fact that " 'losses or damages' [were] 'subject to' the limit of liability reasonably implie[d] that expenses [were] not." *Id.* at 704. The Second Circuit explained that "[a]lthough this negative implication [was] not strong enough—in the context of the Certificate as a whole—to demonstrate that expenses [were] unambiguously excluded from the limit of liability ... it [was] sufficient to render the Certificate ambiguous, even in light of *Excess.*" *Id.* As in *Utica v. Munich Re,* R & Q's agreement to indemnify against *"loss or damage ... subject to the Reinsurance Accepted limits"* reasonably implies that expenses are not subject to those limits. Like the language in *Utica v. Munich Re,* the language in Condition 1 is ambiguous as to whether R & Q's limit of liability includes expenses.[9]

**3. *Condition 4***

Condition 4 provides for R & Q's liability for settlements and expenses. (Dkt. No. 21–1, p. 3). After describing R &

Q's liability for expenses, Condition 4 contains a provision which was not considered in *Bellefonte, Unigard* or *Excess.* It states: "However, should the [reinsured's] policy limit include expenses, the Reinsurer's maximum limit of liability shall be as stated in Item 4, of the Declaration [i.e., $1 million]." (Dkt. No. 21–1, p. 3). The parties dispute whether this provision applies to limit R & Q's liability to $1 million; R & Q is not seeking summary judgment at this time based upon the provision.[10] However, the fact that Condition 4 specifies one instance in which R & Q's liability is capped at the $1 million policy limit must be considered in determining whether the Certificate is ambiguous. "Under the doctrine of *expressio unius est exclusion alterious,* when certain persons or categories are specified in a contract, an intention to exclude all others may be inferred." *Gurney's Inn Resort & Spa Ltd. v. Benjamin,* 878 F.Supp.2d 411, 425 (E.D.N.Y.2012) (quoting *IBM Poughkeepsie Emps. Fed. Credit Union v. Cumis Ins. Soc'y, Inc.,* 590 F.Supp. 769, 773 (S.D.N.Y.1984)). Thus, the fact that the Certificate states one particular instance in which R & Q's liability limit includes expenses implies that its liability limit does not include expenses in other instances. *See Innovative Design & Bldg. Servs., LLC v. Arch Ins. Co.,* No. 12 Civ. 5474 AJN, 2014 WL 4770098, at *6, 2014 U.S. Dist. LEXIS 134737, at *16 (S.D.N.Y. Sept. 23, 2014). ("Under the doctrine of *expressio unius,* the express inclusion of the [letter of intent] raises an inference that the [memorandum of understanding] was intentionally *excluded* from the contract.").

**\*10** Utica argues that if the liability limit were "an absolute cap on loss and expense," the limitation of liability provision in Condition 4 "would have been unnecessary." (Dkt. No. 40–1, p. 12). It asserts that R & Q's interpretation would make the limitation of liability provision "mere surplusage in contravention of basic principles of contract interpretation." (*Id.,* p. 13) (citing *Scholastic, Inc. v. Harris,* 259 F.3d 73, 83 (2d Cir.2001)). It asserts that "[t]he only interpretation that provides meaning to this sentence" is that "R & Q's obligation to reimburse Utica for expense is not capped where ... the direct policy paid expense in addition to limits." (*Id.*). R & Q argues that (1) Utica's argument fails because it "cannot meet 'the requisite express statement of exclusion' requirement articulated by *Excess;*" and (2) that a "more plausible explanation" is that the provision "was included for emphasis and to ensure that there were never any misunderstandings as to whether expenses would reduce R & Q's limit when the underlying policy was cost-inclusive." (Dkt. No. 45, p. 10). R & Q also asserts that the surplusage argument is "not a reason to supplant the ... limit

of liability," and argues that this is "not the only redundancy in the Certificate.' " (*Id.,* p. 10 n. 4).

However, "contract interpretations that render provisions of a contract superfluous" are disfavored. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 86 (2d Cir.2002); *cf. Summit Health, Inc. v. APS Healthcare Bethesda, Inc.,* 993 F.Supp.2d 379, 395 (S.D.N.Y.2014) (finding a contract provision ambiguous where "[t]he first interpretation seem[ed] somewhat inconsistent with the overall structure of the contract" but the second would render the provision "fairly superfluous"). And the Court in *Utica v. Munich Re* did "not read *Excess* as holding that any presumption of expense-inclusiveness can be rebutted only through express language or a separate limit for expenses." 594 F. App'x at 704.

In light of all of the above, the Court finds that the Certificate is ambiguous with respect to whether expenses are included within the limit of R & Q's liability.

**E. Extrinsic Evidence**

Since the Certificate is ambiguous as to whether the limit of liability includes expenses, interpreting it will require consideration of extrinsic evidence. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (1998). Although Utica submitted some extrinsic evidence[11] in opposition to the motion for summary judgment, (Dkt. Nos. 40–3 and 40–4), the Court declines to consider it at this point in the litigation. The record may require further development: R & Q, which has maintained that the Certificate unambiguously indicates that expenses are subject to the $1 million liability cap, has not submitted any extrinsic evidence and should be allowed the opportunity to do so. Accordingly, for the foregoing reasons R & Q's motion for partial summary judgment declaring its liability limited to $1 million is denied.

**V. CONCLUSION**

**\*11 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Defendant's Motion for Partial Summary Judgment (Dkt. No. 31) is **DENIED.**

**IT IS SO ORDERED.**

Utica Mut. Ins. Co. v. R&Q Reinsurance Co., Slip Copy (2015)

**All Citations**

Slip Copy, 2015 WL 4254074

Footnotes

1    The facts material to the issue of contract interpretation before the Court are undisputed. The facts are drawn from the
     amended complaint (Dkt. No. 21), the answer to the amended complaint (Dkt. No. 22), Plaintiff's response to Defendant's
     statement of material facts (Dkt. No. 40), and exhibits to the amended complaint (Dkt. No. 21–1) and to the affidavit of
     Anna Wszalek in support of Defendant's motion for partial summary judgment (Dkt. No. 31–2).

2    In or about February 2003, a coverage dispute arose between Buffalo Pumps and Utica which prompted Utica to file a
     declaratory judgment action against Buffalo Pumps. (Dkt. No. 40, ¶ 15). Later in 2003, Utica and Buffalo Pumps entered
     into a coverage-in-place agreement to settle their disputes. (*Id.*). Utica asserts that it has made and continues to make
     payments to Buffalo Pumps under the terms of that agreement. (*Id.*).

3    The parties agree that the Certificate was "apparently underwritten and issued by [R & Q's predecessor-in-interest] INA
     from INA's offices in Philadelphia, Pennsylvania." (Dkt. No. 40, ¶ 11). While there is no agreement as to when and how the
     Certificate was delivered from INA to Utica, the parties agree that Utica is a New York corporation organized and existing
     under the laws of the state of New York, with its principal place of business in New York, and that R & Q is a Pennsylvania
     corporation existing and organized under the laws of Pennsylvania, with its principal place of business in Pennsylvania.
     (*Id.,* ¶¶ 1–2). The parties also agree that the Certificate reinsures a risk for a company that was headquartered in New
     York (Buffalo Pumps). (*Id.,* ¶ 7).

4    The parties are free to renew their arguments regarding choice of law after the close of discovery. In the absence of
     a choice of law clause, New York's choice of law analysis "requires locating the state with the greatest interest in the
     litigation based on 'factors such as the place of: (1) contracting, (2) negotiation of the contract, (3) performance, (4) the
     location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and
     place of business of the parties.' " *Utica v. Munich Reins. Am., Inc.,* 594 F. App'x 700, 702 (2d Cir.2014) (quoting *Wm.
     Passalacqua Builders, Inc. v. Resnick Developers S. Inc.,* 933 F.2d 131, 137 (2d Cir.1991)).

5    The "follow the fortunes" doctrine, which is referred to as "follow the settlements" in the settlement context, "prevent[s] the
     reinsurer from 'second-guessing' the settlement decisions of the ceding company." *Travelers Cas. & Sur. Co. v. Gerling
     Global Reinsurance Corp.,* 419 F.3d 181, 186 (2d Cir.2005).

6    A "follow the form" clause "incorporates by reference all the terms and conditions of the reinsured policy, except to the
     extent that the reinsurance contract by its own terms specifically defines the scope of coverage differently, i.e., via an
     exclusion." *Aetna Cas. & Sur. Co. v. Home Ins. Co.,* 882 F.Supp. 1328, 1345 (S.D.N.Y.1995). "The purpose ... is to
     achieve concurrency between the reinsured contract and the policy of reinsurance, thereby assuring the ceding company,
     that by purchasing reinsurance, it has covered the same risks by reinsurance that it has undertaken on behalf of the
     original insured under its own policy." *Id.*

7    The case was reassigned to the undersigned on January 21, 2015 (No. 6:12–cv–196, Dkt. No. 73).

8    The Certificate here, like the Certificate in *Utica v. Munich Re,* details the reinsurer's liability for "settlements" and
     "expenses." (Dkt. 21–1, p. 3 (condition 4)).

9    A recent decision by United States District Judge Lorna Schofield, in the Southern District of New York, is not inconsistent
     with this analysis. *Global Reins. Corp. of Am. v. Century Indem. Co.,* No. 13 Civ. 06577(LGS), 2015 WL 1782206, 2015
     U.S. Dist. LEXIS 50236 (S.D.N.Y. Apr. 15, 2015) ("*Global Reins*"). In *Global Reins,* the district court denied a motion
     for reconsideration in light of *Utica v. Munich Re.* Although the court relied upon the "strict" standard that applies to
     motions for reconsideration, it also stated that even if it considered the merits of the motion, *Utica v. Munich Re* would
     "not counsel a different result" because the language of the reinsurance certificate in *Global Reins,* unlike the certificate
     in *Utica v.. Munich Re* did not contain language limiting "loss or damage," but not expenses, to the "accepted limits." 2015
     WL 1782206, at *1–2, 2015 U.S. Dist. LEXIS 50236, at *2, *6.

10   The parties dispute whether Utica's policy limit in the underlying Umbrella Policy includes expenses. Utica asserts that
     it was required to pay expense costs in excess of policy limits, citing to a case interpreting a Utica umbrella policy with
     identical language under California law. (Dkt. No. 67, p. 5, n. 1). *See Cannon Elec., Inc. v. Ace Property & Cas. Ins. Co.,*
     No. BC290354, at *25 (Superior Ct. Ca., Jan. 28, 2014). R & Q argues, with no support, that Utica was not obligated to
     pay defense costs under the Umbrella Policy; R & Q reserves the right to seek summary judgment at a later time based
     on Condition 4. (Dkt. No. 31–1, p. 11 n. 3).

SPA-63

Utica Mut. Ins. Co. v. R&Q Reinsurance Co., Slip Copy (2015)

11    Utica submitted an affidavit from Joanne Caprice, a Senior Vice President with Resolute Management (Inc.) who handled reinsurance claims ceded to INA (R & Q's predecessor company) on behalf of Century Indemnity. (Dkt. No. 40–3, ¶¶ 4–7). She stated that the Certificate at issue in this case has "substantially similar wording" to the facultative certificates issued by INA with which she has experience. (*Id.*, ¶ 9). (Caprice did not describe how the language was "substantially similar.") She stated that at the time she was responsible for INA's claims handling, it "did not consider the reinsurance accepted amount stated on the declaration page of a facultative certificate to constitute a cap of the reinsurer's liability with respect to expense when the direct policy paid expense in addition to limits," and that this practice remained the same even after the decisions in *Bellefonte, Unigard,* and *Excess.* (*Id.*, ¶ 10). Utica also submitted the declaration of Robert M. Hall, filed in the case of *Global Reins. Corp. of Am. v. Century Indem. Co.*, No. 1:13–CV–6577–LGS, 2014 WL 4054260, 2014 U.S. Dist. LEXIS 113793 (S.D.N.Y.2014), opining on the certificate in that case and on "the custom and practice in the reinsurance industry related to the reimbursement by reinsurers of defense costs paid by the reinsureds and the understandings of terms in reinsurance contracts that are common in the industry" (Dkt. No. 40–4, pp. 3–16), as well as assorted treatises and articles on reinsurance. (Dkt. No. 40–4, pp. 31–76).

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

SPA-64

# MEALEY'S LITIGATION REPORTS
## *REINSURANCE*

Vol. 4, #18        January 26, 1994

## *ARBITRATION PANEL FINDS EXPENSES IN EXCESS OF LIMITS COVERED*

NEW YORK — Employers Insurance of Wausau may recover expenses in addition to the reinsurance limits in a facultative certificate issued by Paladin Reinsurance Corp., an arbitration panel ruled Dec. 23.

Although a copy of the award is not available, a source familiar with the case told The Report a unanimous panel ordered Paladin to pay approximately $65,000 in expenses, plus the undisputed balance of approximately $780,000. The panel also awarded $40,000 in interest, with the arbitrator appointed by Paladin dissenting, the source said.

The dispute arose, according to the source, when Employers sought indemnification from Paladin for losses and expenses under three facultative contracts. Paladin challenged a claim for $65,000 in expenses that exceeded the $500,000 limit on a certificate reinsuring an excess policy issued by Employers to Fred S. James & Co.

Paladin cited the Second Circuit U.S. Court of Appeals decisions in Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co. (903 F.2d 910 [2d Cir. 1990]) (See 5/24/90, Page 6) and Unigard Security Co. v. North River Insurance Co. (4 F.3d 1049 [2d Cir. 1993]) (See 9/15/93, Page 3) in arguing that it was not obligated to pay the expenses in excess of the limit of the certificate, according to the source.

Employers countered that the decisions were inapplicable because the underlying policies issued to Fred S. James covered expenses in addition to the limits and Paladin must follow the form of the underlying policies.

The panel was composed of T. Darrington Semple, retired senior vice president, general counsel and secretary of American Re-Insurance Co., who served as umpire; Daniel E. Schmidt IV, senior vice president, general counsel and corporate secretary of Sorema North American Holding Corp.; and

John T. Andrews Jr., senior vice president, general counsel and secretary of SCOR Reinsurance Co.

Employers is represented by Larry P. Schiffer and Tara M. Wall of Werner & Kennedy in New York, and by in-house counsel W. Craig Olafson and Thomas J. Hall. Counsel for Paladin are John P. Higgins and Maryann Taylor of D'Amato & Lynch in New York.

---

## *NEW YORK COURT ORDERS PARTIES TO ARBITRATE*

NEW YORK — Finding that the three reinsurance treaties containing an agreement to arbitrate do not provide for pre-arbitration inspection of books, records and papers relating to the claim, a federal judge in New York has ordered the parties to proceed with arbitration (In the Matter of the Arbitration Between: Philadelphia Reinsurance Corp. v. Universale Ruckversicherungs A.G., No. 93 Civ. 7234 [LMM], S.D. N.Y.).

(Text of 3-page Memorandum and Order in Section E. Mealey's Document #12-940126-104.)

Petitioner Philadelphia Reinsurance Corp. moved for an order directing respondent Universale Ruckversicherungs A.G. to proceed to arbitration. According to U.S. District Judge Lawrence M. McKenna, Universale did not dispute that the reinsurance treaties require disputes to be settled by arbitration, but argued that it is entitled to examine Philadelphia Re's books, records and papers relating to the claim prior to proceeding.

©COPYRIGHT 1994 MEALEY PUBLICATIONS, INC., WAYNE, PA

MODERN REINSURANCE
LAW AND PRACTICE

BY
BARRY R. OSTRAGER
AND
MARY KAY VYSKOCIL

GLASSER
LegalWorks



## MODERN REINSURANCE LAW AND PRACTICE

*by Barry R. Ostrager and Mary Kay Vyskocil*

### Highlights

Thank you for ordering MODERN REINSURANCE LAW AND PRACTICE. Inside this complete reference, you will find:

- A comprehensive overview of the law today with reference to more than 700 cases;

- An identification of the issues being litigated, their resolution, and trends in the law;

- Citation to all relevant authorities; and

- Explanations about how to make strategic judgments about your cases and how to pursue them.

This in-depth reference also offers an extensive index and tables of statutes and treaties, cases and other authorities to facilitate use and make the information you need readily accessible.

Thank you again for your order. We look forward to serving you in the future.

LYNN S. GLASSER
President
GLASSER LEGALWORKS
April, 1996

Copyright © 1996 by Glasser LegalWorks.

All rights reserved. No part of this publication may be reproduced or trans-
mitted in any form or by any means, electronic or mechanical, including
photocopy, recording, or any information storage and retrieval system,
without permission in writing from the publisher.

Requests for permission to make copies of any part of the work should be
mailed to:

Permissions, Glasser LegalWorks
150 Clove Road, Little Falls, NJ 07424

ISBN 1-888075-51-1

Printed in the United States of America.

n.2 (S.D.N.Y. 1993); *Old Reliable Fire Ins. Co. v. Castle Reins. Co.*, 665 F.2d 239, 241 (8th Cir. 1981). The reinsurance treaty defines the class of risks to be reinsured. *See, e.g., Aetna Ins. Co. v. Glens Falls Ins. Co.*, 327 F. Supp. 11, 14 (N.D. Ga. 1971), *rev'd*, 453 F.2d 687 (5th Cir. 1972) (excluding from reinsurance coverage all inland marine risks). A treaty reinsurer may not decline to reinsure and the ceding company may not decline to cede a specific risk that falls within the classes of insurance covered by the terms of the treaty. *Compagnie de Réassur. d'Ile de France v. New England Reins. Corp.*, 57 F.3d 56 (1st Cir.), *cert. denied*, 516 U.S. 1009 (1995); *North River Ins. Co. v. CIGNA Reins. Co, supra*, 52 F.3d at 1199 ("Once a treaty is written, a reinsurer is bound to accept all of the policies under the block of business, including those as yet unwritten"); *In re Pritchard & Baird, Inc.*, 8 Bankr. 265, 268 n.6 (D.N.J. 1980) ("'Treaty Reinsurance' is reinsurance in which the reinsurer is bound to accept the risks and the ceding company is bound to cede them.").

A treaty contract is formed when a cedent transfers to a reinsurer a portion of the premiums for its policies and a corresponding portion of potential losses; no further action is required. *In re Midland Ins. Co., supra*, 79 N.Y.2d at 258, 590 N.E.2d at 1188, 582 N.Y.S.2d at 60. Once a particular reinsurance treaty is in place, the dealings between the parties proceed in an informal fashion.

## [b] Facultative Reinsurance

Facultative reinsurance is reinsurance that is purchased for a specific risk insured by the cedent. *North River Ins. Co. v. CIGNA Reins. Co, supra*, 52 F.2d at 1199; *Compagnie de Réassur. d'Ile de France v. New England Reinsurance Corp., supra*, 57 F.3d 56; *Unigard Sec. Ins. Co. v. North River Ins. Co., supra*, 4 F.3d at 1054 ("In facultative reinsurance, a ceding insurer purchases insurance for a part, or all, of a single insurance policy"); *Allendale Mut. Ins. Co. v. Excess Ins. Co.*, 970 F. Supp. 265, 267 (S.D.N.Y. 1997) *reh'g granted*, 992 F. Supp. 271, (S.D.N.Y. 1998), *remanded for juris. determination*, 172 F.3d 37 (2d

Cir. 1999), *vacated on juris. grounds*, 62 F. Supp. 2d 116 (S.D.N.Y. 1999); *Christiania Gen. Ins. Corp. v. Great American Ins. Co.*, 979 F.2d 268, 271 (2d Cir. 1992). As one court explained:

> Facultative reinsurance is the individual placement, offer and acceptance between the insurance company and reinsurance company of every risk that is being placed. It can be accepted or rejected on an individual basis. In this respect it differs from…treaties…in that under the terms of those treaties, the reinsurer is obligated to accept what has been offered.

*Calvert Fire Ins. Co. v. Unigard Mut. Ins. Co.*, 526 F. Supp. 623, 628 n.8 (D. Neb. 1980) (citations omitted). *See also Employers Ins. of Wausau v. American Centennial Ins. Co.*, No. 86 Civ. 8576 (KTD), 1989 WL 6631, slip op. at 3 (S.D.N.Y. Jan. 24, 1989); *Mutuelle Generale Francaise Vie v. Life Assurance Co. of Pa.*, 688 F. Supp. 386, 388 n.3 (N.D. Ill. 1988) ("As an alternative to treaty reinsurance, companies can enter into facultative reinsurance arrangements, under which the reinsurer and reinsured negotiate and reach agreement on the cession of individual risks"); *In re Pritchard & Baird, Inc.*, 8 Bankr. at 258 n.6.

Under a facultative contract, the option, or "faculty," to "accept or reject each risk offered by the ceding company" is exercised by the reinsurer. *Omaha Indem. Co. v. Royal American Managers, Inc.*, 777 F. Supp. 1488, 1490 (W.D. Mo. 1991); *see also Sumitomo Marine & Fire Ins. Co.-U.S. Branch v. Cologne Reins. Co., supra*, 75 N.Y.2d at 301, 552 N.E.2d at 142, 552 N.Y.S.2d at 894.

Each risk assumed by a facultative reinsurer receives a separate reinsurance certificate. Facultative reinsurance of a single risk can be placed with a number of reinsurers, each issuing its own certificate and assuming a part of the total liability. *Christiania Gen. Ins. Corp. v. Great American Ins. Co., supra*, 979 F.2d at 271. A fac-

2-6

ultative certificate often contains only basic provisions, such as the limits of reinsurance and the identity of the policy being reinsured, with few substantive terms or conditions. The facultative certificate typically incorporates by reference and follows form to the terms and conditions of the direct policy being reinsured. *See* § 2.03[a], *infra*.

### [c] Semiautomatic Reinsurance

Semiautomatic reinsurance allows a cedent to transfer specific risks to a reinsurer and thus is a form of facultative reinsurance coverage. In a semiautomatic reinsurance arrangement, risks are automatically assumed by the reinsurer in exchange for a predetermined premium. However, the reinsurer has a stipulated time period in which to refuse to take the risk. Hence, the issuance of reinsurance is in advance of evaluation of the risk. The risks may be ceded pursuant to a "master facultative certificate," which provides that the reinsurer delegates underwriting authority to the ceding company, which in turn decides whether to cede a particular risk. *Compagnie de Réassur. d'Ile de France v. New England Reins. Corp., supra*, 57 F.3d 56. Notwithstanding the fact that the reinsurance is not negotiated based on an evaluation of the individual risk, "semiautomatic facilities" have been held to be in the "rubric" of facultative insurance because the hallmark of facultative reinsurance—evaluation of each risk separately by the reinsurer's underwriter—is preserved by the reinsurer's right to cancel on a prospective basis after the risk is ceded. 57 F.3d at 78. As the First Circuit explained:

> Although a window of exposure is created during which the reinsurer is bound without his consent on what the latter may later decide is an unacceptable risk, the potential for damage is minimized by the relative shortness of the exposure and by contract conditions which prevent the reinsured from binding the reinsurer to predescribed types of risks the reinsurer does not wish to cover.

*Id.* at 79.

2-7

818 F.2d 2, 3 (2d Cir. 1987) (per curiam) ("Where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established *contra proferentum* principle requires that the ambiguity be construed against that party."); *Travelers Ins. Co. v. Central Nat'l Ins. Co.*, 733 F.Supp. 522, 528 (D. Conn. 1990) (reference in notice clause to claims "likely to involve reinsurance" raises an "ambiguity [that] must be construed against [the reinsurer] which drafted the [facultative] Reinsurance Certificate"); *Justice v. Stuyvesant Ins. Co.*, 265 F. Supp. 63, 65-66 (S.D. W. Va. 1967).

## § 5.03 THE ROLE OF INDUSTRY CUSTOM AND PRACTICE

The special and unique nature of reinsurance arrangements makes it imperative that a court consider industry custom and practice in interpreting reinsurance contracts. Even outside the reinsurance context, basic principles of contract construction require that the terms of a contract are to be construed in light of the "customs, practices, uses and terminology as generally understood in the particular trade or business." *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988); *Walk-in Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263-64 (2d Cir. 1987) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968)); *Restatement (Second) of Contract* § 222(3) (1985) (usage of trade gives meaning to agreements).

The reasons for considering industry custom and practice are even more compelling in the reinsurance context. The typical reinsurance agreement is relatively short and concise, using terms of art rather than lengthy, legalistic explications to define the obligations of the parties. *See* Robert F. Salm, *Reinsurance Contract Wording*, in REINSURANCE 79 (Robert W. Strain ed. 1980); William D. Latza, *Reinsurance*, in 2 BUSINESS INSURANCE LAW AND PRACTICE GUIDE § 14.08[1], at 14-96 (1992). "[R]einsurance is, by its nature and tradition, an often informal affair between knowledgeable parties. Therefore, the typical reinsurance contract is correspondingly brief

and dependent upon a degree of common understanding among industry participants." *Id.*

For example, the form facultative certificate in use in the reinsurance industry for decades generally consists of two pages: a declarations page providing the limits and effective dates of the certificate and a second page containing the terms and conditions of the coverage. It is understood in the industry that a facultative certificate need not contain detailed policy provisions (such as those found in direct policies) because the reinsurer's obligations flow from the coverage terms in the reinsured policy, the utmost good faith of the parties, and the well-established industry custom and practice. *Affiliated FM Ins. Co. v. Constitution Reins. Corp.*, 416 Mass. 839, 846, 626 N.E.2d 878, 882 (1994). *See also*, Henry T. Kramer, *The Nature of Reinsurance*, in REINSURANCE 4, 13 (Robert W. Strain ed. 1980) (facultative certificates lack the detail characteristic of other types of contracts and are dependent upon a degree of common understanding among industry participants).

Indeed, those facultative certificates that contain arbitration clauses often require that the arbitrators be current or former industry professionals and direct the arbitrators to interpret the contract as an honorable engagement, rather than as a merely legal obligation. *See, e.g., Phoenix Mut. Life Ins. Co. v. N.Am. Co. for Life & Health Ins.*, 661 F.Supp. 751, 755 (N.D. Ill. 1987) (arbitration agreement explicitly provided "[i]t is the intention of the parties that the customs and usages of the business of reinsurance be given full effect in interpretation of this Agreement").

The concise nature of the facultative certificate, which has developed in reliance upon the principle of utmost good faith, requires that the certificate be construed in light of industry custom and practice in order to effectuate the intent of the parties and to give proper meaning to the contract's technical terms. Thus, in *Affiliated FM Ins. Co. v. Constitution Reins. Corp., supra*, the Massachusetts Supreme Court reversed the trial court's finding that

5-7

the parties' reinsurance contract was unambiguous and remanded for consideration of evidence of industry custom and practice. *See also Travelers Indem. Co. v. Scor*, 62 F.3d 74, 78 (2d Cir. 1995) (evidence of custom and usage in the reinsurance industry is relevant to a determination of the reasonableness of a reinsurer's notice).

## § 5.04 ARBITRATION

Historically, arbitration has been the preferred mechanism for resolving reinsurance disputes. John S. Butler & Robert M. Merkin, REINSURANCE LAW (rev. ed. 1993) Ch. 5.1.01. The earliest arbitration clauses appeared in European reinsurance contracts dating as far back as the early 19th century. J. Gerathewohl, K., REINSURANCE PRINCIPLES AND PRACTICE (1980) 716. Arbitration clauses in reinsurance contracts have provided an efficient and effective means of resolving commercial disputes between the parties by enabling the parties to submit their cases to a panel of experts who render an award on the basis of their understanding of reinsurance custom and practice. *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 63 (2d Cir. 1983). *See generally*, Chapter 14, *infra*.

5-8

# HANDBOOK OF
# REINSURANCE LAW

Eugene Wollan



ASPEN
PUBLISHERS

1185 Avenue of the Americas, New York, NY 10036
www.aspenpublishers.com

2003 SUPPLEMENT

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

—From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations

© 2003, 2002 Aspen Publishers, Inc.
*www.aspenpublishers.com*

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to make copies of any part of this publication should be mailed to:

Permissions
Aspen Publishers
1185 Avenue of the Americas
New York, NY 10036

Printed in the United States of America

1 2 3 4 5 6 7 8 9 0

Library of Congress Cataloging-in-Publication Data

Wollan, Eugene.
    Handbook of reinsurance law / Eugene Wollan.
        p. cm.
    Includes index.
        ISBN 0-7355-2249-9
    1.  Reinsurance—Law and legislation—United States.    I. Title.
        KF1236 .W65 2002
        346.73'0860122—dc21

                                                    2002000015

2003 SUPPLEMENT

§ 2.01[d]　　MODERN REINSURANCE LAW AND PRACTICE

[d] Automatic Reinsurance

In automatic reinsurance, as in semiautomatic reinsurance, an insurer may cede a risk under a master facultative certificate. Unlike semiautomatic reinsurance, however, automatic reinsurance provides no "right to reject" an individual risk. *Compagnie de Réassur.*

---

**ASPEN PUBLISHERS**

---

HANDBOOK OF REINSURANCE LAW

2003 Supplement

FILING INSTRUCTIONS

This is the first supplement to *Handbook of Reinsurance Law*. If you have questions or problems, please contact our Customer Service Department at 1-800-234-1660 for assistance.

| Check as done: | Remove and discard old pages: | Insert new page(s): |
|---|---|---|
| ☐ | Title page to xviii | Title page to xvi |
| ☐ | 2-9 to 2-10 | 2-9 to 2-10.1 |
| ☐ | 2-15 to 2-18 | 2-15 to 2-18.1 |
| ☐ | 2-23 to 2-28 | 2-23 to 2-28.2 |
| ☐ | 2-33 to 2-34 | 2-33 to 2-34.1 |
| ☐ | 2-39 to 2-40 | 2-39 to 2-40 |
| ☐ | 3-9 to 3-19 | 3-9 to 3-20 |
| ☐ | 4-7 to 4-8 | 4-7 to 4-8.1 |
| ☐ | 4-17 to 4-18 | 4-17 to 4-18 |
| ☐ | 5-9 to 5-18 | 5-9 to 5-18.2 |
| ☐ | 7-7 to 7-16 | 7-7 to 7-16.2 |
| ☐ | 8-1 to 8-2 | 8-1 to 8-2 |
| ☐ | 8-9 to 8-18 | 8-9 to 8-18.2 |
| ☐ | 8-23 to 8-36 | 8-23 to 8-36.2 |
| ☐ | 8-41 to 8-44 | 8-41 to 8-44.1 |
| ☐ | 9-1 | 9-1 |
| ☐ | 9-13 | 9-13 to 9-14 |
| ☐ | A-1 | A-1 |
| | | N-1 to N-21 |
| | | (insert after M-13) |
| ☐ | TC-1 to TC-17 | TC-1 to TC-18 |
| ☐ | IN-1 to IN-14 | IN-1 to IN-14 |

When you have finished filing your 2003 Supplement, please place these instructions immediately inside the cover of your book.

^3/03

## § 1.01    INTRODUCTION

Even among sophisticated, experienced business people, including many insurance professionals, the term *reinsurance* has a way of evoking unenthusiastic reactions ranging from disinterest to bewilderment. The world of reinsurance is generally considered, by those not part of it, to be an isolated corner of the universe devoted to a subject that is at once arcane and parochial.

The truth is precisely the opposite. The subject is fascinating from many perspectives. Reinsurance arrangements can be enormously complex, and they tend to involve very large amounts of money. Reinsurance relationships present a curious blend of the personal and the arm's length. Reinsurance agreements frequently represent a shotgun wedding of the boilerplate and the painstakingly negotiated. To the lawyer, there is special attraction in the fact that what seems on the surface to be such a narrowly specialized area in actuality involves a broad spectrum of knowledge, calling for expertise in so many subjects that it seems like a law school curriculum: contract law, tort law, agency law, commercial law, legal accounting, advocacy and trial practice, and much more.

It is also true, however, that reinsurance is still a specialized world that can often seem ingrown. It has been said, not entirely facetiously, that "in the reinsurance business, sooner or later you meet yourself coming around the corner." Despite the notable expansion in recent years of the number of players in the game, by and large most of them still know one another and do business with one another on a more or less regular basis. Indeed, it is not at all uncommon for parties to be engaged in a lawsuit or an arbitration arising out of one piece of business even while continuing to do many other pieces of business together.

Reactions to the subject remain mixed. On the one hand, "to some, reinsurance is a mystery not worth solving."[1] But, on the other hand, reinsurance continues to have "a magic aura around it of dignity and quality and integrity."[2]

## § 1.02    DEFINITIONS

Possibly the easiest way to clarify the nature of reinsurance to a jury without making their eyes glaze over is to analogize it to a bookie

---

[1] Henry T. Kramer, *The Nature of Reinsurance, in* Reinsurance 1 (Robert W. Strain ed., 1980).

[2] Francis v. United Jersey Bank, 87 N.J. 15, 22, 432 A.2d 814, 817 (N.J. 1981).

SPA-78

laying off a piece of the action, which for all its apparent flippancy carries a ring of accuracy; indeed, it has even received judicial recognition.[3]

The basic (and less mundane) definition of reinsurance is:

> [a] contract by which an insurer procures a third person to insure him against loss or liability by reason of original insurance. A contract that one insurer makes with another to protect the latter from a risk already assumed.[4]

Slightly expanded versions appear in various texts:

- "[t]he transaction whereby the reinsurer, for a consideration, agrees to indemnify the reinsured company against all or part of the loss that the company may sustain under the policy or policies that it has issued."[5]

- "the insurance of one insurer (the 'reinsured') by another insurer (the 'reinsurer') by means of which the reinsured is indemnified for loss under insurance policies issued by the reinsured to the public."[6]

- "insurance purchased by one underwriter from another, the latter wholly or partially indemnifying the former against the risks that it has assumed. The rights as between the underwriters are governed by the terms of the reinsurance contract."[7]

- "ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsurer, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior and subsequent to loss."[8]

---

[3] Continental Cas. Co. v. Stronghold Ins. Co., Ltd., 77 F.3d 16 (2d Cir. 1996) (quoting People *ex rel.* Sea Ins. Co. v. Graves, 274 N.Y. 312, 315, 8 N.E.2d 872, 873-74 (1937)).

[4] Black's Law Dictionary 1287-88 (6th ed. 1990).

[5] Robert W. Strain, Reinsurance, *Glossary* 783 (rev. ed. 1997).

[6] Henry T. Kramer, *The Nature of Reinsurance, in* Reinsurance 5 (Robert W. Strain ed., 1980).

[7] Allan D. Windt, Insurance Claims and Disputes § 7.10 (2d ed. 1998) (quoting Higginbotham v. Clark, 189 W. Va. 504, 432 S.E.2d 774 (1993)).

[8] 13A John Alan Appleman & Jean Appleman, Insurance Law & Practice § 7681, at 480 (West Publishing Co., perm. ed. rev. vol. 1976).

1-4

A court considering an insurance question does not ordinarily think it necessary, or even appropriate, to start at square one and explain what insurance is, but the courts that have addressed reinsurance issues often seem compelled to begin the analysis with just this kind of background exposition. There is certainly ample history, since the concept and practice of reinsurance have been traced back to the fourteenth century.[9]

The well-known decision *Unigard Security Insurance Co. v. North River Insurance Co.*,[10] by the United States Court of Appeals for the Second Circuit, contains a brief but comprehensive summary of what reinsurance is all about:

> Reinsurance occurs when one insurer (the "ceding insurer" or "reinsured") "cedes" all or part of the risk it underwrites, pursuant to a policy or a group of policies, to another insurer. The reinsurer agrees to indemnify the ceding insurer on the risk transferred. The purpose of reinsurance is to diversify the risk of loss, and to reduce required capital reserves. Spreading the risk prevents a catastrophic loss from falling upon one insurer. By reducing the legal reserve requirement, the ceding insurer then possesses more capital to invest or to use to insure more risks.[11]

Two themes are paramount: reinsurance spreads the risk and thus helps to protect the insurer from catastrophic loss experience,[12] and the

---

[9] C. E. Golding, The Law and Practice of Reinsurance 2 (5th ed. 1987); Robert F. Hall, Reinsurance Claims, 343 PLI/Lit. 405 (Practicing Law Institute Jan. 1, 1988); Graydon S. Staring, Law of Reinsurance § 1:4, at 5 (ed. 1993).

[10] 4 F.3d 1049, 1053 (2d Cir. 1993).

[11] *Id.* at 1053 (citations omitted).

[12] *See:*

*U.S. Supreme Court:* Colonial Am. Life Ins. Co. v. Commissioner of Internal Revenue, 491 U.S. 244, 246, 109 S. Ct. 2408, 105 L. Ed. 2d 199 (1989).

*Second Circuit:* Continental Cas. Co. v. Stronghold Ins. Co., Ltd., 77 F.3d 16 (2d Cir. 1996); Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co., 979 F.2d 268, 271 (2d Cir. 1992).

*Third Circuit:* North River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194 (3d Cir. 1995).

*Eleventh Circuit:* American Bankers Ins. Co. v. Northwestern Nat'l Ins. Co., 198 F.3d 1332 (11th Cir. 1999).

*Federal District Court:* Security Ben. Life Ins. Co. v. F.D.I.C., 804 F. Supp. 217 (D. Kan. 1992); Consumer Ben. Ass'n of U.S. v. Lexington Ins. Co., 731 F. Supp. 1510 (M.D. Ala. 1990).

*Cal.:* Lipton v. Superior Court, 48 Cal. App. 4th 1599, 56 Cal. Rptr. 2d 341 (1996); Prudential Reins. Co. v. Superior Court, 3 Cal. 4th 1118, 842 P.2d 48, 14 Cal. Rptr. 2d 749 (1992).

protection of reinsurance reduces the reserves required to be maintained
for the policies issued and thus enables the insurer to expand its
underwriting activities.[13] Reinsurance also permits an insurer to deter-
mine in advance how much loss it might incur on a particular risk, which
obviously increases the stability of the system.[14]

---

*Ill.:* In re Liquidation of Inter-American Ins. Co. of Ill., 303 Ill. App. 3d 95, 707
N.E.2d 617, 236 Ill. Dec. 490 (1999).

*La.:* Fontenot v. Marquette Cas. Co., 258 La. 671, 247 So. 2d 572 (1971).

*Mich.:* Michigan Township Participating Plan v. Federal Ins. Co., 233 Mich. App.
422, 592 N.W.2d 760 (1999).

*Minn.:* Vetter v. Security Continental Ins. Co., 567 N.W.2d 516 (Minn. 1997); Epland
v. Meade Ins. Agency Assocs., Inc., 545 N.W.2d 401 (Minn. Ct. App. 1996), *rev'd*, 564
N.W.2d 203 (Minn.), *cert. denied*, 522 U.S. 869, 118 S. Ct. 181, 139 L. Ed. 2d 121
(1997).

*N.J.:* Francis v. United Jersey Bank, 87 N.J. 15, 432 A.2d 814 (N.J. 1981); Matter of
Liquidation of Sussex Mut. Ins. Co., 301 N.J. Super. 595, 694 A.2d 312 (App. Div.
1997).

*N.Y.:* Matter of Liquidation of Union Indem. Ins. Co. of N.Y., 89 N.Y.2d 94, 674
N.E.2d 313, 651 N.Y.S.2d 383 (N.Y. 1996) (*quoting* Henry T. Kramer, *The Nature of
Reinsurance, in* Reinsurance 6 (Robert W. Strain ed., 1980)).

*Pa.:* Reid v. Ruffin, 503 Pa. 458, 469 A.2d 1030 (1983).

[13] *See:*

*U.S. Supreme Court:* Colonial Am. Life Ins. Co. v. Commissioner of Internal
Revenue, 491 U.S. 244, 246, 109 S. Ct. 2408, 105 L. Ed. 2d 199 (1989).

*Second Circuit:* Unigard Sec. Ins. Co. v. North River Ins. Co., 4 F.3d 1049, 1054 (2d
Cir. 1993).

*Third Circuit:* North River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194 (3d Cir.
1995).

*Ninth Circuit:* Excess & Casualty Reins. Ass'n v. Insurance Comm'r, 656 F.2d 491,
492 (9th Cir. 1981).

*Eleventh Circuit:* American Bankers Ins. Co. v. Northwestern Nat'l Ins. Co., 198 F.3d
1332 (11th Cir. 1999).

*La.:* Fontenot v. Marquette Cas. Co., 258 La. 671, 247 So. 2d 572 (1971); Donaldson
v. United Community Ins. Co., 741 So. 2d 676 (La. Ct. App. 1999).

*Mich.:* Michigan Township Participating Plan v. Federal Ins. Co., 233 Mich. App.
422, 592 N.W.2d 760 (1999).

*N.Y.:* U.S. Reinsurance Corp. v. Humphreys, 205 A.D.2d 187, 618 N.Y.S.2d 270
(1994), *appeal after remand*, 240 A.D.2d 264, 667 N.Y.S.2d 2 (1997).

[14] *See* H. Hinkleman, *Reinsurance—What Is It?*, Reinsurance and Reinsurance
Management (Interstate Service Corporation 1981) (four purposes cited: increased risk
capacity; stability; protection of ceding company against catastrophe; and obtaining
financial support by shifting liabilities to others).

1-6

## §1.03 DIFFERENCES FROM DIRECT INSURANCE

Reinsurance is, of course, insurance, but of a special kind. A noted commentator has identified seven very practical differences between direct insurance and reinsurance:

1. Reinsurance tends to be somewhat less regulated;
2. Reinsurers are more internationally oriented;
3. Reinsurers are more involved in transactions of large monetary value and risk;
4. The reinsurer relies on the reinsured to produce proper underwriting at proper rates;
5. The reinsurer usually has the right to inspect records of the reinsured;
6. Reinsurance requires absolute honesty and utmost good faith among the parties;
7. The reinsurer is less able to exert much influence to alter practices that may lead to increased underwriting losses.[15]

A distinction frequently made by the courts is that reinsurance is a contract of indemnity, not of liability.[16] What this means in practical

---

[15] Robert W. Strain, Reinsurance 15 (rev. ed. 1997).

[16] *See:*

*Second Circuit:* Unigard Sec. Ins. Co. v. North River Ins. Co., 4 F.3d 1049, 1054 (2d Cir. 1993); Great Am. Ins. Co. v. Fireman's Fund Ins. Co., 481 F.2d 948 (2d Cir. 1973).

*Eleventh Circuit:* American Bankers Ins. Co. v. Northwestern Nat'l Ins. Co., 198 F.3d 1332 (11th Cir. 1999).

*Federal District Court:* Skandia Am. Reins. Corp. v. Schenck, 441 F. Supp. 715 (S.D.N.Y. 1977).

*Colo.:* Bluewater Ins. Ltd. by Tennessee Ins. Co. v. Balzano by Colaiannia, 823 P.2d 1365 (Colo. 1992).

*Del.:* Hoechst Celanese Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 623 A.2d 1099 (Del. Super. Ct. 1991).

*Ill.:* Union Cent. Life Ins. Co. v. Lowe, 349 Ill. 464, 182 N.E. 611 (1932).

*La.:* Fontenot v. Marquette Casualty Co., 258 La. 671, 247 So.2d 572 (1971).

*Mass.:* Friend Bros., Inc. v. Seaboard Surety Co., 316 Mass. 639, 56 N.E.2d 6 (1944) (quoting Royal Ins. Co. v. Vanderbilt Ins. Co., 102 Tenn. 264, 267, 52 S.W. 168 (1899)).

*Mich.:* Michigan Tp. Participating Plan v. Federal Ins. Co., 233 Mich. App. 422, 592 N.W.2d 760 (1999).

*Minn.:* Epland v. Meade Ins. Agency Assocs., Inc., 564 N.W.2d 203 (Minn. 1997), *cert. denied,* 522 U.S. 869, 118 S. Ct. 181, 139 L. Ed. 2d 121 (1997).

*N.J.:* Liquidation of Sussex Mut. Ins. Co., 301 N.J. Super. 595, 694 A.2d 312 (App. Div. 1997); Vera Democrazia Soc. v. Bankers' Nat'l Life Ins. Co., 160 A. 767, 768, 10 N.J. Misc. 632, 160 A. 767 (Dist. Ct. 1932).

terms is that the reinsurer is not insuring any property or any liability; it is agreeing to indemnify—*i.e.*, reimburse—the reinsured for certain defined losses the reinsured is obliged to pay under policies it has issued that do insure property or liability. At least theoretically, therefore, the reinsurer's duty to pay does not arise until its reinsured has actually made payment, although this can depend on the particular contract wording. In some agreements, for example, provision is made for "cash calls" by the reinsured so that it will be relieved of the need to fund the loss payments while awaiting reimbursement from its reinsurer.

As a parenthetical note on this point, many reinsurance contracts, particularly in the United Kingdom, memorialize the indemnity nature of the relationship by calling upon the reinsurer to "pay as paid" by the reinsured, or similar words. In a recent case that went all the way up to, and was affirmed by, the House of Lords, however, a Commercial Court Justice ruled that, even in the face of such language, the reinsurer's duty to pay was triggered by the fixing of the reinsured's obligation to pay, although actual payment had not yet been made. The basis of the decision was a very pragmatic interpretation of how the concept of "payment" is used in ordinary parlance: when a husband asks his wife how much she "paid" for her new coat, she responds with the price, not with the fine distinction that she has not yet actually paid for it because it was charged to her account.[17] The distinction may be a trivial one in domestic relations, but it can obviously have serious repercussions in reinsurance, particularly in the event of the reinsured's insolvency.

## § 1.04    TYPES OF REINSURANCE

One of the reasons reinsurance has always seemed less accessible than it really is stems from its highly specialized vocabulary, which is

---

*N.Y.:* Matter of Liquidation of Union Indem. Ins. Co. of N.Y., 89 N.Y.2d 94, 674 N.E.2d 313, 651 N.Y.S.2d 383 (1996); Matter of Midland Ins. Co., 79 N.Y.2d 253, 590 N.E.2d 1186, 582 N.Y.S.2d 58 (1992); Mercantile & General Reins. Co., plc. v. Spanno Corp., 151 Misc. 2d 311, 573 N.Y.S.2d 102 (Sup. Ct. 1991), *rev'd*, 184 A.D.2d 177, 591 N.Y.S.2d 1015 (1992), *leave to appeal granted*, 81 N.Y.2d 708, 615 N.E.2d 224, 598 N.Y.S.2d 767 (N.Y.), *rev'd*, 82 N.Y.2d 248, 624 N.E.2d 629, 604 N.Y.S.2d 492 (1993), *reargument denied*, 82 N.Y.2d 917, 632 N.E.2d 456, 610 N.Y.S.2d 146 (1994).

*Tenn.:* Gillespie v. Federal Compress & Warehouse Co., 37 Tenn. App. 476, 265 S.W.2d 21 (1953).

*Tex.:* Stradley v. Southwestern Life Ins. Co., 341 S.W.2d 195 (Tex. Civ. App. 1960), *writ refused n.r.e.* (1961).

[17] *In re* Charter Reins. Co., No. 4655/99, Eng. High Ct., Ch. Div. (1999), *reprinted in* 10 Mealey's Litig. Rep.: Reins. No. 8, 15 (Aug. 26, 1999).

SPA-83

perforce the starting point for any discussion of the subject. Learning the jargon of the trade is always half the battle. The two basic kinds of reinsurance are facultative and treaty.

## [A] Facultative

### [1] Defined

Facultative reinsurance has many variations and subdivisions, but it is usually easy to identify:

> Facultative refers to a relationship under which the company negotiates certain individual policies to be reinsured on a stand-alone basis. The company is not obliged to submit any policy, and the reinsurer is not obligated to assume any policy submitted. Each party to the arrangement or agreement has the faculty or option of submission or acceptance. The insurance policy involved may cover an individual risk or may cover a number of risks, as with a blanket policy in primary insurance. A characteristic of facultative reinsurance is that the particular policy reinsured is specifically identified.[18]

Unlike a treaty reinsurer who must accept all covered business, the facultative reinsurer assesses the unique characteristics of each policy to determine whether to reinsure the risk, and at what price. The distinguishing characteristic is always the reinsurer's right of individual risk rejection.[19] (Appendix A shows two typical facultative certificate forms.)

---

[18] Robert W. Strain, Reinsurance 17 (rev. ed. 1997); *see also:*
*Second Circuit:* Unigard Sec. Ins. Co. v. North River Ins. Co., 4 F.3d 1049, 1054 (2d Cir. 1993).
*Cal.:* Prudential Reins. Co. v. Superior Ct., 3 Cal. 4th 1118, 842 P.2d 48, 14 Cal. Rptr. 2d 749 (1992); *In re* Mission Ins. Co., 41 Cal. App. 4th 828, 48 Cal. Rptr. 2d 209 (2d Dist. 1995).
*Conn.:* North Am. Philips Corp. v. Aetna Cas. & Sur. Corp., No. CV-91-0395790 S, 1993 WL 213717 (Conn. Super. Ct. Jun 07, 1993).
*N.Y.:* Matter of Liquidation of Union Indem. Ins. Co. of N.Y., 89 N.Y.2d 94, 674 N.E.2d 313, 651 N.Y.S.2d 383 (N.Y. 1996); Matter of Midland Ins. Co., 167 A.D.2d 75, 569 N.Y.S.2d 951, *appeal granted,* 78 N.Y.2d 858, 580 N.E.2d 1057, 575 N.Y.S.2d 454 (1991), *aff'd,* 79 N.Y.2d 253, 590 N.E.2d 1186, 582 N.Y.S.2d 58 (1992).
[19] North River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194 (3d Cir. 1995).

1-9

SPA-84

[2]  Automatic and Semiautomatic

Sometimes a reinsurer will issue what is known as a master facultative certificate, describing the class of business covered, and the reinsured then cedes specific risks to the reinsurer. If the arrangement is "automatic," the reinsurer has no right to reject any individual risk but ordinarily does have a right to terminate the entire arrangement on short notice. If the facility is "semiautomatic," the reinsurer retains the right to reject individual risks.[20]

[3]  Open Cover

There is a hybrid species called variously "facultative obligatory" or "open cover." It is generally regarded as facultative reinsurance because the reinsured decides what risks, or shares of risks, within the defined area should be ceded to the reinsurer, but from the reinsurer's perspective the arrangement is obligatory because there is no right to decline an individual risk. In this respect it is quite similar to an automatic facility but lacks the reinsurer's right to cancel on short notice.[21]

[B]  Treaty

[1]  Characteristics

The origins of the term are obscured in the mists of history, but essentially it refers to a reinsurance agreement that covers a class of business or group of policies, rather than an individual risk. Presumably, the name derives from the way the coverage is negotiated between two parties of more or less equivalent bargaining power. It may well be also that the designation of the reinsured as the "cedent"[22] has the same murky origin, since one of the common historic functions of an international treaty is to cede territory; this is, however, pure speculation. At any rate, the terms *reinsured* and *cedent* are interchangeable.

---

[20] Compagnie de Reassurance d'Ile de France v. New England Reins. Corp., 57 F.3d 56, RICO Bus. Disp. Guide 8837 (1st Cir.), *as amended on denial of reh'g, cert. denied*, 516 U.S. 1009, 116 S. Ct. 564, 133 L. Ed. 2d 490 (1995), *on remand*, 944 F. Supp. 986 (D. Mass. 1996).

[21] *Compagnie de Reassurance*, 57 F.3d at 76 (quoting C. E. Golding, The Law and Practice of Reinsurance 42 (K.V. Louw ed., 5th ed. 1987)).

[22] Sometimes spelled "cedant." Both are considered correct.

The essential characteristics of treaty reinsurance are that the reinsurer does not scrutinize or underwrite individual risks (it is often said that the treaty reinsurer underwrites the cedent rather than any one risk, *i.e.*, satisfies itself regarding the ceding company's underwriting standards, claim handling procedures, financial stability, and the like, whereas a facultative reinsurer underwrites the individual risks) and that all of the business defined in the treaty automatically becomes reinsured, *i.e.*, neither the cedent nor the reinsurer has the right to be selective about what is and is not covered.[23]

It is sometimes said that there is a third characteristic: a long-term relationship that is expected to be profitable for the reinsurer and beneficial for the cedent over an extended period of time, despite short-run deviations one way or the other.[24] There is still a good deal of truth in this generalization, although it has suffered quite a bit of dilution over the past decade or two. (Appendix B shows a typical form of reinsurance treaty, although there are, of course, innumerable variations in use.)

### [2]  Proportional Reinsurance

Proportional reinsurance is exactly what it sounds like, but, in keeping with the axiom that nothing is as simple as it sounds, it, too, has subdivisions.

#### 1.  *Quota Share Insurance*

Quota-share (or pro-rata) reinsurance is also what it sounds

---

[23] *See:*

*Second Circuit:* Unigard Sec. Ins. Co. v. North River Ins. Co., 4 F.3d 1049 (2d Cir. 1993).

*Third Circuit:* North River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194 (3d Cir. 1995).

*Cal.:* Prudential Reins. Co. v. Superior Court, 3 Cal. 4th 1118, 842 P.2d 48, 14 Cal. Rptr. 2d 749 (1992); *In re* Mission Ins. Co., 41 Cal. App. 4th 828, 48 Cal. Rptr. 2d 209 (2d Dist. 1995).

*Conn.:* North Am. Philips Corp. v. Aetna Cas. & Sur. Corp., No. CV-91-0395790 S, 1993 WL 213717 (Conn. Super. Ct. June 7, 1993).

*Mich.:* Michigan Millers Mut. Ins. Co. v. North Am. Reins. Corp., 182 Mich. App. 410, 452 N.W.2d 841 (1990).

*Mo.:* First Am. Ins. Co. v. Commonwealth Gen. Ins. Co., 954 S.W.2d 460 (Mo. Ct. App. W.D. 1997), *reh'g and/or transfer denied* (1997).

[24] Matter of Liquidation of Union Indem. Ins. Co. of N.Y., 89 N.Y.2d 94, 674 N.E.2d 313, 651 N.Y.S.2d 383 (N.Y. 1996).

like: a proportional sharing of the risk (and premium) by cedent and reinsurer, ordinarily "from the ground up."[25]

2. *Surplus Share Reinsurance*

Surplus share reinsurance is proportional coverage that applies only in excess of a certain minimum loss, or, in more generic terms, it kicks in after the reinsured has absorbed the specified retention, which operates like a deductible.[26]

### [3] Excess of Loss Reinsurance

Excess of loss reinsurance is like surplus share reinsurance in the sense that it covers only in excess of a specified retention, but the coverage beyond that point is not proportional. Once the retention has been exhausted, the risk passes to the reinsurer(s). Excess of loss reinsurance is typically layered, and each layer may involve multiple reinsurers, so that a characteristic structure might look like this:

| | |
|---|---|
| $5,000,000<br>excess of $5,000,000 | —Reinsurer E (50%), F (30%), and G (20%) |
| $3,000,000<br>excess of $2,000,000 | —Reinsurers B, C, and D, 1/3 each |
| $1,500,000<br>excess of $500,000 | —Reinsurer A |
| First $500,000 | —Retained by cedent |

---

[25] *See* Compagnie de Reassurance d'Ile de France v. New England Reins. Corp., 944 F. Supp. 986 (D. Mass. 1996); Central Nat'l Ins. Co. v. Devonshire Coverage Corp., 426 F. Supp. 7, 11 n.5, 21 (D. Neb. 1976), *aff'd in part and remanded*, 565 F.2d 490 (8th Cir. 1977); Ott v. All-Star Ins. Corp., 99 Wis. 2d 635, 643, 299 N.W.2d 839 (Wis. 1981).

[26] See:

*Federal District Courts:* Colonial Penn Ins. Co. v. American Centennial Ins. Co., No. 96 Civ. 6051 (MBM), slip op. at n.2 (S.D.N.Y. Jan. 10, 1997); Compagnie de Reassurance d'Ile de France v. New England Reins. Corp., 944 F. Supp. 986 (D. Mass. 1996); CNA Reins. of London Ltd. v. Home Ins. Co., No. 85 Civ. 5681, 1990 WL 3231 (S.D.N.Y. Jan 10, 1990).

*Mo.:* First Am. Ins. Co. v. Commonwealth Gen. Ins. Co., 954 S.W.2d 460 (Mo. Ct. App. W.D. 1997), *reh'g and/or transfer denied* (1997).

*Wis.:* Employers Ins. of Wausau v. Certain Underwriters at Lloyd's London, 202 Wis. 2d 673, 552 N.W.2d 420 (Ct. App. 1996).

This is, be it noted, a relatively simple excess of loss reinsurance program.[27] This kind of reinsurance is also frequently purchased as a protection against the exposure represented by the risk retained by the cedent under its proportional contracts. From time to time, a court finds it necessary to wrestle with some of the intricacies. A Wisconsin court identified and defined three distinct kinds of excess of loss reinsurance:

(i) Per Risk or Specific Excess Reinsurance, which indemnifies the ceding insurer, subject to a specified limit, against the amount of loss in excess of a specified retention with respect to each risk covered by a reinsurance arrangement;

(ii) Per Occurrence Reinsurance, which indemnifies the ceding insurer, subject to a specified limit, against the amount of loss in excess of a specified retention with respect to each occurrence; and

(iii) Aggregate Excess of Loss Reinsurance, which indemnifies the ceding insurer for the amount by which the ceding insurer's loss during a specified period exceeds either (a) a specific dollar amount or (b) a percentage of the company's subject premium.[28]

## [4] Stop Loss Reinsurance

This, again, is what it sounds like: protection against payment of claims in excess of some defined hallmark, which might, for example, be a dollar amount,[29] or a certain loss ratio,[30] or a specified percentage of all claims.[31]

---

[27] *See:*

*Federal District Courts:* Compagnie de Reassurance d'Ile de France v. New England Reins. Corp., 944 F. Supp. 986 (D. Mass. 1996); CNA Reins. of London Ltd. v. Home Ins. Co., No. 85 Civ. 5681, 1990 WL 3231 (S.D.N.Y. Jan. 10, 1990).

*Mo.:* First Am. Ins. Co. v. Commonwealth Gen. Ins. Co., 954 S.W.2d 460 (Mo. Ct. App. W.D. 1997), *reh'g and/or transfer denied* (1997).

*Wis.:* Employers Ins. of Wausau v. Certain Underwriters at Lloyd's London, 202 Wis. 2d 673, 552 N.W.2d 420 (Ct. App. 1996).

[28] Ott v. All-Star Ins. Corp., 99 Wis. 2d 635, 299 N.W.2d 839 (1981).

[29] *See:*

*Fifth Circuit:* Reich v. Lancaster, 55 F.3d 1034 (5th Cir.1995).

*Federal District Courts:* Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund, 933 F. Supp. 1124 (D. Mass. 1996).

*Iowa:* New Hampshire Ins. Co. v. National Recreation Equip. Co., 322 N.W.2d 890 (Iowa Ct. App. 1982).

*Tex.:* Board of Ins. Com'rs v. Texas Emp. Ins. Ass'n, 189 S.W.2d 47 (Tex. Civ. App. 1945), *aff'd*, 144 Tex. 543, 192 S.W.2d 149 (1946).

*Va.:* Swiss Re Life Co. Am. v. Gross, 253 Va. 139, 479 S.E.2d 857 (1997).

[30] Bonhiver v. Affiliated Cos. of Am., 447 F.2d 108 (5th Cir. 1971).

[31] *See* Harbor Ins. Co. v. Resolute Ins. Co., 23 Cal. App. 3d 190, 99 Cal. Rptr. 916 (1972).

1-13

[5]   Catastrophe Reinsurance

The industry, perhaps in an effort to shake off its stodgy reputation, refers to this as "cat cover." It, too, harbors no particular surprises. It protects the cedent from financial ruin as a result of a single catastrophic event or series of events.[32] Hurricanes, floods, and earthquakes come to mind. This device can also be used to protect against accumulation of too much risk in one geographical area.

[6]   Financial Reinsurance

This is a new breed of reinsurance protection that is really still in the process of being invented. It is also sometimes known as finite risk reinsurance. It comes in a large variety of shapes and sizes and is in reality a financial arrangement, but care must be taken to ensure that there is a genuine transfer of risk or it will not be considered insurance at all, with all of the commercial and regulatory consequences that would ensue. The typical contract is a time-and-distance policy that discounts the future or time value of money and projects the anticipated investment income, giving the reinsurer reasonable assurance of profitability and the reinsured a discounted premium plus the right to take full credit for the reinsurance (for accounting and regulatory purposes) without establishing reserves in the usual fashion.

If this sounds complicated, it is. One authority's attempt to define it is this:

> In its October 1998 response to the European Union Commission working paper on financial reinsurance, the Association of British Insurers (ABI) made the following observations: It is difficult to define financial reinsurance in a clear and unambiguous way, although certain common characteristics can be identified. These include:
>     • They are multi-annual policies (typically they cover five to seven years).

---

[32] *See* Robert F. Hall, *Reinsurance Claims*, 343 PLI/Lit 405 (Practicing Law Institute Jan. 1, 1988); Robert M. Mangino, *Reinsurance*, 395 PLI/Comm 283 (Practicing Law Institute Sept. 29, 1986). *See also* Vesta Fire Ins. Corp. v. State of Fla., 141 F.3d 1427 (11th Cir. 1998); Northwestern Mut. Fire Ass'n v. Union Mut. Fire Ins. Co. of Providence, R. I., 144 F.2d 274 (9th Cir. 1944).

**1-14**

- The terms of the contracts have regard to the time value of money. Future investment income is explicitly defined as a factor in the premium calculation.
- There may be limited risk transfer (especially of underwriting risk).
- There is a close connection between the cedent's own loss experience and the actual cost of reinsurance. This is because the profits or losses arising from the contract are shared between the reinsurer and the cedent to a substantial extent. Premiums may be refunded or additional premiums may become payable in the light of claims experience.[33]

### [7]  Reinsurance to Close

This specimen is indigenous to the Lloyd's market, where Syndicates normally operate on a three-year basis. In recent years, as a result of major catastrophes and mass tort developments, it frequently proved entirely impracticable to close the books after only three years because too many claims remained outstanding. Reinsurance to close was developed to circumvent this difficulty. It is simply reinsurance of the losses that are still open, with its terms based on the best estimates of outstanding liabilities.[34] It can also be used in a runoff situation, that is, to enable a Syndicate that is no longer writing business to close its books by transferring elsewhere its remaining claim liabilities.[35]

### [C]  Retrocession

Just as reinsurance is insurance of insurance, so retrocession is simply reinsurance of reinsurance:

Reinsurance is an agreement involving an insurer—known as the cedent or reinsured—who transfers certain risks it has assumed to a second insurer, known as the reinsurer. When this reinsurer in turn transfers this risk, the transaction is known as a retrocessional

---

[33] Omar Hameed, *Alternative Risk Transfer: Legal and Regulatory Issues*, 5 No. 7 Andrews Sec. Litig. & Reg. Rep. 10 (Dec. 8, 1999).

[34] Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996); Long Island Lighting Co. v. Aetna Casualty & Surety Co., No. 96 Civ. 9664 (MBM), 1997 WL 567342 (S.D.N.Y. Sept. 11, 1997).

[35] *See* Millennium Petrochemicals, Inc. v. C. G. Jago, 50 F. Supp. 2d 654 (W.D. Ky. 1999).

1-15

agreement. The transferring reinsurer is known as a retrocedent; the assuming reinsurer is known as a retrocessionaire.[36]

## § 1.05   PORTFOLIO TRANSFERS

This kind of arrangement inhabits the borderline between true reinsurance and something else, perhaps best described in the words of recognized authorities on the business aspects of reinsurance:

> Two other types of reinsurance could reasonably fall under the rubric of proportional reinsurance: "portfolio reinsurance" and "fronting contracts." The simultaneous reinsurance of a defined group of policies already in force has been defined as "portfolio reinsurance." A separate and less common form of portfolio reinsurance arises when a reinsurer assumes the risk for all of a direct insurer's business, or all of one or more classes of the direct insurer's business, effectively substituting the reinsurer for the original insurer. This form of reinsurance usually arises when the reinsured is liquidating its business, whether voluntarily or involuntarily.[37]

> Under a type of contract called portfolio reinsurance, the reinsurer assumes liability for the reinsured's full book of business, or portfolio, or perhaps for one or more classes of the business. This will occur because the reinsured is liquidating its business, either perforce or voluntarily. In the absence of novations between the insureds and the reinsurer, the contract is one of true reinsurance, although the reinsurer will presumably take active control of claims and, for that reason, if no other, be treated for practical purposes as a direct insurer.[38]

## § 1.06   FRONTING ARRANGEMENTS

A fronting contract is, in essence, a validated fiction. The cedent issues its policies, which are then reinsured 100 percent or very close to it, with the cedent being paid a modest fee, often a very small percentage of the premium, for the use of its name and its "paper" (the policies). The most common reason for such an arrangement is that the reinsurer

---

[36] John Hancock Property & Cas. Ins. Co. v. Universale Reins. Co., Ltd., 147 F.R.D. 40, 42 (S.D.N.Y. 1993); Employers Ins. of Wausau v. Jackson, 190 Wis. 2d 597, 527 N.W.2d 681, *reconsideration denied,* 534 N.W.2d 88 (Wis. 1995).

[37] John S. Diaconis, *Introductory Comments and Basic Overview of Reinsurance Terms,* 793 PLI/Comm 7 (Practicing Law Institute Sept. 1999).

[38] Graydon S. Staring, Law of Reinsurance § 2:7, at 7 (1993).



CHAPTER 2

# THE CONTRACT OF REINSURANCE

§ 2.01   Contract Construction Generally
    [A]   Rules of Construction
    [B]   Plain Meaning
    [C]   Intent: A Comment
    [D]   Ambiguity and the *Contra Proferentem* Principle

§ 2.02   Relationship to Underlying Coverage

§ 2.03   Choice of Law

§ 2.04   Evidence
    [A]   General
    [B]   Custom and Practice
    [C]   Follow the Settlements/Fortunes

§ 2.05   Limits on Reinsurer's Obligations
    [A]   Limit of Liability
    [B]   Underlying Policy Coverage
    [C]   Declaratory Judgment Expenses
    [D]   Punitive and Extra-Contractual Damages
    [E]   Bad Faith
    [F]   Waiver and Estoppel

§ 2.06   Privity of Contract

SPA-92



*Ltd. v. Norges Brannkasse*[109] described the clause as a follow-the-fortunes clause.

It is obviously implicit in these concepts that the reinsurer's contractual obligation is, unless otherwise specifically agreed, substantially co-extensive with the cedent's contractual obligation to its insureds. For this reason, clauses contained in the original insurance, if they are the usual clauses, are considered to be incorporated into a reinsurance policy in the usual form, unless they are inconsistent with its express terms.[110] And, of course, a specific recital that the reinsurance is "subject to the same clauses and conditions" as the original policy incorporates into the insurance policy every single clause of the original. The purpose of such a clause obviously is to place the reinsurer in the same position as the original insurer.[111]

However much the courts and commentators may have belabored the semantics, probably the most important point for a claim executive or a practitioner of insurance law to bear in mind is that arbitration panels, which after all decide by far the majority of reinsurance disputes, for the most part continue to treat the principle of follow-the-fortunes as not only alive and well but still a vital force in the dynamics of the industry. The follow-the-fortunes clause is also discussed in *Section 4.03*.

## § 2.05   LIMITS ON REINSURER'S OBLIGATIONS

### [A]   Limit of Liability

Ordinarily the contract of reinsurance will recite the amount or limit of the reinsurer's liability, and ordinarily that limit will be self-explanatory and uncomplicated.[112] It should come as no surprise, however, that there are times when even an element of the contract that sounds so simple can become complicated and can present problems. One such problem, and one that has recently been the subject of extensive debate, is what has become known as "the *Bellefonte* issue."

---

[109] 996 F.2d 506, 508, 516 (2d Cir. 1993).

[110] *See* Kenneth R. Thompson, Reinsurance 269 (4th ed. 1966).

[111] *See* Kenneth R. Thompson, Reinsurance 269 (4th ed. 1966); *see also* First Nat'l Bank of Kansas City v. Higgins, 357 S.W.2d 139. (Mo. 1962); Homan v. Employers Reins. Corp., 136 S.W.2d 289 (Mo. 1939).

[112] *See* Michigan Millers Mut. Ins. Co. v. Northern Am. Reins. Corp., 452 N.W.2d 841 (Mich. Ct. App. 1990) (citing Couch on Insurance 2d § 80.66, at 673-74); St. Nicholas Ins. Co. v. Mercantile Mut. Ins. Co., 1859, 18 N.Y. Super. Ct. 238, 5 (1859). *See also* J. S. Butler & R. M. Merkin, Reinsurance Law § B.2.1-01 (rev'd ed. 1998).

2-29

In *Bellefonte Reinsurance Co. v. Aetna*,[113] the Second Circuit was faced with the question of whether a reinsurer is liable to follow the fortunes of its cedent when doing so would require the reinsurer to pay more than the stated limit of its liability. At issue was a facultative certificate that contained two potentially contradictory provisions: on the one hand the reinsurer's obligation was said to be "subject to the . . . amount of liability set forth herein," but on the other hand the reinsurer was obligated to pay its share of indemnity imposed on the cedent and "in addition" its share of the cedent's expenses. The debate centered in large measure on the latter phrase: the words presented no problem as long as the combination of indemnity and expense "in addition" remained within the overall limit of the reinsurer's liability, but did it require payment of expenses even when doing so would bring the reinsurer's exposure to a level in excess of the stated limit of liability? Or was that exposure subject in any and all events to the limit of liability? The Second Circuit said that the reinsurer's duty to follow its cedent's fortunes did not supersede the limit of liability, adding that "[t]o construe the certificates otherwise would effectively eliminate the limitation on the reinsurers liability to the stated amount."[114]

This holding was specifically (and a bit impatiently) reaffirmed three years later in *Unigard Security Ins. Co. v. North River Insurance Co.*[115] In reaching its conclusion that the reinsurer was not liable for expenses beyond the stated liability limit in the contract, the *Unigard* court also relied on the contractual terms themselves, which stated that the obligation of the reinsurers to follow the settlement of the insurer, "except as otherwise provided by this [Contract], shall be subject in all respects to all the terms and conditions of [the reinsurance agreement]."[116] It was clear, the court ruled, that the contract "otherwise provided" for the policy limit; thus, the follow-the-settlement clause was to be construed in light of that limit.[117]

In *Allendale Mutual Insurance Co. v. Excess Insurance Co., Ltd.*,[118] the cedent attempted to distinguish *Bellefonte* and *Unigard* by arguing that the holdings in both cases were based entirely on the phrases "subject to" or "except as otherwise provided," whereas the reinsu-

---

[113] 903 F.2d 910 (2d Cir. 1990).
[114] *Id.* at 913.
[115] 4 F.3d 1049 (2d Cir. 1993).
[116] *Id.* at 1070-71.
[117] *Id.* at 1071.
[118] 970 F. Supp. 265 (S.D.N.Y. 1997).

2-30

rance agreement in dispute in *Allendale* lacked any such terms. The court acknowledged that both earlier holdings relied in part on express contractual terms unambiguously indicating that the reinsurers' obligation to follow the insured's settlement was "subject to" the limit clause. The court went on to say, however, that the primary underpinning of both cases was the parties' assumed intent to give meaning to both the limit clause and the follow-the-fortunes clause. It concluded that, to fulfill this intent, the reinsurers' duty to follow the settlement must be understood to be capped by the limit clause. Thus, the *Allendale* court expanded the application of *Bellefonte* and *Unigard* beyond the specific wording of that particular form of facultative certificate and held that the limit of liability clause of the subject reinsurance agreement must be interpreted as an absolute cap on the reinsurer's liability, including its share of the cedent's costs and expenses.

As firmly as the courts have enunciated this interpretation, the industry generally views it as diametrically opposed to long-standing practice and by and large continues to ignore the cases and adhere to the practice. Several arbitration panels, relying on their authorization in the contract wording to treat the relationship as an "honorable engagement and not merely a legal obligation," have likewise come down firmly for custom and practice, and the Second Circuit be damned.

In addition, it has been noted that *Bellefonte* and *Unigard* were governed by the substantive law of New York, and the law of other jurisdictions may call for a different result. In *TIG Premier Insurance Co. v. Hartford Accident & Indemnity Co.*,[119] the court found a genuine issue of fact as to whether the reinsurer's potential liability was limited by a stated limit in the policy. Applying California law, the court held that extrinsic evidence was admissible to show a latent ambiguity as to whether language used in the reinsurance certificate was a kind of shorthand intended by the parties to mean that the reinsurer's coverage included not only 20 percent of the primary insurer's obligations to its insured on the $750,000 reinsured liability risk but also 20 percent of the related defense costs incurred or covered by the primary insurer under its policy with its insured.

## [B] Underlying Policy Coverage

It is generally accepted that industry practice, and particularly the concept known variously as "follow the fortunes" or "follow the

---

[119] 35 F. Supp. 2d 348 (S.D.N.Y. 1999).

2-31

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Pitchford Law Group LLC
David L. Pitchford
1700 Broadway 41st Floor New York NY 10019
212-757-3343


s/ Elissa Matias
Senior Appellate Paralegal
COUNSEL PRESS LLC